William R. Baldiga, Esquire
R. Benjamin Chapman, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Proposed Counsel for the*
*Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-_____(___) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

**DECLARATION OF RAMON A. RIVERA, SECRETARY, TREASURER,**
**AND CHIEF FINANCIAL OFFICER OF AEREO, INC.**
**IN SUPPORT OF FIRST DAY PLEADINGS**

I, Ramon A. Rivera, declare under penalty of perjury:

1.     I am the Secretary, Treasurer, and Chief Financial Officer of Aereo, Inc.

("Aereo"), the above-captioned debtor and debtor-in-possession ("Debtor") in these proceedings.

2.     I am familiar with the Debtor's day-to-day operations, business affairs and books

and records.  I am authorized to submit this Declaration on behalf of the Debtor.

3.     On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition for

relief under chapter 11 title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended

(the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New

York (the "Chapter 11 Case").  The Debtor is operating its business and managing its properties

1

as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Case.

4.       To enable the Debtor to operate effectively and preserve estate value as it works toward its goal of consummating a sale of substantially all of its assets, recapitalizing or entering into some other reorganization transaction for the benefit of its creditors and shareholders, the Debtor has requested various types of relief in its "first day" motions and applications (each a "First Day Motion" and collectively the "First Day Motions"). The First Day Motions seek preliminary and final relief intended to allow the Debtor to: (i) retain the professionals needed to guide them through the bankruptcy process, and (ii) perform and meet those obligations necessary to fulfill those duties as debtor-in-possession in this Chapter 11 Case. The First Day Motions include:

- Motion to Retain Prime Clerk, Inc. as Noticing and Claims Agent

- Motion to Retain Brown Rudnick LLP as Debtor's Counsel

- Motion to Retain Argus Capital Management as Chief Restructuring Officer

- Motion to Pay Property Taxes

- Motion to Approve Key Employee Incentive Plan

- Motion to Approve Cash Management System

- Motion to Approve Payment of Pre-Petition Wages and Continuing Workforce Obligations

5.       I am familiar with the contents of each First Day Motion (including the exhibits thereto) and believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to achieving the Debtor's Chapter 11 goals of consummating a sale

of substantially all of its assets, recapitalizing or entering into a similar restructuring transaction

for the benefit of its creditors and shareholders; (c) best serves the interests of the Debtor's

creditors and shareholders; and (d) is critical to avoiding immediate and irreparable harm to the

Debtor's estate.

6.      I submit this affidavit in support of the First Day Motions pursuant to Rule 1007-2

of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York (the "Local Bankruptcy Rules").  Except as otherwise indicated, all facts set forth

in this Affidavit are offered to the best of my knowledge, information and belief, and are based

on my personal knowledge, my review of relevant documents, information provided to me by the

Debtor's management or professionals working with me or under my supervision, or my

informed opinion based upon my experience and knowledge of the Debtor's industry, operations

and financial condition.  If I were called upon to testify, I could and would testify competently to

the facts set forth herein.

7.      This affidavit is divided into three sections.  Part I of the affidavit describes the

Debtor's business and the circumstances surrounding the commencement of the Chapter 11

Case, as required by Local Bankruptcy Rule 1007-2(a)(1).  Part II of the affidavit sets forth the

relevant facts in support of each First Day Motion.  Part III contains schedules providing

additional information about the Debtor as required by Local Bankruptcy Rules 1007-2(a)(2)-

(12) and (b)(1)-(3).

## PART I

### OVERVIEW OF DEBTOR'S BUSINESS OPERATIONS AND CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

**A.     Overview of the Debtor's Corporate History and Structure**

8.     The Debtor is a privately held corporation organized under the laws of the State of New York with headquarters in Boston, Massachusetts.  The Debtor was formed in 2010 as Bamboom-Entertainment Inc. and subsequently changed its name to Aereo, Inc. in 2011.

9.     The Debtor has one wholly-owned subsidiary, Aereo Securities Corp. ("ASC"), which is not a co-debtor in this case.

**B.     The Debtor's Business**

10.     The Debtor is a technology company that provided subscribers with the ability to watch live or "time-shifted" local over-the-air broadcast television on internet-connected devices, such as personal computers, tablet devices, and "smartphones."  The Debtor provided to each subscriber access, via the internet, to individual remote or micro-antennas and a cloud-based DVR, which were maintained by the Debtor in facilities within the local market.  The system was inactive unless a Customer logged into Debtor's website and selected a television program to record and watch live or later.

11.     The Debtor's system was designed to replicate the traditional in- or on-home antenna and digital video recorder ("DVR") but to allow consumers the advantage of no installation, ease of use, and mobility.  In contrast to traditional over-the-air antennas and DVR boxes, which are located in subscribers' homes, the Debtor's individual antennas and hard disks were located in the Debtor's facilities and individually made available to subscribers, who could then, using an internet browser, access local broadcast programming with an individual antenna and record it to disk.  The Debtor's subscribers could then watch their recordings live or save

4

them for later viewing.  Essentially, the Debtor's technology provided a modern, easy-to-use option for consumers to watch over-the-air television without having to install cumbersome home equipment or subscribe to cable packages and bundles.  The Debtor's technology also includes a user interface, social networking features and other features designed to create a compelling consumer experience.

12.     The Debtor based its business plan on three fundamental legal principles: a) that consumers have the right to watch local, over-the-air broadcast television via an individual antenna; b) that consumers have the right to record these broadcasts for later viewing for personal use;[1] and c) that consumers have the right to use remote technology to record and watch individual copies of broadcast programming.[2]

13.     In the months prior to launching its service, the Debtor's Chief Executive Officer, Chaitanya Kanojia, met with representatives of several of the major broadcasters as well as the National Association of Broadcasters and described the Debtor's technology and business concept in detail.  None of those parties objected or sent a cease-and-desist letter.

14.     Accordingly, the Debtor continued to prepare in earnest for its initial launch in New York City, including raising capital, entering into leases, hiring employees, and buying equipment.  In early 2012, the Debtor made its technology available to consumers in New York City.  Over the next two years, the Debtor rolled out its services in thirteen other markets across the United States including, among others, Boston, Miami, Houston, and Atlanta.

---

[1] Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417 (1984) (holding that making personal recordings of television shows for the purpose of time-shifting is fair use, and does not constitute copyright infringement).
[2] Cartoon Network, LP v. CSC Holdings, Inc., 536 F.3d 121 (2d Cir. 2008), cert. denied, 557 U.S. 946 (2009) (holding that a cable television provider does not infringe when it records and transmits a copyrighted program via DVR technology at the request of a consumer.).

15.     The Debtor has an intellectual property portfolio that includes two trademarks, one issued patent, and nineteen patent applications pending (fourteen of which are published).  The Debtor also has thirty foreign applications pending for certain of our United States patent applications.

## C.     Pre-petition Financing

16.     As the Debtor built its business, it raised approximately $95.6 million in venture equity.  That funding came in two Seed Rounds and three Series Financings.  The first Seed Round, on December 31, 2010, raised approximately $2 million.  The second Seed Round, on June 30, 2011, raised approximately $2.5 million.  The Series A equity tranche, on July 8, 2011, raised approximately $20.3 million.  The Series B equity tranche, on November 14, 2012, raised approximately $37.2 million.  Finally, the Series C equity tranche, on October 25, 2013, raised approximately $33.5 million.

17.     The Debtor used all of that funding primarily to lease facilities and purchase equipment in each market, hire staff, and develop, deploy, and market its product.  The Debtor was able to generate over $3 million in gross revenue from its consumers before ceasing its operations in accordance with the preliminary injunction  issued by the United States District Court for the Southern District of New York (the "District Court"), as further detailed below.

## D.     Assets / Liabilities

18.     As of the Petition Date, the Debtor's reported total assets were approximately $20.5 million, and its total undisputed liabilities (primarily trade debt) were approximately $4.2 million.  The Debtor's assets consist primarily of its cash on hand, its equipment and technology, its intellectual property portfolio and its business potential.

19.     The Debtor has no secured debt.   Its unsecured debts consist primarily of operational costs owed to vendors, suppliers, landlords, utilities, employees and service providers.   As discussed below, the Debtor also faces asserted liability in a contingent and unliquidated amount due to litigation being pursued by various television broadcasters seeking damages for copyright infringement.

## E.     Events Leading to the Commencement of the Chapter 11 Case

### (i)     The District Court Action

20.     Beginning in March 2012, shortly after the Debtor began operating in New York, several major television broadcasting networks, including ABC, CBS, NBC and other broadcasters (collectively, the "Broadcasters"), commenced actions in the District Court seeking to enjoin the Debtor from allowing consumers to stream over-the-air broadcast content to themselves while the show was still airing solely on the asserted grounds that such transmissions were public performances under the Copyright Act.[3]   After an evidentiary hearing, the District Court denied the preliminary injunction, finding that the Debtor's technology, which enabled consumer transmission via individual antennas and DVR recordings did not constitute a public performance under the Copyright Act.   See Am. Broad. Co., Inc. v. Aereo, Inc., 874 F. Supp. 2d

---

[3]  On March 1, 2012, two groups of plaintiffs filed related actions against the Debtor in the District Court. The first action, 12-1540, was brought by American Broadcasting Companies, Inc., Disney Enterprises, Inc., CBS Broadcasting, Inc., CBS Studios, Inc., NBCUniversal Media, LLC, NBC Studios, LLC, Universal Network Television, LLC, Telemundo Network Group, LLC, and WNJU-TV Broadcasting, LLC (the "ABC Plaintiffs").   The second action, 12-1543, was brought by WNET, Thirteen, Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, WPIX, Inc., Univision Television Group, Inc., the Univision Network Limited Partnership and Public Broadcasting Service (the "Fox Plaintiffs"). On May 6, 2013, Aereo filed a declaratory judgment action against CBS Studios Inc.; CBS Television Licenses, L.L.C. d/b/a WSBK-TV, WBZ-TV, WJZ-TV; Atlanta Television Station WUPA, Inc. d/b/a WUPA-TV; CBS Television Stations, Inc. d/b/a WFOR-TV, KCNC-TV; Miami Television Station WBFS, Inc. d/b/a WBFS-TV; CBS Broadcasting Inc. d/b/a WBBM-TV, WWJ-TV, WCCO, KDKA-TV, KYW-TV; CBS Stations Group of Texas, Inc. d/b/a KTVT-TV; Television Station KTXA, Inc. d/b/a KTXA-TV; CBS Operations, Inc. d/b/a WTOG-TV; Detroit Television Station WKBD, Inc. d/b/a WKBD-TV; Pittsburgh Television Station WPCW, Inc. d/b/a WPCW-TV; and Philadelphia Television Station WPSG, Inc. d/b/a WPSG-TV.

373 (S.D.N.Y. 2012).  The Second Circuit affirmed the District Court's holding.  See WNET v. Aereo, Inc., 712 F.3d 676 (2d Cir. 2013), reh'g en banc denied, 722 F.3d 500 (2d Cir. 2013).[4]

(ii)    *The Supreme Court Decision*

21.    On June 25, 2014, the United States Supreme Court reversed the Second Circuit and held that the Debtor, with respect to live or contemporaneous transmissions, was essentially performing as a traditional cable system under the Copyright Act.  The Court held that the contemporaneous performances made using the Debtor's system were, therefore public performances under the Copyright Act.  See Am. Broad. Co., Inc. v. Aereo, Inc., 573 U.S. __, 134 S. Ct. 2498 (2014).

22.    The Supreme Court remanded the case to the District Court, which entered a preliminary injunction on October 23, 2014 preventing the use of the Debtor's system for playback while the underlying program was still airing.  See Am. Broad. Co., Inc. v. Aereo, Inc., No. 12-cv-1540, slip op. at 15 (S.D.N.Y. Oct. 23, 2014).  The Debtor has complied with the injunction and stopped permitting any transmission while the underlying program is airing.  In fact, as a result of the Supreme Court decision, the Debtor decided, in its business judgment, to suspend offering its technology to consumers.

---

[4] On July 9, 2013, Hearst Stations, Inc. d/b/a WCVB-TV filed an action against the Debtor in the United States District Court for the District of Massachusetts (13-cv-11649-NMG), alleging copyright infringement (including public performance, reproduction, distribution and derivative work claims) and seeks a preliminary and permanent injunction, declaration of infringement, injunctive relief, damages and attorneys' fees.  A hearing on the motion for a preliminary injunction, which concerned all of the asserted claims, was heard on September 18, 2013 and the motion was denied on October 8, 2013.  The plaintiffs appealed to the United States Court of Appeals for the First Circuit ("First Circuit").  That appeal was stayed during the SCOTUS proceedings. Upon the parties' agreement, all claims in the Boston case were dismissed without prejudice on August 7, 2014.  In February 2014, the Debtor was enjoined from operating within the 10th Circuit by the United States District Court in Salt Lake City, Utah.  Community Television of Utah, LLC v. Aereo, Inc., No. 2:13-CV-910 (DAK) (D. Utah).  The Debtor appealed that injunction, which appeal is pending.  KSTU, LLC v. Aereo, Inc., No. 14-4020 (10th Cir, 2014).

23.    Without customers, the current ability to provide services, or a significant current source of revenue, the Debtor has taken significant steps to materially reduce its operational overhead.    On November 12, 2014, the Debtor laid off 74 employees, a majority of its workforce, and closed down its operations centers in Boston.    Currently, the only remaining employees are 14 individuals whose institutional knowledge and experience is necessary to achieving the Debtor's goal of conducting a successful sale of substantially all of its assets, recapitalizing or entering into a similar restructuring transaction for the benefit of its creditors and shareholders.

*(iii)*    *The Debtor's Current Business Activities*

24.    After ceasing its services to customers, the Debtor's primary business operations have been devoted towards defending against lawsuits by the Broadcasters seeking further and permanent injunctive relief, damages, and penalties for alleged copyright infringement.    The Debtor has also been formulating new legal strategies and potential new business models consistent with the Supreme Court's decision.    Although the Broadcasters have not disclosed what amounts they are seeking, they have confirmed their intention to seek statutory damages, which can range from $750 to $30,000 per work.

25.    Whatever the range of alleged damages the Broadcasters choose to seek here, the facts of this case overwhelmingly support application of the lowest possible level of statutory damage claims in favor of the Broadcasters, if liability is assessed at all. As indicated above, the Debtor announced its business plans and met with numerous Broadcasters before launching, none of whom raised any objections to its services.    Thereafter, when the Broadcasters sued to enjoin the Debtor from conducting its business, the District Court ruled in favor of the Debtor and denied the injunction, which ruling was affirmed by the Second Circuit.    As soon as the

Supreme Court overturned the decisions of the lower courts, the Debtor suspended all of its consumer operations, which action was well-beyond what the Supreme Court's decision required. In short, the Debtor painstakingly followed the law in building its business, only to have the law change under its feet. As soon as the law changed, the Debtor complied. For these reasons, if any damages were appropriate they should be at the lowest end of statutory damages, which, based on registrations produced to date in the New York cases, is estimated to be less than $5 million.

26.     In any event, I understand that all claims that may be asserted by the Broadcasters are "claims", as that term is used in the Bankruptcy Code.

27.     Certain legal and regulatory issues relating to the Debtor's business may be soon resolved for the Debtor, which will favorably impact the vitality and value of the Debtor's technology and business operations.

28.     First, the Debtor has taken the position that it is entitled to a "compulsory" statutory license under Section 111 of the Copyright Act, based on the Supreme Court's decision that the Debtor's contemporaneous transmissions are essentially identical to those of a cable system. Thus, the Debtor has filed documents and payments with the United States Copyright Office for a compulsory license which, would result in there being no copyright infringement claims against the Debtor.[5] See 17 U.S.C. § 111(c)(1).

29. Second, as recently as October 28, 2014, Tom Wheeler, Chairman of the Federal Communications Commission ("FCC"), proposed potential rule changes that would give

---

[5]   The United States Copyright Office has provisionally accepted those filings pending the Court's ultimate determination of the issue. While the argument was not accepted at the preliminary injunction stage, it appears likely that the regulatory environment with respect to FCC regulation and compulsory license may be changing in a way that will sustain a viable business model for the Debtor.

internet-based broadcasters such as the Debtor the same classification as cable companies.[6]

Also, on November 4, 2014, in a speech to  the Mid-Atlantic Venture Association Chairman

Wheeler stated:

> "Two weeks ago I proposed to my colleagues that we require of cable operators
> and broadcasters the same thing that spurred the growth of the satellite video
> business in the mid-1990s – that competitors should be able to negotiate in good
> faith for video content, even if it is owned by cable companies and broadcasters . .
> . . As you know, a startup called Aereo has already proposed doing this [being an
> over-the-top video competitor], but the broadcasters were able to stop it in court,
> in part because of the old rules of the FCC. Aereo wasn't the reason for the new
> rules, but the idea that entrepreneurs should be able to assemble programs to offer
> consumers choices is something that shouldn't be hindered by the FCC."

See http://www.broadcastingcable.com/news/washington/wheeler-old-fcc-rules-shouldn-t-

impede-services-aereo/135351 (last visited Nov. 11, 2015).

30.    If the FCC changes its position, as Chairman Wheeler previewed, then it may also

be likely that the U.S. Copyright Office's position regarding compulsory license eligibility for

providers of linear broadcast programming via the Internet would shift in the Debtor's favor.   If

the FCC elects to permit internet transmission of local linear broadcast channels, then the Debtor,

assuming its continued viability, expects to be able to operate profitably within that framework.

*(iv)*    *The Chapter 11 Case*

31.    Although the legal and regulatory framework is shifting in the Debtor's favor, the

timing of a decision from the FCC is uncertain.   Faced with mounting litigation costs and

operational concerns, on November 14, 2014, the Debtor's board of directors determined that it

would be in the best interests of the Debtor and its creditors and shareholders to commence these

Chapter 11 proceedings in order to obtain necessary breathing room while it seeks to effectuate a

---

[6]  Tom Wheeler, Tech Transitions, Video, and the Future, Official FCC Blog (Oct. 28, 2014, 1:48 PM),
http://www.fcc.gov/blog/tech-transitions-video-and-future.   It appears from the Chairman's public
comments that a Notice of Proposed Rule Making ("NPRM") on this subject is imminent.

sale of all or substantially all of its assets, or to achieve a recapitalization or similar restructuring transaction.

32.     Also, on November 12, 2014, after conducting interviews of various firms providing restructuring and financial advisory services, the Debtor engaged Lawton Bloom of Argus Management Corporation as its Chief Restructuring Officer (the "CRO").   The CRO reports directly to the Debtor's Board of Directors (the "Board"), and has responsibilities specifically focused on conducting a sale of all or substantially all of its assets in one or more transactions, a recapitalization, or a similar restructuring transaction in this Chapter 11 Case.

## PART II

## FIRST DAY PLEADINGS

33.     As previously noted, in order to enable the Debtor to minimize the adverse effects of the commencement of the Chapter 11 Case on its business and financial operations, the Debtor has requested various types of customary interim relief in its First Day Motions.   The First Day Motions, which are being filed concurrently with this Declaration, include the following motions and applications:

**I.     Administrative and Procedural Motions**

    **A.     Retention Applications**

34.     <u>Noticing and Claims Agent</u>.   The Debtor seeks to employ and retain Prime Clerk as the Debtor's noticing and claims agent pursuant to Local Bankruptcy Rule 2002-1(f).   In that capacity, Prime Clerk will: (i) give notice of the order for relief, the hearings, and orders filed in the case, the meeting of creditors pursuant to section 341 of the Bankruptcy Code, and the setting of a claims bar date; (ii) provide record keeping and claims docketing and reconciliation; and (iii) mail and tabulate ballots for the purposes of voting in chapter 11 cases.   The Debtor has

identified over 700 entities to which notice of certain proceedings in this Chapter 11 Case must be provided and believes that Prime Clerk's retention is the most effective and efficient manner of providing notice to the Debtor's creditors and other parties in interest of the commencement of this Chapter 11 case and any other developments that occur in this Chapter 11 Case.

35.    I have been informed that Prime Clerk is a well-known and highly respected notice and claims administration firm that has substantial experience in assisting with the orderly administration of chapter 11 bankruptcy cases. I believe that Prime Clerk is well qualified to serve as the Debtor's notice and claims agent in this Chapter 11 Case. I have read the Prime Clerk Retention Application and believe that the retention of Prime Clerk is in the best interests of the Debtor and its estate.

36.    <u>Bankruptcy Counsel</u>.  The Debtor also seeks the entry of an order authorizing the employment and retention of Brown Rudnick, LLP ("<u>Brown Rudnick</u>") as the Debtor's bankruptcy counsel in this matter.  The Debtor selected Brown Rudnick based on the firm's extensive experience, knowledge and resources in the area of debtors' and creditors' rights. Brown Rudnick also has the ability to commit substantial resources to legal problems on an urgent basis.  Under the circumstances, the Debtor has concluded that Brown Rudnick is particularly well qualified to represent the Debtor in this Chapter 11 Case.

37.    By assisting the Debtor with preparations for the filing of this Chapter 11 Case, Brown Rudnick's attorneys have become familiar with the complex factual and legal issues that will have to be addressed in this Chapter 11 Case in order to preserve the possibility of a reorganization for the Debtor and to maximize the value of the assets of the Debtor's estate.

38.     I believe that the retention of Brown Rudnick, with its knowledge of and experience with the Debtor and the industry in which it operates, will assist in the efficient administration of the estate, and is therefore in the best interests of the Debtor and its estate.

### B.      Motion to Employ Ordinary Course Professionals

39.     The Debtor also seeks to retain the law firms of Fish & Richardson PC, Houston & Associates, LLP, Constantine Cannon, LLP, Womble Carlyle Sandridge & Rice, LLP, and Durie Tangri, LLP as Ordinary Course Professionals for the purpose of providing specific and limited guidance and advice regarding non-bankruptcy matters.    The Ordinary Course Professionals represent and advise the Debtor on three key aspects of the Debtor's business: patent law, document retention, and advice regarding the Debtor's relationship with the United States Copyright Office and the Federal Communications Commission ("FCC").

40.     Prior to the Petition Date, the Debtor retained Fish & Richardson to advise it in connection with, among other things, its document retention and storage obligations resulting from the Broadcasters' litigation claims.    Those lawsuits are still pending in District Court and, as such, the Debtor's document and equipment retention obligations arguably continue.    The Debtor estimates that it will spend no more than approximately $25,000 per month in professional fees to be paid to Fish & Richardson.    Fish & Richardson will not be rendering any legal advice relating to these Chapter 11 proceedings.

41.     The Debtor retained Houston & Associates prior to the Petition Date to perform routine and ongoing services in connection with domestic and foreign patent applications and maintenance efforts to ensure the Debtor's patents do not lapse.    These services are critical to the Debtor's technology-based business.    The Debtor estimates that it will spend no more than

14

approximately $25,000 per month in professional fees paid to Houston & Associates. Houston & Associates will also not be rendering any legal advice relating to these Chapter 11 proceedings.

42.    The Debtor retained Constantine Cannon, LLP, prior to the Petition Date to provide specific advice regarding the Debtor's ongoing matter before the FCC. As the FCC is currently re-evaluating its position regarding internet-based broadcasters such as the Debtor, and any new position may significantly alter the Debtor's rights, the services of Constantine Cannon are critical to protect the interests of the Debtor's estate, creditors, and shareholders. The Debtor estimates that it will spend no more than approximately $25,000 per month in professional fees paid to Constantine Cannon. Constantine Cannon will not be rendering any legal advice related to these Chapter 11 proceedings.

43.    The Debtor retained Womble Carlyle Sandridge & Rice, LLP prior to the Petition Date to provide specific advice regarding the Debtor's statutory license filings with the United States Copyright Office and with respect to regulatory matters with the FCC. As the FCC is currently re-evaluating its position regarding internet-based broadcasters such as the Debtor, and any new position may significantly alter the Debtor's rights, the services of Womble Carlyle are critical to protect the interests of the Debtor's estate, creditors, and shareholders. The Debtor estimates that it will spend no more than approximately $25,000 per month in professional fees paid to Womble Carlyle. Womble Carlyle will not be rendering any legal advice related to these Chapter 11 proceedings.

44.    The Debtor retained Durie Tangri, LLP, prior to the Petition Date to provide specific advice regarding the Debtor's defense of copyright litigation and the development of the Debtor's business. The legal landscape has changed in the context of ongoing litigation and the prospect of additional regulatory changes at the FCC, all of which may significantly alter the

Debtor's rights.  Thus, the services of Durie Tangri are critical to protect the interests of the Debtor's estate, creditors and shareholders. The Debtor estimates that it will spend no more than approximately $25,000 per month in professional fees paid to Durie Tangri.  Durie Tangri will not be rendering any legal advice related to these Chapter 11 proceedings

### C.   Motion to Pay Ordinary Course Taxes

45.   Pursuant to the Tax Motion, the Debtor seeks entry of an order pursuant to Bankruptcy Code Sections 105(a), 506(a), 507(a)(8) and 541 and Bankruptcy Rule 6003, authorizing it to pay, in its sole discretion, any pre-petition tax and fee obligations including, without limitation, sales, use and excise taxes; real and personal property taxes, any other types of taxes, fees or charges, and any penalty, interest or similar charges (collectively, the "Taxes and Fees") owing to certain domestic federal, state and local governmental entities (the "Taxing Authorities").

46.   In addition, the Debtor requests in the Tax Motion that the Court authorize and direct the Debtor's bank to receive, process, honor and pay all pre-petition and post-petition checks and fund transfers on account of the Taxes and Fees that had not been honored and paid as of the Petition Date, and authorize the Debtor's banks to rely on the representation of the Debtor as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

47.   The Debtor estimates that, as of the Petition Date, its accrued and unpaid liabilities for Taxes and Fees is approximately $50,000.  The continued payment of Taxes and Fees will ultimately preserve the resources of the Debtor's estate.  If such obligations are not

16

timely paid, the Debtor may be required to expend time and incur inordinate attorneys' fees and other costs to resolve these obligations with the Taxing Authorities.

## II.    **Business Operations Motions**

### A.    **"KEIP" Motion**

48.    The Debtor seeks an order approving a Key Employee Incentive Plan ("KEIP").

49.    On November 12, 2014, in order to preserve resources, the Debtor laid off the majority of its workforce.  Of the 14 remaining individuals, the Debtors have identified 11 (the "Key Employees") whose services and efforts are critical to preserving the value of the Debtor's assets and ensuring a sale to the best and highest purchaser through a sale, recapitalization or similar restructuring transaction.  Accordingly, the Debtor's Board of Directors (the "Board"), with input from the Debtor's advisors, believe that it is essential – and in the best interests of the Debtor's estate and all of its creditors and shareholders – to motivate and incentivize the Key Employees to set forth an effort that will achieve the best and highest price for the Debtor's assets.

50.    Under the KEIP, each Key Employee would receive an incentive-based bonus designed to achieve, under Chapter 11, a successful sale of all or substantially all of the Debtor's business or assets in one or more transactions to a qualified bidder for the best and highest price, a recapitalization or a similar restructuring transaction (any of the foregoing, a "Qualified Transaction").  Specifically, under the KEIP, Key Employees may earn a bonus in the lesser amount of: (a) a Key Employee's respective share of 3% of gross Qualified Transaction proceeds (calculated as the percentage of a Key Employee's annual base salary as compared to total aggregate amount of all Key Employees' annual base salaries),[7] or (b) 50% of a Key Employees

---

[7]  The calculation of bonus payments under the KEIP program does not reflect a voluntary reduction to the annual base salaries by five Key Employees effective November 10, 2014: (i) Chaitanya Kanojia, the Debtor's president

Annual Base Salary (the "Maximum Transaction Bonus"), to be paid within 21 days following

closing of a Qualified Transaction to Key Employees who either (x) remain employed by the

Debtor on the date of the closing of the Qualified Transaction, or (y) are involuntarily terminated

without cause prior to the closing of such Qualified Transaction.

51.    As part of its efforts to limit the scope of the KEIP, the Debtor has set the

incentive payment pool to a maximum of $940,500, which, if earned, would mean that the

Debtor would be receiving at least approximately $31.35 million in exchange for its assets.  On

the other hand, in the event no sale occurs, no payouts will be made under the KEIP.  As such,

the bonus payment under the KEIP is specifically designed to incentivize the Key Employees to

go beyond their ordinary job functions and take all necessary steps to ensure that the Debtor's

assets will be sold to a purchaser at the best and highest price, which is for the ultimate benefit of

the Debtor's creditors and shareholders.

52.    In analyzing various proposals to formulate the KEIP, the Board focused on two

overarching principles: the incentive plan must be (1) market-based and (2) performance-linked.

The KEIP was ultimately designed to keep the Debtor's Key Employees' total compensation at a

market rate, in accordance with the standards implemented in previous chapter 11 cases.  The

KEIP was also designed to enhance value in the Debtor's estate and meet the requirements of the

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 331,

119 Stat. 23, 102-03 (April 20, 2005) ("BAPCPA").  Accordingly, the Key Employees are only

---

and CEO; (ii) Alex Moulle-Berteaux, the Debtor's Chief Commercial Officer; (iii) Virginia Thuy Lam Abrams, the
Debtor's Senior Vice President of Communications and Government Relations; (iv) Joseph Lipowski, the Debtor's
Chief Technology Officer; and (v) Brian Loveland, the Debtor's Director of Infrastructure Operations.  The Debtor
has not changed the KEIP calculation for any Key Employee on account of that base salary reduction and believes,
in its business judgment, that the bonuses thereunder should be based on the annual base salary amounts before such
reduction.

eligible to earn incentive payments, as a percentage of their base salaries, if the Debtor consummates a successful sale of its business or assets.

53.     Furthermore, the amount of the incentive payments is based upon a percentage of each Key Employee's annual base salary (determined and approved by the Board prior to the voluntary reductions to base salary elected by 5 Key Employees, as discussed in fn. 7, <u>supra</u>) and, thus, is tied to the Key Employee's job level and duties.   <u>Exhibit B</u> thereto reflects the maximum amount that each Key Employee could receive in connection with the Maximum Transactional Bonus, which in no event will exceed 3% of the total transaction value.

54.     Key Employees who are involuntarily terminated without cause prior to the Sale Order Date do not forfeit their unpaid benefits under the KEIP.  Key Employees who voluntarily terminate their employment or who are terminated for cause prior to the Sale Order Date will forfeit any bonus payments under the KEIP.

55.     A successful Qualified Transaction will require an intensity of effort and performance from the Key Employees that goes well above the ordinary responsibilities of their positions.  The Debtor and the Board, in their sound business judgment, have developed the KEIP, and believe that it is important and necessary to quickly implement this incentive plan that would motivate and reward the continued dedication and efforts of the Key Employees.

56.     I have read the KEIP Motion and believe that the relief requested by the KEIP Motion is in the best interests of the Debtor and its creditors and shareholders.

**B.     <u>Cash Management Motion</u>**

57.     In the Cash Management Motion, the Debtor seeks interim authority to maintain its existing bank accounts and cash management system for 30 days following the entry of an order granting the relief requested in the Cash Management Motion (the "<u>Grace Period</u>") as it

19

takes steps to close its pre-petition bank accounts and open new accounts with banking institutions approved by the UST (the "Approved Accounts") as complying with the UST's Guidelines. The Debtor also seeks to continue using its current business forms until its stock runs out and it replaces its forms with ones that will comply with the UST Guidelines. Finally, if required, the Debtors seek to obtain a limited waiver of the requirements of 11 U.S.C. § 345(b).

(i)    <i>Maintenance of Existing Bank Accounts</i>

58.     Prior to the Petition Date, the Debtor, in the ordinary course of its business, maintained eight bank accounts, which are described more fully on Exhibit B to the Cash Management Motion (collectively, the "Bank Accounts"). Prior to the Petition Date, the Debtor's cash management system operated in the manner described in the Cash Management Motion. The flow of the Debtor's funds through the Bank Accounts is described in the Cash Management Motion and incorporated by reference herein.

59.     I understand that the United States Trustee has established Operating Guidelines for chapter 11 cases (the "Operating Guidelines") applicable to debtors in possession that continue to operate their businesses after the commencement of their chapter 11 cases. One provision of the Operating Guidelines requires a chapter 11 debtor in possession to open new bank accounts and close all existing accounts.

60.     The Debtor seeks a Grace Period in which to comply with the Operating Guidelines' requirement that the Bank Accounts be closed and new post-petition bank accounts be opened. If the Grace Period is not granted in this Chapter 11 Case, I believe this requirement would cause undue disruption to the Debtor's continued operations and would impair its efforts to maximize value through this chapter 11 process. Immediately dismantling the Debtor's cash

20

management system would likely disrupt the Debtor's relationships with its key stakeholders and would make it materially more difficult and expensive to maintain operations during the Grace Period.

### (ii)     Continued Use of Existing Business Forms

61.     To minimize expense and inconvenience to its estate, the Debtor has also requested authority to continue to use its existing supply of correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, and checks), without reference to its status as debtor in possession.

62.     The Debtor will, of course, ensure that the "Debtor in Possession" designation is placed on any new checks ordered after the Petition Date.

63.     The continued use of the Debtor's existing business forms and checks will avoid the expense and disruption that might otherwise result from ordering and instituting the use of new business forms during the initial days of this Chapter 11 Case.

### (iii)     Continuation of the Existing Cash Management System

64.     The Debtor maintains current and accurate accounting records of daily cash transactions and submits that maintenance of its current cash management system will prevent undue disruption to its business and operations, while protecting its existing cash assets for the benefit of its estate.  The components of the Debtor's cash management system and the flow of funds among the various Bank Accounts are set forth in detail in the Cash Management Motion.

65.     If the Debtor is not permitted to continue to use its cash management system as described therein during the Grace Period, it will impair the orderly operation of the Debtor's business at this critical time immediately following the filing of the Chapter 11 petition.

66.     The Debtor requests that the Court grant further relief from the UST Guidelines to the extent that they require the Debtor to make all disbursements by check.  Specifically, the UST Guidelines require all receipts and disbursements of estate funds to be made by check with a notation representing the reason for the disbursement.  In the ordinary course of operating its business as a going concern, the Debtor pays all of its expenses by debit, wire, or automatic clearing house payment and other similar electronic methods, including through the website "bill.com," as further described in the Cash Management Motion.  Additionally, the Debtor receives funds into the Bank Accounts by similar methods.  To deny the Debtor the opportunity to conduct transactions by such methods would interfere with the Debtor's ordinary course business operations as a going concern, and create additional costs to the Debtor.  Thus, the Debtor requests a waiver of the UST Guidelines to grant the Debtor the authority to continue paying its expenses by debit, wire, automatic clearing house payments or similar electronic methods used in the ordinary course of the Debtor's business, as such expenses come due.

*(iv)*     *The Requirements of Bankruptcy Code Section 345 Are Satisfied*

67.     I believe that the Debtor's accounts are in compliance with 11 U.S.C. § 345(b) as more specifically identified in the Cash Management Motion.  In the event that any of the Bank Accounts do not comply with Section 345(b) of the Bankruptcy Code, the Debtor requests a limited waiver of the requirements of Bankruptcy Code Section 345(b) at this time, and will comply with any direction of the United States Trustee to ensure that deposit or investment of the money of the Debtor's estate will comply with Section 345(b) of the Bankruptcy Code.

68.     I have read the Cash Management Motion and believe that the relief requested by the Cash Management Motion is in the best interests of the Debtor and its estate.

C.        **Wage Motion**

69.        Pursuant to the Wage Motion, the Debtor seeks the ability to pay certain pre-petition employee wages and expenses, and to continue employee benefit programs in the ordinary course of business.   As of the Petition Date, the Debtor employs approximately 14 individuals (the "Retained Employees").   On November 12, 2014, the Debtor laid off 74 employees (collectively, the "Terminated Employees").   The Terminated Employees, under the terms of their termination, are eligible to continue receiving certain benefits for four months after their termination (the "Severance Period").   As the Debtor owes Employee Obligations to both Retained and Terminated Employees for the extent of the Severance Period, the term "Employees" is used to refer to both of these groups for that four-month duration.   All of the Debtor's Retained Employees are based in the United States.   All of the Retained Employees are full-time, and all are compensated on the basis of a fixed salary.

70.        The Retained Employees perform a variety of critical functions for the Debtor's business, and the Retained Employees' skills and their specialized knowledge and understanding of the Debtor's infrastructure and operations are essential to the Debtor's continuing operations and its efforts to consummate a sale of substantially all of its assets, recapitalize or enter into a similar restructuring transaction for the benefit of its creditors and shareholders.   The continued and uninterrupted service of the Employees is critical to the Debtor's ability to effectuate a Qualified Transaction.

71.        The Debtor believes that failing to honor its Employee Obligations would harm morale and discourage Employee retention.   If the Retained Employees were to cease providing services to the Debtor (even for a short time), the Debtor would face immediate and irreparable harm to its businesses prospects that could potentially jeopardize its ability to maximize the

value of its assets.   Thus, the Debtor seeks authority to continue to honor the Employee Obligations that the Debtor historically paid or honored in the ordinary course of business, to pay accrued pre-petition wages and other benefits, and to pay all costs incident to the foregoing.

*(i)*   *Unpaid Wages and Salaries*

72.   In the ordinary course of business, the Debtor incurs payroll obligations to the Employees.   Such obligations comprise wages and salaries.   The Debtor pays the Employees every other Friday for the two weeks prior to the payroll date, through a third-party payroll processing company, ADP.   All of the Employees receive their wages and salaries by direct deposit through electronic transfer of funds directly to the Employees' accounts.

73.   On average, the Debtor has gross payroll expenses for Employees of approximately $75,384 per bi-weekly period.   The Debtor's last gross payroll for Employees, in the approximate amount of $95,656 (including all employee deductions, withholding, and employee-paid taxes and benefits) was paid on November 14, 2014 for the pay period ending November 7, 2014.

74.   As of the Petition Date (but subject to change), approximately $43,000 in accrued pre-petition wages, salaries, and other compensation (but excluding reimbursement of business expenses) were earned prior to the Petition Date but were not yet paid, together with associated withholding and payroll taxes (collectively, the "Unpaid Compensation").   Accordingly, the Debtor requests authorization, in its discretion, to pay the Unpaid Compensation in the ordinary course of its business.

75.   To the best of my knowledge, no Employees were owed Unpaid Compensation in excess of the $12,475 statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code.

*(ii)*    *Reimbursement of Business Expenses*

76.     The Debtor regularly reimburses Employees for amounts paid by the Employees for certain expenses incurred in the ordinary course of carrying out the Debtor's business (the "Reimbursable Expenses").  To the extent that any amounts are outstanding, the Debtor seeks the authority to reimburse Employees for all such Reimbursable Expenses.  The Debtor estimates that pre-filing amounts due for any one Employee do not exceed approximately $5,500 as of the Petition Date.

77.     Reimbursable Business Expenses are all incurred on the Debtor's behalf and with the understanding that the Employees will be reimbursed in the normal course of business.  The Debtor submits that authority to reimburse Employees for Reimbursable Business Expenses is necessary to avoid the immediate and irreparable harm that could result to the Employees if they are not paid for the amounts that they expected to be reimbursed.  The Debtor thus requests authority, to be exercised in its sole discretion, to (a) continue paying Reimbursable Business Expenses in accordance with pre-petition practices, (b) modify its pre-petition policies relating thereto as it deems appropriate, and (c) pay all Reimbursable Business Expenses that relate to the pre-petition period and are submitted to the Debtor post-petition.

*(iii)*    *Deductions and Withholdings*

78.     During each applicable pay period, the Debtor routinely deducts certain amounts from Employees' paychecks, including, without limitation, (a) any legally ordered deductions such as wage garnishments, child support, and tax levies, and (b) other pre-tax and after tax deductions payable pursuant to certain of the Employee benefit plans described in the Wage Motion, such as Employee contributions to retirement plans, contributions under flexible spending plans, Employee voluntary insurance premiums and miscellaneous deductions

(collectively, the "Employee Deductions"). The Debtor then forwards the amount of the Employee Deductions to the appropriate third party recipients. Due to the commencement of this Chapter 11 Case, however, certain Employee Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. Accordingly, the Debtor requests authority, but not direction, to forward any unpaid Employee Deductions to the appropriate third-party recipients and to continue to forward these pre-petition Employee Deductions to the applicable third-party recipients on a post-petition basis, in the ordinary course of business as routinely done prior to the Petition Date.

79.      Further, the Debtor is required by law to withhold from an Employee's wages amounts related to federal, state, and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). The Debtor must then pay social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes"). Prior to the Petition Date, the Debtor withheld the appropriate amounts from the Employees' earnings for the Withheld Amounts and the Employee Payroll Taxes (collectively, the "Payroll Taxes"), but such funds may not have been forwarded to the appropriate taxing authorities. The Debtor requests the authority, but not direction, to forward any outstanding Payroll Taxes to the appropriate third parties, and to continue to honor and process the pre-petition payments for Payroll Taxes on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

(iv)      *Employee Benefits*

80.      The Debtor maintains various plans and policies to provide its active Employees with various benefits, including (i) medical, dental, and vision coverage through employee

26

benefit plans and flexible spending accounts; (ii) long term disability, life, and accidental death and dismemberment insurance; (iii) employee assistance plans; (iv) retirement plans; and (v) severance benefits (collectively, the "Employee Benefits").  The Employee Benefits are described in greater detail in the Wage Motion.

81.    Health Benefits.  The Debtor provides group health insurance (through Blue Cross Blue Shield of Massachusetts), dental insurance (through Delta Dental) and vision insurance (through Vision Service Plan) for all Employees who work thirty or more hours per week, and in some instances, their dependents.  The cost of the premiums for the Health Benefits is paid by the Debtor.  During the 4-month Severance Period for the Terminated Employees, the Debtor estimates that it will pay at most approximately $90,000 per month related to Health Benefits costs under COBRA.  After the Severance Period ends, the Debtor estimates that Health Benefits costs will be approximately $18,000 per month. Because such costs are borne under COBRA, they are likely to decrease significantly before the end of the Severance Period, as Terminated Employees acquire new health insurance.  The Health Benefits costs for November and December 2014 have already been paid as of the Petition Date.

82.    The Employees are also entitled to participate in self-funded pre-tax flexible spending accounts, health reimbursement accounts and dependent care accounts (each an "FSA") administered by Choice.  The Debtor deducts the Employee contributions to the FSA from the Employees' paychecks.  There is a small cost associated with the administration of the Employees' FSAs, which is paid by the Debtor to Choice. The Debtor estimates that, as of the Petition Date, approximately $11,584 is due and owing with respect to pre-tax withholdings that have not been reimbursed to Employees for FSAs.

83.    <u>Insurance Benefits</u>.  The Debtor provides the Employees with basic life insurance equal to an Employee's annual base salary.  Additionally, for those cases not involving the loss of life but dismemberment of a Full-Time Employee (such as the loss of a hand or foot, or the total loss of sight in an eye), the Debtor also provides an Accidental Death and Dismemberment ("<u>AD&D</u>") policy equal to an Employee's annual base salary

84.    The Debtor provides, at its own cost, short-term disability ("<u>STD</u>") coverage for Employees who work at least 30 hours per week, if the Employee is unable to work due to serious illness or injury.  The STD benefit provides an Employee with a continuation of that Employee's weekly earnings at sixty percent (60%) of such earnings, up to a maximum weekly benefit of $2000.  STD coverage begins on the eighth consecutive day of disability.  The Debtor also provides, at its own cost, Employees who have been disabled for at least ninety (90) days with long-term disability ("<u>LTD</u>") coverage. The LTD benefit provides an Employee with sixty percent (60%) of that Employee's monthly earnings, to a maximum of $10,000 per month. The Debtor pays approximately $3,300 per month for the Insurance Benefits.  The Debtor has not yet received an invoice for Insurance Benefits for November, 2014, but the amount for November will be due December 1.

85.    The Debtor seeks authority, in the Debtor's discretion, to continue to pay the foregoing Insurance Benefit premiums through Choice in the ordinary course of business for the Retained Employees, including, for all such programs, paying amounts due as of the Petition Date.

86.    <u>Employee Assistance Programs</u>.  The Debtor provides, at its own cost, an Employee Assistance Program ("<u>EAP</u>") that is administered by UNUM LifeBalance.  This program provides Employees with counseling services to help Employees manage day-to-day

challenges or problems associated with home or work, including Life Care Referral Services, Financial and Legal Counseling Services, and Budget and Debt Counseling. Employees can receive up to three free counseling sessions per issue. The Debtor believes that no outstanding EAP amounts are due.

87.    The Debtor also provides, at its own cost, an Employee Travel Assistance plan ("ETA") that is administered by UNUM.  This program provides Employees with worldwide emergency travel assistance, including emergency medical evacuations, medical repatriation, and legal and interpreter referrals. ETA premiums are paid when Employee expense reports are received, usually one week after the end of each month in which there was relevant Employee travel.  There are no outstanding Employee travel expense reports.

88.    Out of an abundance of caution, the Debtor seeks authority, in the Debtor's discretion, to pay UNUM and UNUM LifeBalance any amounts due as of the Petition Date in on its Employee Assistance programs, and to continue such programs going forward for the Retained Employees in the ordinary course of business.  Any failure to pay these amounts would be detrimental to employee welfare, morale, and expectations, which, in turn, would result in immediate and irreparable harm to the Debtor and the Employees.

89.    401(k) Plan.  In the ordinary course of its business, the Debtor also maintains a 401(k) plan (the "401(k) Plan") for its Employees, which is administered by Guardian Insurance and Annuity Company ("Guardian").  The 401(k) Plan is a defined contribution plan in accordance with Section 401(k) of the Internal Revenue Code.  An eligible Employee may contribute a portion of his or her compensation on a pre-tax basis, through voluntary deductions, to the 401(k) Plan, up to a maximum of $17,000 per year for Employees under age 50 and $23,000 for Employees over age 50.  These contributions are deducted from the paychecks of

participating Employees and contributed by the Debtor to the 401(k) Plan. The 401(k) Plan allows, but does not require, the Debtor to make discretionary matching contributions, as well as discretionary profit-sharing contributions for those Employees who worked at least 1000 hours during the Plan year. As of the Petition Date, the average quarterly administration costs owed to Guardian for the 401(k) Plan are $500. These costs have been paid through the third quarter of 2014, and the fourth quarterly bill will arrive at the end of the fourth quarter.

90. Out of an abundance of caution, the Debtor seeks authority to pay any pre-petition amounts accrued and owing to participating Retained Employees or to Guardian on account of the 401(k) Plan, and to continue to make payments to Retained Employees pursuant to such programs to the extent that such obligations accrue post-petition

91. The Debtor is requesting authority to take all appropriate steps as administrator of the 401(k) Plan to administer the plan and, when determined appropriate, wind down the plan and pay 401(k) Plan closing costs in the ordinary course of business. The Debtor intends and proposes to itself incur those shut-down costs. To the extent winding down the 401(k) Plan requires the Debtor to retain qualified professional to assist in these efforts, the Debtor will seek appropriate relief to do so.

*(v)*   *Severance Benefits*

92. Prior to the Petition Date, the Debtor maintained a severance policy (the "Severance Policy"), pursuant to which full-time employees received a severance payment of at least four weeks of salary plus certain Health Benefits for the four-month duration of the Severance Period. On November 14, the Debtor paid in full the severance payments owing to the Terminated Employees under the Severance Policy, but is still responsible for paying for the

Terminated Employees' Health Benefits under the Severance Policy during the Severance Period.

93.    The Severance Policy was and is a critical component of the Retained Employees' compensation, and the Debtor believes that Retained Employee morale would be severely impacted if the Debtor were not permitted to continue such policy in the ordinary course of its business.  The Debtor requests authority, in its sole discretion, to continue in the ordinary course of its business the Severance Policy for the benefit of both Terminated and Retained Employees, and to continue making Benefit Payments for the Terminated Employees during the Severance Period and to provide any eligible Retained Employee severance benefits in the event a Retained Employee is terminated post-petition.

94.    The Employee Benefits represent an integral component of each Employee's compensation package, and without these benefits, the Debtor believes it would be unable to retain all of its personnel and would impose a severe hardship on the Employees and their families.  The Debtor requests the authority, but not the direction, to continue to honor the Employee Benefits in the ordinary course of business, and to honor and pay any pre-petition amounts related thereto.

95.    I have read the Wage Motion and I believe that the relief requested by the Wage Motion is in the best interest of the Debtor and its estate.

96.    I have reviewed each of the First Day Motions (including the exhibits and schedules thereto) and, to the best of my knowledge, the facts stated therein are true and correct. Such representation is based on my personal knowledge, information supplied to me by other members of the Debtor's management and the Debtor's professionals, or information learned from my review of relevant documents or upon my opinion based upon my experience and

knowledge of the Debtor's operations and financial condition.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in the First Day Motions.

97.    I believe that the information sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.

98.    Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

## PART III

## INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2

99.    The nature of the Debtor's business and description of the circumstances leading to the commencement of this Chapter 11 Case is described in Part I of this affidavit.  LBR 1007-2(a)(1).

100.    Because this Chapter 11 Case was not originally commenced under Chapter 7 or Chapter 13 and no committees were organized prior to the filing of the voluntary bankruptcy petition, Local Bankruptcy Rules 1007-2(a)(2) and (a)(3) are not applicable to this Chapter 11 Case.  LBR 1007-2(a)(2) and (a)(3).

101.    Information for holders of the 40 largest unsecured claims is attached to this affidavit as Schedule 1.  LBR 1007-2(a)(4).

102.    Because there are no secured claims, Local Bankruptcy Rule 1007-2(a)(5) is not applicable to this Chapter 11 Case.  LBR 1007-2(a)(5).

103.    The Debtor's assets and liabilities as of November 17, 2014 are listed in <u>Schedule 2</u>.  LBR 1007-2(a)(6).

104.    As the Debtor is a privately held corporation and has no publicly held securities, Local Bankruptcy Rule 1007-2(a)(7) is not applicable to this Chapter 11 Case.  LBR 1007-2(a)(7).

105.    The Debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity is listed in <u>Schedule 3</u>.  LBR 1007-2(a)(8).

106.    A list of the premises owned, leased, or held under other arrangement where the Debtor operates its business is attached to this affidavit as <u>Schedule 4</u>.  LBR 1007-2(a)(9).

107.    The location of the Debtor's substantial assets and the location of its books and records is attached to this affidavit as <u>Schedule 5</u>.  The Debtor holds no assets outside the territorial limits of the United States.  LBR 1007-2(a)(10).

108.    Attached as <u>Schedule 6</u> is a list of pending or threatened actions or proceedings against the Debtor or its property.  LBR 1007-2(a)(11).

109.    A list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience is attached to this affidavit as <u>Schedule 7</u>.  LBR 1007-2(a)(12).

110.    The weekly payroll to employees (exclusive of officers, directors, partners and stockholders) in the next 30 days is approximately $136,446.  This represents total salaries and wages and severance payouts.  LBR 1007-2(b)(1).

111.    The amount proposed to be paid to officers, directors, and stockholders for the next 30 days is approximately $78,398.  LBR 1007-2(b)(2)(A).

112.    The amount proposed to be paid to financial or business consultants retained by the Debtor is approximately $561,000.  LBR 1007-2(b)(2)(C).

113.    A schedule for the estimated cash receipts and disbursements for the next 30 days is attached hereto as <u>Schedule 8</u>.  LBR 1007-2(b)(3).

114.    Pursuant to Local Bankruptcy Rule 1007-2(d), the Debtor seeks a waiver from the requirements of Local Bankruptcy Rule 1007-2 to the extent this affidavit fails to include information called for by the Rule, as being impracticable to furnish in light of the size of this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated: November 20, 2014

Respectfully submitted,

Ramon A. Rivera,
Secretary, Treasurer and Chief Financial Officer

35

## Schedule 1

### List of 40 Largest Unsecured Creditors

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a list of the holders of the 40 largest unsecured claims.

| Name of creditor and complete mailing address including zip code | Name, telephone number, and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim [trade debt, bank loan, government contract, etc.] | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| Level 3 Communications<br>P.O. Box 910182<br>Denver, CO 80291-0182 | Tara Abel<br>Tel: (814) 260-3026<br>E-Mail: Tara.abel@level3.com | Trade Debt | | $605,939.08 |
| Quality Technology Services<br>12851 Foster Street<br>Overland Park, KS 66213 | Darwin Shultz<br>Tel: (913) 312-2423<br>E-Mail:<br>Darwin.Shultz@Qtsdatacenters.com | Trade Debt | | $520,980.88 |
| Google Inc.<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043-1351 | Carmen Bonayon<br>Tel: (866) 954-0453 ext 8544<br>Fax: (650) 963-3574<br>E-Mail: c.bonayon@google.com | Trade Debt | | $309,421.58 |
| Fish & Richardson P.C.<br>P.O. Box 3295<br>Boston, MA 02241-3295 | Barbara Gomez<br>Tel: (617) 956-6943<br>E-Mail: Gomez@fr.com | Professional Fees | | $117,382.75 |
| Bingham McCutchen LLP<br>2020 K Street, NW<br>Washington, DC 20006 | Valerie Dory<br>Tel: (202) 373-6566<br>E-Mail:<br>Valerie.Dory@bingham.com | Professional Fees | | $105,000.00 |
| Vanderbilt Associates Owners LP<br>625 RXR Plaza<br>Uniondale, NY 11556 | Francine Pearsall<br>Tel: (516) 506-6762<br>Fax: (516) 506-6810<br>E-Mail: fpearsall@rxrrealty.com | Trade Debt | | $74,282.47 |
| Facebook, Inc.<br>1601 Willow Road<br>Menlo Park, CA 94025 | Flor Calonzo<br>Tel: (855) 232-8440 Ext 820.3422<br>E-Mail: fcalonzo@fb.com | Trade Debt | | $62,617.63 |
| NetBase Solutions, Inc.<br>2987 Landings Drive<br>Mountain View, CA 94043 | Brian Benedict<br>Tel: (650) 810-2106<br>E-Mail: bbenedict@netbase.com | Trade Debt | | $62,603.13 |
| Expedient Data Centers<br>P.O. Box 645209<br>Pittsburgh, PA 15264-5209 | Kathleen Kramer<br>Tel: (877) 570-7827<br>E-Mail:<br>Kathleen.Kramer@expedient.com | Trade Debt | | $59,028.02 |
| Tribune Media Services, Inc.<br>40 Media Drive<br>Queensbury, NY 12804 | Michael DiMezza<br>Tel: (800) 833-9581 Ext 2199<br>E-Mail: medimezza@gracenote.com | Trade Debt | | $48,480.00 |
| Constantine Cannon, LLP<br>355 Madison Avenue<br>9th Floor<br>New York, NY 10017 | Seth Greenstein<br>Tel: (212) 350-2343<br>E-Mail:<br>sgreenstein@constantinecannon.com | Trade Debt | | $43,815.49 |

| Name of creditor and complete mailing address including zip code | Name, telephone number, and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim [trade debt, bank loan, government contract, etc.] | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| Kellogg, Huber, Hansen, Todd, Evans & Figel 1615 M Street, NW Suite 400 Washington, DC 20036-3215 | David Frederick Tel: (202) 326-7900 Fax: (202) 326-7999 E-Mail: dfrederick@khte.com | Professional Fees | | $41,021.03 |
| Bernhard, Jennifer T. 1020 W. Daniel Street Champaign, IL 61821 | Jennifer Bernhard Tel: (217) 390-7836 E-Mail: jtbernhard1105@gmail.com | Trade Debt | | $33,003.41 |
| C7 Data Centers 14944 Pony Express Dr. Bluffdale, UT 84065 | Ron Driggs Rel: (801) 822-5327 E-Mail: r.driggs@c7dc.com | Trade Debt | | $29,887.50 |
| Houston & Associates, LLP 1666 Massachusetts Avenue Suite 12 Lexington, MA 02420 | Grant Houston Tel: (781)863-9991 E-Mail: grant.houston@houstonllp.com | Professional Fees | | $29,834.22 |
| ExactTarget, Inc. and Subsidiaries 26487 Network Place Chicago, IL 60673-1264 | Angela Holtzleiter Tel: (317) 378-7996 E-Mail: aholtzleiter@exacttarget.com | Trade Debt | | $28,887.50 |
| Vindicia 303 Twin Dolphin Drive Suite 20C Redwood City, CA 94065 | Jeff Sevel Tel: (650) 264-4757 E-Mail: jsevel@vindicia.com | Trade Debt | | $27,586.07 |
| Womble Carlyle Sandridge & Rice, LLP 1200 Nineteenth Street, NW Suite 50C Washington, DC  20036 | Rebecca E. Jacobs Tel: (202) 857-4547 Fax: (202) 261-0047 E-Mail: rjacobs@wcsr.com | Professional Fees | | $26,435.60 |
| Full Loyal Industrial Ltd. 26 Lan Hing Street Kowloon Bay Kowloon, Hong Kong | Maurice Chan Tel: (852) 279 60682 Fax: (852) 279 52626 E-Mail: maurice@fullloyal.com.hk | Trade Debt | | $26,110.00 |
| American Broadcasting Cos., Inc c/o Debevoise & Plimpton, LLP Attn:  Bruce P. Keller, Esq. 919 Third Avenue, 31st Floor New York, NY 10022 | Bruce P. Keller, Esq. Tel.: (212) 909-6118 Fax: (212) 521-7118 E-mail: bpkeller@debevoise.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| CBS Broadcasting Inc. c/o Debevoise & Plimpton, LLP Attn:  Bruce P. Keller, Esq. 919 Third Avenue, 31st Floor New York, NY 10022 | Bruce P. Keller, Esq. Tel.: (212) 909-6118 Fax: (212) 521-7118 E-mail: bpkeller@debevoise.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |

| Name of creditor and complete mailing address including zip code | Name, telephone number, and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim [trade debt, bank loan, government contract, etc.] | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| CBS Studios Inc.<br>c/o Debevoise & Plimpton, LLP<br>Attn:  Bruce P. Keller, Esq.<br>919 Third Avenue, 31st Floor<br>New York, NY 10022 | Bruce P. Keller, Esq.<br>Tel.: (212) 909-6118<br>Fax: (212) 521-7118<br>E-mail: bpkeller@debevoise.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Community Television of Utah<br>d/b/a KSTU Fox 13<br>c/o Jenner & Block LLP<br>Attn:  Richard L. Stone, Esq.<br>633 West 5th Street<br>Los Angeles, CA  90071-2054 | Richard L. Stone, Esq.<br>Tel.: (213) 239-2203<br>Fax: (213) 239-2213<br>E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Disney Enterprises, Inc.<br>c/o Debevoise & Plimpton, LLP<br>Attn:  Bruce P. Keller, Esq.<br>919 Third Avenue, 31st Floor<br>New York, NY 10022 | Bruce P. Keller, Esq.<br>Tel.: (212) 909-6118<br>Fax: (212 521-7118<br>E-mail: bpkeller@debevoise.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Fox Broadcasting Company<br>c/o Jenner & Block LLP<br>Attn:  Richard L. Stone, Esq.<br>633 West 5th Street<br>Los Angeles, CA  90071-2054 | Richard L. Stone, Esq.<br>Tel.: (213) 239-2203<br>Fax: (213) 239-2213<br>E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Fox Television Stations, Inc.<br>c/o Jenner & Block LLP<br>Attn:  Richard Stone, Esq.<br>633 West 5th Street<br>Los Angeles, CA  90071-2054 | Richard L. Stone, Esq.<br>Tel.: (213) 239-2203<br>Fax: (213) 239-2213<br>E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| KUTV Licensee<br>d/b/a KUTV d/b/a KMYU<br>c/o Jenner & Block LLP<br>Attn:  Richard Stone, Esq.<br>633 West 5th Street<br>Los Angeles, CA  90071-2054 | Richard L. Stone, Esq.<br>Tel.: (213) 239-2203<br>Fax: (213) 239-2213<br>E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| NBC Studios, LLC<br>c/o Debevoise & Plimpton, LLP<br>Attn:  Bruce P. Keller, Esq.<br>919 Third Avenue, 31st Floor<br>New York, NY 10022 | Bruce P. Keller, Esq.<br>Tel.: (212) 909-6118<br>Fax: (212 521-7118<br>E-mail: bpkeller@debevoise.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| NBCUniversal Media, LLC<br>c/o Debevoise & Plimpton, LLP<br>Attn:  Bruce P. Keller, Esq.<br>919 Third Avenue, 31st Floor<br>New York, NY 10022 | Bruce P. Keller, Esq.<br>Tel.: (212) 909-6118<br>Fax: (212 521-7118<br>E-mail: bpkeller@debevoise.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |

| Name of creditor and complete mailing address including zip code | Name, telephone number, and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim [trade debt, bank loan, government contract, etc.] | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| Nexstar Broadcasting Snow Christiensen & Martineau Attn: Rodney R. Parker, Esq. 10 Exchange Place, 11th Floor Salt Lake City, UT 84145-5000 | Rodney R. Parker, Esq. Tel.: (801) 322-9134 Fax: (801) 363-0400 E-mail: rrp@scmlaw.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Public Broadcasting Service c/o Jenner & Block LLP Attn: Richard Stone, Esq. 633 West 5th Street Los Angeles, CA 90071-2054 | Richard L. Stone, Esq. Tel.: (213) 239-2203 Fax: (213) 239-2213 E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Telemundo Network Group LLC c/o Debevoise & Plimpton, LLP Attn : Bruce P. Keller, Esq. 919 Third Avenue, 31st Floor New York, NY 10022 | Bruce P. Keller, Esq. Tel.: (212) 909-6118 Fax: (212) 521-7118 E-mail: bpkeller@debevoise.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Thirteen c/o Jenner & Block LLP Attn: Richard Stone, Esq. 633 West 5th Street Los Angeles, CA 90071-2054 | Richard L. Stone, Esq. Tel.: (213) 239-2203 Fax: (213) 239-2213 E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Twentieth Century Fox Film Corporation c/o Jenner & Block LLP Attn: Richard Stone, Esq. 633 West 5th Street Los Angeles, CA 90071-2054 | Richard L. Stone, Esq. Tel.: (213) 239-2203 Fax: (213) 239-2213 E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Universal Network Television c/o Debevoise & Plimpton, LLP Attn: Bruce P. Keller, Esq. 919 Third Avenue, 31st Floor New York, NY 10022 | Bruce P. Keller, Esq. Tel.: (212) 909-6118 Fax: (212) 521-7118 E-mail: bpkeller@debevoise.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Univision Network Limited Partnership [The] c/o Jenner & Block LLP Attn: Richard Stone, Esq. 633 West 5th Street Los Angeles, CA 90071-2054 | Richard L. Stone, Esq. Tel.: (213) 239-2203 Fax: (213) 239-2213 E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| Univision Television Group, Inc. c/o Jenner & Block LLP Attn: Richard Stone, Esq. 633 West 5th Street Los Angeles, CA 90071-2054 | Richard L. Stone, Esq. Tel.: (213) 239-2203 Fax: (213) 239-2213 E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |

| Name of creditor and complete mailing address including zip code | Name, telephone number, and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim [trade debt, bank loan, government contract, etc.] | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim [if secured also state value of security] |
|---|---|---|---|---|
| WNET<br>c/o Jenner & Block LLP<br>Attn:  Richard Stone, Esq.<br>633 West 5th Street<br>Los Angeles, CA  90071-2054 | Richard L. Stone, Esq.<br>Tel.: (213) 239-2203<br>Fax: (213) 239-2213<br>E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| WNJU-TV Broadcasting LLC<br>c/o Debevoise & Plimpton, LLP<br>Attn:  Bruce P. Keller, Esq.<br>919 Third Avenue, 31st Floor<br>New York, NY 10022 | Bruce P. Keller, Esq.<br>Tel.: (212) 909-6118<br>Fax: (212 521-7118<br>E-mail: bpkeller@debevoise.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |
| WPIX, Inc.<br>c/o Jenner & Block LLP<br>Attn:  Richard Stone, Esq.<br>633 West 5th Street<br>Los Angeles, CA  90071-2054 | Richard L. Stone, Esq.<br>Tel.: (213) 239-2203<br>Fax: (213) 239-2213<br>E-mail: rstone@jenner.com | Litigation Party | Contingent, unliquidated and disputed | Unknown |

## Schedule 2

**Debtor's Assets and Liabilities**

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following summarizes the Debtor's assets and liabilities.

| Assets | |
|---|---:|
| Cash | $ 4,596,091 |
| Interest Receivable | 2,202 |
| Raw Materials / In Process Matrials | 1,366,253 |
| Prepaid Expenses | 877,242 |
| Sales Tax Refunds | 6,476 |
| Net Fixed Assets | 11,466,473 |
| Security Deposits | 38,246 |
| Intangible Assets | 769,288 |
| Total Assets | $ 19,122,271 |
| Liabilities | |
| Accounts Payable | $ 2,472,163 |
| Credit Cards | 6,013 |
| Accrued Expenses | 1,405,926 |
| Payroll Liabilities | 13,975 |
| Deferred Rent (GAAP v Cash Basis) | 178,876 |
| Total Liabilities | 4,076,953 |

## Schedule 3

### Debtor's Property Not in Debtor's Possession

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtor's property that is in the possession or custody of a custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or any agent for such entity.

| Third Party | Property Description |
|---|---|
| Atara Office LLC, 50 Broadway, 4th Floor, New York, NY  10004, | Security Deposit in the amount of $629,200 |
| Retals, LLC, 1963 Commonwealth Ave, Brighton, MA 02135; (617)- 789-3944 | Surety Bond in the amount of $42,606 |
| Acumen Capital Partners, 37-18 Northern Blvd, suite 300, Long Island City, NY 11101 | Security Deposit in the amount of $21,000 |
| 56 7th Ave, LLC, 56 7th Ave, New York, NY 10011 | Security Deposit in the amount of $10,000 |

## **Schedule 4**

### **List of Leased Premises**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following is a list of the premises leased by the Debtor from which the Debtor operates its business.

| Vendor | Address | Monthly Rent | Note | Purpose |
|--------|---------|--------------|------|---------|
| Vanderbilt Associates Owners LP | 470 Vanderbilt Brooklyn, NY 11238-2208 | $58,227.84 | | Data center / equipment storage |
| Quality Technology Services Holdings, LLC | 1033 Jefferson St NW Atlanta, GA 30318-8024 | $3,450.00 | | Colocation data center |
| Expedient Data Centers | 1050 Hull St Baltimore, MD 21230-5342 | $15,774.73 | | Colocation data center |
| C7 Data Centers | 14944 Pony Express Drive Bluffdale, UT 84065-4801 | $4,000.00 | | Colocation data center |
| Retals LLC | 280 Summer St Boston, MA 02210 | $14,597.00 | | Office space |
| Acumen Capital Partners | 37-18 Northern Blvd Long Island City, NY 11101 | $3,775.63 | *This property is subleased, and the "Monthly Rent" is the amount paid by the Debtor to its Landlord in excess of what it receives from the Sublessor | Office space subleased to Bluestone Designs and Creations Inc |
| 56 7th Ave LLC | 56 7th Ave New York, NY | $5,150.00 | | Company Apartment |

## Schedule 5

### Location of Debtor's Substantial Assets, Books, and Records

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtor's substantial assets, and the location of its books and records.  The Debtor holds no assets located outside the territorial limits of the United States.

### Assets

The Debtor's inventory consists of antennas, servers, firewalls, transcoders, and their component parts, located as follows:

$11,684,477 of inventory at 470 Vanderbilt, Brooklyn, NY 11238
$1,409,264 of inventory at QTS, 1033 Jefferson St. NW, Atlanta, GA 30318
$784,650 of inventory at C7 Data Centers, 14944 Pony Express Dr., Bluffdale, UT 84065
$614,761 of inventory at Expedient, 1050 Hull St., Baltimore, MD 21230
$605,243 of inventory at EIT, 19 Keewaydin Dr., Suite 3, Salem, NH 03079
$557,907 of inventory at Altronics, 12 Executive Dr. Unit 2, Hudson, NH 03051
$203,103 of inventory at Avnet, 6 Craig Rd., Acton, MA 01720


The Debtor also maintains bank accounts at Boston Private Bank & Trust, Ten Post Office Square, Boston, MA 02109.

### Books and Records

The Debtor's books and records are located at 280 Summer St., Boston, MA 02210.

## Schedule 6

### Nature and Present Status of Each Action Against the Debtor

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists the nature and present status of each action or proceeding, pending or threatened, against the debtor or its property where a judgment against the debtor or a seizure of its property may be imminent.

| | Caption of Suit and Case Number | Nature of Proceeding | Court and Location | Status or Disposition |
|---|---|---|---|---|
| 1. | American Broadcasting Cos., Inc., Disney Enterprises, Inc., CBS Broadcasting, Inc., CBS Studios Inc., NBCUniversal Media, LLC, NBC Studios, LLC, Universal Network Television, LLC, Telemundo Network Group LLC, and WNJU-TV Broadcasting LLC v. Aereo, Inc.<br><br>Counterclaim Defendants:<br><br>WNET, Thirteen, Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, WPIX, Inc., Univision Television Group, Inc., The Univision Network | Civil action alleging direct and indirect infringement of copyrighted works seeking damages and injunctive relief. | United States District Court for the Southern District of New York; New York, New York | Plaintiffs moved for a preliminary injunction which was denied and then appealed to the United States Court of Appeals for the Second Circuit (the "Second Circuit") (see Case Nos. 12-cv-2786 and 12-cv-2807). On 4/1/13, the Second Circuit affirmed the District Court's denial of the preliminary injunction. The Plaintiffs then sought *en banc* review from the Second Circuit. That request was denied (in a 10 to 2 vote) on July 16, 2013. The plaintiffs then appealed the denial of the injunction to the United States Supreme Court ("SCOTUS") and certiorari was granted. The District Court action was stayed in the interim. SCOTUS reversed the Second Circuit in a 6/25/14 decision and remanded the case. On 10/23/14, after having had briefing and a hearing, the District Court entered a nationwide preliminary injunction. On 11/14/14, the District Court entered an order requiring the parties to complete discovery by 1/16/15 and to submit motions for summary judgment by 2/16/15. |

| | Caption of Suit and Case Number | Nature of Proceeding | Court and Location | Status or Disposition |
|---|---|---|---|---|
| | Limited Partnership and Public Broadcasting Service v. Aereo, Inc.<br><br>Case No. 12-cv-1540 (AJN) | | | |
| 2. | Aereo, Inc. v. CBS Broadcasting Inc., CBS Studios Inc., CBS Television Licenses, LLC d/b/a WSBK-TV, WBZ-TV, WJZ-TV; Atlanta Television Station WUPA, Inc. d/b/a WUPA-TV; CBS Television Stations, Inc.. d/b/a WFOR-TV, KCNC-TV; Miami Television Station WBFS, Inc. d/b/a WBFS-TV; CBS Broadcasting Inc.. d/b/a WBBM-TV, WWJ-TV, WCCO, KDKA-TV, KYW-TV; CBS Stations Group of Texas, Inc. d/b/a KTVT-TV; Television Station KTXA, Inc. d/b/a KTXA- | Declaratory judgment action seeking a declaration of non-infringement of copyright. | United States District Court for the Southern District of New York; New York, New York | On 11/18/14, the Court ordered the parties to submit a joint letter indicating their views on whether the action should remain stayed until anticipated summary judgment issues in Case No. 12-cv-1540 are resolved. |

| | Caption of Suit and Case Number | Nature of Proceeding | Court and Location | Status or Disposition |
|---|---|---|---|---|
| | TV; CBS Operations, Inc. d/b/a WTOG-TV; Detroit Television Station WKBD, Inc. d/b/a WKBD-TV, Pittsburgh Television Station WPCW, Inc. d/b/a WPCW-TV; And Philadelphia Television Station WPSG, Inc. d/b/a WPSG-TV<br><br>Case No. 13-cv-3013 (AJN) | | | |
| 3. | Aereo, Inc. v. Community Television of Utah, LLC d/b/a KSTU Fox 13, KUTV Licensee, LLC d/b/a KUTV and KMYU, Fox Broadcasting Company, and Nexstar Broadcasting, Inc.<br><br>Case No. 13-cv-00910 DAK | Two (2) civil suits which have been consolidated, alleging copyright infringement and seeking a preliminary injunction. | United States District Court for the District of Utah, Central Division Salt Lake City, Utah<br><br>Currently, appeal pending in the Tenth Circuit (Case No. 14-4020) | Preliminary injunction entered on 2/25/14; On 10/27/14 the District Court stayed the proceeding pending further action by the Circuit Court. |

## Schedule 7

### Debtor's Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtor's existing senior management, a description of their tenure with the Debtor and a brief summary of their relevant responsibilities and experience.

| Name/Position | Responsibilities and Background |
|---|---|
| Chaitanya "Chet" Kanojia<br><br>President and Chief Executive Officer | Chet Kanojia is the president and chief executive officer of Aereo, Inc., as well as a member of Aereo's board of directors. As chief executive officer, Mr. Kanojia focuses on the company's strategic plans and priorities with the goal of maximizing Aereo's opportunities and long-term value of its stakeholders.<br><br>Mr. Kanojia founded Aereo in 2010. Prior to founding Aereo, from 2000 until 2008, Mr. Kanojia served as founder and CEO of Navic Networks, and from 2008 until 2010 was the CEO of Navic Networks at Microsoft.<br><br>Mr. Kanojia holds a Master's degree in Computer Systems Engineering from Northeastern University, and a Bachelor's degree from the National Institute of Technology in Bhopal, India. |
| Ramon A. Rivera<br><br>Secretary, Treasurer, and Chief Financial Officer | Ramon Rivera is the secretary, treasurer, and chief financial officer of Aereo, Inc. Mr. Rivera oversees the preparation of all financial reporting materials, and is responsible for all financial planning and analysis.<br><br>Mr. Rivera has been at Aereo since 2011. Prior to his role at Aereo, Mr. Rivera served as Director of International Finance at LoJack Corporation.<br><br>Mr. Rivera holds an LLM from the Boston University School of Law, as well as a JD and a Bachelor's of Business Administration from the Universidad de Puerto Rico. |
| Alex Moulle-Berteaux<br><br>Chief Commercial Officer | Alex Moulle-Berteaux is the chief commercial officer for Aereo, Inc. Mr. Moulle-Berteaux manages the company's business marketing and consumer-facing function, including the company BI databases, and provides analysis of product performance and market potential in various applications and settings.<br><br>Prior to joining Aereo in 2012, Mr. Moulle-Berteaux was the Global Head of Marketing and Public Relations at Rockstar Games.<br><br>Mr. Moulle-Berteaux holds a Bachelor's degree from Boston College. |

| | |
|---|---|
| Joseph Lipowski<br><br>Chief Technology Officer | Joseph Lipowski is the chief technology officer at Aereo, Inc.  Mr. Lipowski has primary responsibility for all intellectual property, product development, and system level operations.<br><br>Mr. Lipowski joined Aereo, Inc. in 2010.  Mr. Lipowski has over 25 years of experience in technology development, including at LoJack Corporation, Andrew Corporation, Celiant Corporation, Lucent Technologies, and Cirrus Logic.<br><br>Mr. Lipowski holds a Master's of Science in Electrical Engineering from the University of Michigan and a Bachelor's of Science in Electrical Engineering from the Massachusetts Institute of Technology. |
| Brenda Cotter<br><br>General Counsel | Brenda Cotter is general counsel for Aereo, Inc.  Ms. Cotter is responsible for all internal legal functions of Aereo, including managing its ongoing intellectual property litigation.<br><br>Ms. Cotter joined Aereo in 2011, prior to which she was Senior Counsel at Staples, Inc., and a partner at Brown Rudnick, LLP.<br><br>Ms. Cotter holds a JD from Northeastern University School of Law. |

## Schedule 8

**Debtor's Estimated Cash Receipts and Disbursements**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the
30-day period following the filing of the Debtors' chapter 11 petitions, the estimated cash
receipts and disbursements, net cash gain or loss and obligations and receivables expected to
accrue that remain unpaid, other than professional fees. The amounts set forth exclude any
disbursements to professionals. The amounts set forth below could change substantially if any of
the assumptions prove incorrect.

| | |
|---|---|
| **Cash Receipts** | $0 |
| **Cash Disbursements** | ($1,022,997) |
| **Net Cash Gain (Loss)** | ($1,022,997) |
| **Estimated Unpaid Postpetition Obligations Accrued During First 30 Days** | ($160,000) |
| **Estimated Unpaid Postpetition Receivables** | $0 |