William R. Baldiga, Esquire
R. Benjamin Chapman, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Proposed Counsel for the*
*Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-_____(___) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER**
**APPROVING KEY EMPLOYEE INCENTIVE PLAN**

Aereo, Inc., as debtor and debtor-in-possession (the "Debtor") in the above-captioned Chapter 11 case, files this Motion for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), approving a key employee incentive plan (the "KEIP"), the terms of which are set forth herein and in Exhibit B attached hereto. In support of this Motion, the Debtor refers to the *Declaration of Ramon A. Rivera, Secretary, Treasurer, and Chief Financial Officer of Aereo, Inc. in Support o First Day Pleadings* (the "Rivera Declaration"), filed contemporaneously herewith, and the Declaration of Lawton Bloom of Argus Management Corporation ("Argus"), proposed Chief Restructuring Officer to the Debtor, which is attached hereto as Exhibit C (the "Bloom Declaration"). In further support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363(b) and 503(c) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (as amended, the "Bankruptcy Code").

## BACKGROUND

4.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this chapter 11 case and, as of the date of the filing of this Motion, no official committees have been appointed.

### A.      The Debtor's Business

5.      As more particularly described in the Rivera Declaration filed contemporaneously herewith, the Debtor is a privately-held New York corporation with headquarters in Boston, Massachusetts.  The Debtor is a technology company founded in 2010 that provided subscribers with the ability to record and watch live or "time-shifted" (*i.e.*, delayed) local over-the-air broadcast television on internet-connected devices, such as personal computers, tablet devices, and "smartphones."

6.      The Debtor provided to each subscriber access via the internet to individual remote micro-antennas and a cloud-based digital video recorder ("DVR") that enabled a subscriber to receive and store local television programming broadcast over public airwaves.

Subscribers could designate which television programs to record by logging into the Debtor's website and selecting the programming they wanted to record and watch live or later.

7.     In contrast to traditional cable antennas and DVR boxes, which are located in subscribers' homes, the Debtor's individual antennas and hard disks are located in the Debtor's facilities within the local market and were individually made available to subscribers, who could then, using an internet browser, access local broadcast programming with an individual antenna and record it to disk.  The Debtor's subscribers could then watch their recordings live or save them for later viewing.  Essentially, the Debtor's technology provided a modern, easy-to-use option for consumers to watch over-the-air television without having to install cumbersome home equipment or subscribe to cable packages and bundles.  The Debtor's technology also includes a user interface, social networking features, and other features designed to create a compelling consumer experience.

**B.     Events Leading to Chapter 11**

8.     Beginning in March 2012, several major television broadcasting networks, including, among others, ABC, CBS and NBC (collectively, the "Broadcasters"),[1] commenced actions in the United States District Court for the Southern District of New York (the "District

---

[1]   The Broadcasters include: American Broadcasting Companies, Inc., Disney Enterprises, Inc., CBS Broadcasting, Inc., CBS Studios, Inc., NBCUniversal Media, LLC, NBC Studios, LLC, Universal Network Television, LLC, Telemundo Network Group, LLC, and WNJU-TV Broadcasting, LLC (the "ABC Plaintiffs"), as well as WNET, Thirteen, Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, WPIX, Inc., Univision Television Group, Inc., the Univision Network Limited Partnership and Public Broadcasting Service (the "Fox Plaintiffs").  On May 6, 2013, the Debtor filed a declaratory judgment action against CBS Studios Inc.; CBS Television Licenses, L.L.C. d/b/a WSBK-TV, WBZ-TV, WJZ-TV; Atlanta Television Station WUPA, Inc. d/b/a WUPA-TV; CBS Television Stations, Inc. d/b/a WFOR-TV, KCNC-TV; Miami Television Station WBFS, Inc. d/b/a WBFS-TV; CBS Broadcasting Inc. d/b/a WBBM-TV, WWJ-TV, WCCO, KDKA-TV, KYW-TV; CBS Stations Group of Texas, Inc. d/b/a KTVT-TV; Television Station KTXA, Inc. d/b/a KTXA-TV; CBS Operations, Inc. d/b/a WTOG-TV; Detroit Television Station WKBD, Inc. d/b/a WKBD-TV; Pittsburgh Television Station WPCW, Inc. d/b/a WPCW-TV; Philadelphia Television Station WPSG, Inc. d/b/a WPSG-TV.

Court") seeking to enjoin the Debtor from allowing consumers to stream over-the-air broadcast content to themselves while the show was still airing solely on the asserted grounds that such transmissions were public performances under the Copyright Act.  The District Court denied the preliminary injunction, finding that the Debtor's technology, which enabled consumer transmission via individual antennas and DVR recordings, did not constitute a public performance under the Copyright Act.  See Am. Broad. Co., Inc. v. Aereo, Inc., 874 F. Supp. 2d 373 (S.D.N.Y. 2012).  The Second Circuit affirmed the District Court's holding.  WNET v. Aereo, Inc., 712 F.3d 676 (2d Cir. 2013), reh'g en banc denied, 722 F.3d 500 (2d Cir. 2013).[2]

9.      The Broadcasters appealed to the Supreme Court, which reversed the Second Circuit, holding that live transmissions using the Debtor's technology were essentially like cable company transmissions and therefore were public performances under the Copyright Act.  Am. Broad. Co., Inc. v. Aereo, Inc., 134 S. Ct. 2498 (2014).

10.      On remand, the District Court granted the Broadcasters' request for a nationwide preliminary injunction preventing use of the Aereo system for playback while the underlying program was still airing.  See Am. Broad. Co., Inc. v. Aereo, Inc., No. 12-cv-1540, slip op. at 15

---

[2]  On July 9, 2013, Hearst Stations, Inc. d/b/a WCVB-TV filed an action against the Debtor in the United States District Court for the District of Massachusetts (13-cv-11649-NMG), alleging copyright infringement (including public performance, reproduction, distribution and derivative work claims) and seeking a preliminary and permanent injunction, declaration of infringement, injunctive relief, damages and attorneys' fees. A hearing on the motion for a preliminary injunction, which concerned all of the asserted claims, was heard on September 18, 2013 and the motion was denied on October 8, 2013.  The plaintiffs appealed to the United States Court of Appeals for the First Circuit (the "First Circuit"). That appeal was stayed during the Supreme Court proceedings discussed below. Upon the parties' agreement, all claims in the Hearst case were dismissed without prejudice on August 7, 2014. In February, 2013, the Debtor was enjoined from operating within the 10th Circuit by the United States District Court in Salt Lake City Utah.  Community Television of Utah, LLC et al. v. Aereo, Inc., No. 2:13CV910DAK (D. Utah). The Debtor appealed that injunction and that appeal remains pending. KSTU LLC, et al. v. Aereo, Inc., No. 14-4020 (10th Cir.).

(S.D.N.Y. Oct. 23, 2014).  The Debtor has complied with the injunction and stopped permitting any transmission while the underlying program is airing.  In fact, as a result of the Supreme Court decision, the Debtor, in its business judgment, decided to suspend offering its technology to consumers.  Since then, the Debtor has had no material source of revenue and its business operations have been devoted towards defending against lawsuits by the Broadcasters seeking further and permanent injunctive relief, damages and penalties for alleged copyright infringement.  The Debtor has also been formulating new legal strategies and potential new business models consistent with the Supreme Court's decision.

11.    A number of legal and regulatory issues relating to the Debtor's business may soon be resolved favorably in terms of the ability of the Debtor to use its technology in a viable business opportunity.  First, the Debtor has taken the position that it is entitled to a "compulsory" statutory license under Section 111 of the Copyright Act based on remarks by the Supreme Court during oral argument that the Debtor's operation is essentially identical to that of a cable network.  Thus, the Debtor has filed documents and payments with the United States Copyright Office seeking such a license/as a compulsory licensee, which, if accepted, would result in there being no copyright infringement claims against the Debtor.  See 17 U.S.C. § 111(c)(1).

12.    Second, as recently as October 28, 2014, Tom Wheeler, Chairman of the Federal Communications Commission ("FCC"), proposed potential rule changes that would give internet-based broadcasters such as the Debtor the same classification as cable companies.[3] Also, on November 4, 2014, in a speech to the Mid-Atlantic Venture Association Chairman Wheeler stated:

---

[3] Tom Wheeler, Tech Transitions, Video, and the Future, Official FCC Blog (Oct. 28, 2014, 1:48 PM), http://www.fcc.gov/blog/tech-transitions-video-and-future.    It appears from the Chairman's public comments that a Notice of Proposed Rule Making ("NPRM") on this subject is imminent.

"Two weeks ago I proposed to my colleagues that we require of cable operators and broadcasters the same thing that spurred the growth of the satellite video business in the mid-1990s – that competitors should be able to negotiate in good faith for video content, even if it is owned by cable companies and broadcasters . . . . As you know, a startup called Aereo has already proposed doing this [being an over-the-top video competitor], but the broadcasters were able to stop it in court, in part because of the old rules of the FCC. Aereo wasn't the reason for the new rules, but the idea that entrepreneurs should be able to assemble programs to offer consumers choices is something that shouldn't be hindered by the FCC."

See http://www.broadcastingcable.com/news/washington/wheeler-old-fcc-rules-shouldn-t-impede-services-aereo/135351 (last visited Nov. 11, 2015).

13.    If the FCC changes its position, as Chairman Wheeler previewed, then it may also be likely that the U.S. Copyright Office's position regarding compulsory license eligibility for providers of linear broadcast programming via the Internet would shift in the Debtor's favor.  If the FCC elects to permit internet transmission of local linear broadcast channels, then the Debtor, assuming its continued viability, expects to be able to operate within that framework.

14.    However, even though the legal and regulatory framework is shifting in the Debtor's favor, the timing of a decision from the FCC is ultimately uncertain. Thus, during the several months since the Supreme Court's decision, the Debtor undertook a concerted effort to attract new capital or to effect a sale of its business.  Those efforts have not been successful, in significant part due to the over-hang of the Broadcasters' litigation and potential damage claims. Without current customers or the ability to provide services, the Debtor also dramatically reduced its operational overhead.  On November 6, 2014, the Debtor laid off a majority of its workforce and closed down its business operations in Boston.  As of the Petition Date, the Debtor's reported assets at book value were approximately $20.5 million, and its aggregate recognized liabilities were approximately $4.2 million.

C.      **Asset Sale or Similar Restructuring Transaction**

15.      The Debtor commenced this Chapter 11 Case to maximize the value of its assets

through a sale of all or substantially all of its assets in one or more transactions to one or more

qualified purchasers, a recapitalization or similar restructuring transaction that will be in the best

interests of its creditors and shareholders (any of the foregoing transactions, a "Qualified

Transaction").  On November 12, 2014, after conducting several interviews of various firms

providing restructuring and financial advisory services, the Debtor hired Lawton Bloom of Argus

as Chief Restructuring Officer (the "CRO").  The CRO reports directly to the Debtor's Board of

Directors (the "Board"), and his responsibilities are primarily focused on conducting a sale,

recapitalization or similar transaction in this Chapter 11 Case.

16.      The value of the Debtor's assets – which are comprised of, among other things, its

remote antenna and DVR technology, related social networking and guide features, and its

intellectual property portfolio – may be impacted by a number of things, including, without

limitation: (i) collecting and preserving the Debtor's technology and equipment; (ii) active and

robust marketing of the technology to a number of potentially interested purchasers from various

industries that may seek to implement the technology in different ways; and (iii) the viability of

the Debtor's technology going forward.   Moreover, impending decisions from certain

government agencies may also impact the Debtor's business operations and the value of its

assets, including, without limitation: (i) a determination by the U.S. Copyright Office as to the

Debtor's eligibility for a cable system compulsory license under Section 111 of the Copyright

Act; and (ii) the potential regulation of certain linear online video service providers currently

being considered by the FCC.  See Rivera Dec. ¶ 29.  As of the Petition Date, the Debtor has

received no bids from potential purchasers of its assets, nor has it undertaken many of the steps

that will be required to successfully market its assets for a Qualified Transaction in the Chapter 11 Case.

### D.    The Debtor's Need for the KEIP

17.    The success of the Debtor's Qualified Transaction, including its ability in the interim to preserve and enhance its cash position and to market its assets appropriately, will determine the level of recovery that the Debtor's stakeholders will ultimately realize.   On November 6, 2014, in order to preserve resources, the Debtor laid off the majority of its workforce, leaving only the eleven individuals identified herein (the "Key Employees") whose services and efforts are critical to preserving the value of the Debtor's assets and ensuring a successful Qualified Transaction.   The Debtor has also materially reduced the salaries of five of its remaining employees, including its chief executive.[4]   Accordingly, the Debtor's Board of

---

[4]  The Debtor has evaluated the anticipated demands to be made on each of its remaining employees, and has attempted to adjust salaries to better match compensation to anticipated burdens on those employees, considering that the Debtor now has engaged a CRO to manage the process of securing and closing a Qualified Transaction.   The Debtor has accordingly reduced, effective as of November 10, 2014, the salaries of five of its remaining Key Employees: Chaitanya Kanojia, its Chief Executive Officer (50% reduction); Alex Moulle-Berteaux, Chief Commercial Officer (50% reduction); Virginia Thuy Lam Abrams, Senior Vice President of Communications and Government Relations (50% reduction); Joseph Lipowski, Chief Technology Officer (30% reduction); and Brian Loveland, Director of Infrastructure Operations (30% reduction).   In addition, the Debtor has increased the salaries of two Key Employees, also as of November 10, 2014.   The salary of Ramon A. Rivera, its Secretary, Treasurer, and Chief Financial Officer, was increased by $50,000 to $200,000 per year.   The salary of Daniel Brown, Deputy General Counsel, was increased by $20,000 to $185,000 per year.   These increases were made to reflect the increased burdens that will be imposed on Mr. Rivera and Mr. Brown in the months ahead and to bring their salaries more in line with the market compensation for those positions.   The net effect of all seven salary adjustments is an annualized aggregate savings of $299,800.

Mr. Kanojia was and is concerned that these salary reductions could harm the Debtor's efforts to effectuate its sale or reorganization in this case, as each of the employees who have had material salary reductions are important to the successful sale of the Debtor's assets and also likely to have many other opportunities for gainful employment and, if they take other employment, the Debtor would likely lose the ability to access the knowledge and experience of such persons to maximize the Debtor's value in the context of a Qualified Transaction.   Mr. Kanojia, accordingly, has made available to those Debtor's employees who have agreed to take material salary reductions the opportunity to potentially earn consulting fees or other income for work that is altogether unrelated to the Debtor at a think tank / incubator he formed earlier this year, with the hope that the incubator is able to offset some of the salary

Directors (the "Board"), with input from the Debtor's advisors, believe that it is essential – and in the best interests of the estates and all creditors and shareholders – to motivate and incentivize the Key Employees to set forth an effort that will achieve the best and highest price for the Debtor's assets.

18.    A successful Qualified Transaction will require an intensity of effort and performance from the Key Employees that goes well above the ordinary responsibilities of their positions.  Indeed, it will require the coordinated efforts of the remaining employee teams – which include management; finance and administration; information technology and infrastructure; and legal, government and public relations – to engage in a concerted effort to identify, target and solicit interest in the Debtor's assets from potential purchasers in various industries that may assign varying value to some or all of the Debtor's assets, depending on the use going forward.  This will in turn require, *inter alia*, intimate knowledge of the current and potential uses of the Debtor's technology as set against the complex legal and regulatory framework as it current exists and may exist in the future.  It will also require facilitating and conducting an expeditious diligence, auction (if required) and sale process, while also winding down operations and limiting the Debtor's obligations to preserve cash on hand.

---

previously paid by the Debtor to such persons and some of them may delay finding other permanent positions.  To ensure complete transparency, Mr. Kanojia has confirmed to the undersigned that: (i) the incubator has no business operations at this time of any type; (ii) the incubator is completely unrelated to the Debtor's business in all respects; (iii) the Debtor has no ownership interest in that incubator, and the incubator has no ownership interest in the Debtor or any of its assets or affairs; (iv) the incubator and the Debtor have no claims of any type against the other; (v) there have been and will be no transactions of any type between the incubator and the Debtor; (vi) no intellectual property or other assets of the Debtor will be used in any business that may be conducted by the incubator; and (vii) each of the Debtor's employees who may provide services to the incubator has agreed or will agree that no such services would interfere with such employee's primary loyalty to and availability to the Debtor, as needed to conduct the Debtor's business and, especially, effectuate the Qualified Transaction that is in the best interests of the Debtor and its creditors and shareholders.

19.     The Key Employees are certain irreplaceable employees at the Debtor that have deep institutional knowledge and experience necessary to achieve a successful Qualified Transaction.  Moreover, the Key Employees' understanding of the Debtor's business process, complex technology, operations, industry contacts and relationships with the Debtor's vendors are necessary to minimize the costs of administration and promote a robust marketing and sales process.  Further, the Key Employees have a deep understanding of the current legal and regulatory landscape in which the Debtor operates, as well as impending developments and efforts to resolve issues relating to the viability of the Debtor's technology.  The Debtor believes the Key Employees have developed relationships and/or possess knowledge that will be invaluable to marketing the Debtor's assets and evaluating and negotiating a successful Qualified Transaction.

20.     The KEIP is narrow in scope and covers only the eleven Key Employees who are critical to successful sale efforts.  Furthermore, the KEIP is designed to maximize value for all stakeholders by incentivizing those employees who are in the best position to impact the sale of the Debtor's assets.  The Debtor and the Board, in their sound business judgment, have developed the KEIP, and believe that it is important and necessary to quickly implement this incentive plan that would motivate and reward the continued dedication and efforts of the Key Employees.

## THE PROPOSED KEIP

**A.**     **Key Employee Participant Groups**

21.     The KEIP provides incentive-based cash awards to the Key Employees who were retained in connection with this Chapter 11 Case to provide efforts in maximizing the value received for the Debtor's assets.  Such employees can be categorized into five respective teams

(the "<u>Employee Teams</u>"), each of which is critical to achieve the KEIP target of successful bidding and sale process. The Employee Teams, and the eleven individual Key Employees and their respective job titles, are as follows:

➢ **Management**:

- o <u>Chaitanya (Chet) Kanojia, Chief Executive Officer</u>

- o ***Responsibilities/Functions in Connection with Sale***: In addition to his responsibilities to oversee and lead the Debtor, Mr. Kanojia is responsible for developing and implementing the Debtor's micro-antenna technology (which is its primary asset), and as such is intimately familiar with the technical specifications and potential uses of the Debtor's technology. Mr. Kanojia is critical for a successful Qualified Transaction because of his technical knowledge and network of contacts in the tech and on-line and television broadcast industries. Mr. Kanojia will be working with the Debtor's CRO and legal counsel to identify potential acquirers of its assets, advise and/or participate in potential acquisition transactions, and will be an important contact for potential bidders in connection with due diligence efforts.

➢ **Legal, Government and Public Relations**:

- o ***Employees***: (i) Brenda Cotter, General Counsel; (ii) Daniel Brown, Deputy General Counsel; and (iii) Virginia Thuy Lam Abrams, Senior <u>Vice President, Communications and Government Relations</u>

- o ***Responsibilities/Functions in Connection with Sale***: The Legal, Government and Public Relations team (the "<u>LGP Team</u>") is responsible for advising the Debtor in connection with this Chapter 11 Case, as well as advising the Debtor in connection with all legal and regulatory matters impacting the Debtor's business and interfacing with governmental and regulatory authorities, including the FCC and U.S. Copyright Office. The LGP Team is also responsible for continuing to manage the copyright litigations that the Debtor is subject to, including advising as to appropriate steps the Debtor is required to take in connection therewith. The LGP Team (which includes two insiders who overlap with the Management Team) will support and participate in the Management Team's efforts to market the Debtor's assets to the highest bidder, including by advising Management as to potential impacts of legal and regulatory developments on the Debtor's technology; managing relationships with the Debtor's vendors and contract counterparties; and providing advice in connection with a proposed Qualified Transaction. The LGP Team will also continue to interface with the FCC and other

regulatory or governmental agencies in connection with the Debtor's ongoing business efforts.

➤ **Sales and Customer Strategies**

- o *Employee*: <u>Alex Moulle-Berteaux, Chief Commercial Officer</u>

- o *Responsibilities/Functions in Connection with Sale*: Mr. Moulle-Berteaux is primarily responsible for investigating and analyzing the current and future commercial activities of the Debtor, including development and implementation of business models and commercial strategies for delivering the Debtor's services to consumers. Mr. Moulle-Berteaux has extensive knowledge of the markets and business plans that were targeted by the Debtor in implementing its business and expanding its operations. He will be important to a sale, recapitalization or similar transactions, as he will be able to advise Management as to the Debtor's business operations and targeted markets, including implementation strategies and customer programs.

➤ **Finance and Administration**

- o *Employees*: (i) Ramon A. Rivera, Secretary, Treasurer, and Chief Financial Officer; and (ii) <u>Matthew Calabro, Director of FP&A and Revenue</u>

- o *Responsibilities/Functions in Connection with Sale*: The Finance Team is responsible for providing the Debtor with financial analysis and projections, including preparation of budget reports, in connection with its business operations, as well as providing human resources administrative functions, coordinating payment of benefits to terminated and retained employees. The Finance Team is critical to sale efforts as they will provide Management with necessary financial analyses of proposed transactions, and oversee a number of wind down efforts, including payment of severance and benefits to terminated employees, administering and closing the Debtor's 401(k) plan, and overseeing the Debtor's expenditures in the course of bankruptcy proceedings to ensure compliance with projected budgets.

➤ **Information Technology and Infrastructure**:

- o *Employees*: (i) Joseph Lipowski, Chief Technology Officer; (ii) Johnathan Greenleaf, Director of Information Systems; (iii) Brian Loveland, Director of Infrastructure Operations; and (iv) Michael Helgeson, Director of User <u>Experience Development</u>

- o The Information Technology and Infrastructure Team is critical to ensure proper performance of the Debtor's online technology-based business, as

well as its internal network and Information Technology. The team is also responsible for maintaining the Debtor's facilities, including the location of its micro-antenna technology and equipment. The IT and Infrastructure Team has extensive knowledge of the Debtor's technology and will provide necessary support in connection with the proposed Qualified Transaction by, among other things, advising Management in connection with performance, capabilities and value of the Debtor's online network, including its user interface. It will also provide value in connection with providing assessments of the Debtor's physical assets and equipment, providing information as to the Debtor's physical assets in connection with due diligence efforts, and collecting and consolidating the Debtor's remaining assets in a manner that will preserve value and reduce the expenses that the Debtor currently incurs for storage.

22.      Each of the functions performed by these teams is critical to ensuring a successful Qualified Transaction at the best and highest price available.

**B.      Overview of the KEIP**

23.      Under the KEIP, each Key Employee can earn an incentive-based bonus designed to achieve a successful Qualified Transaction of the Debtor's business or assets for the best and highest price. Specifically, under the KEIP, Key Employees may earn a bonus (the "Transaction Bonus") in the lesser amount of: (a) a Key Employee's respective share of 3% of gross Qualified Transaction proceeds (calculated as the percentage of a Key Employee's annual base salary as compared to total aggregate amount of all Key Employees' annual base salaries),[5] or (b) 50% of a Key Employees Annual Base Salary (the "Maximum Transaction Bonus"), to be paid within 21 days following closing of a Qualified Transaction to Key Employees who either (x) remain employed by the Debtor on the date of the closing of the Qualified Transaction, or (y) are involuntarily terminated without cause prior to the closing of such Qualified Transaction.

---

[5]  The calculation of bonus payments under the KEIP program does not reflect the recent reduction to the annual base salaries of five Key Employees described at footnote 4 above, as the Debtor believes that it is most fair and conducive to the achievement of a successful Qualified Transaction that the bonuses thereunder should be based on the annual base salary amounts before such reductions.

24.     As part of its efforts to limit the scope of the KEIP, the Debtor has set the incentive payment pool to a maximum of $940,500 (*i.e.*, the Maximum Transaction Bonus), which, if earned, would mean that the Debtor would be receiving *at least* $31.35 million in exchange for its assets.  On the other hand, in the event no Qualified Transaction occurs, no payouts will be made under the KEIP.  As such, the bonus payment under the KEIP is specifically designed to incentivize the Key Employees to go beyond their ordinary job functions and take all necessary steps to ensure that the Debtor's assets will be sold to a purchaser at the best and highest price, which is for the ultimate benefit of the Debtor's creditors and shareholders.

25.     In analyzing various proposals to formulate the KEIP, the Board focused on two overarching principles: the incentive plan must be (1) market-based and (2) performance-linked. The KEIP was ultimately designed to keep the Debtor's Key Employees' total compensation at a market rate, in accordance with the standards implemented in previous chapter 11 cases.  The KEIP was also designed to enhance value in the Debtor's estate and meet the requirements of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 331, 119 Stat. 23, 102-03 (April 20, 2005) ("BAPCPA").  Accordingly, the Key Employees are only eligible to earn incentive payments, as a percentage of their base salaries, if the Debtor consummates a successful sale of its business or assets.

26.     Furthermore, the amount of the incentive payments is based upon a percentage of each Key Employee's annual base salary (determined and approved by the Board prior to the voluntary reductions to base salary by certain Key Employees, as discussed in fn. 4, supra) and, thus, is tied to the Key Employee's job level and duties.  Exhibit B hereto reflects the maximum

amount that each Key Employee could receive in connection with the Maximum Transactional Bonus, which in no event will exceed 3% of the total Qualified Transaction value.

27.     Key Employees who are involuntarily terminated without cause prior to the Sale Order Date <u>do not</u> forfeit their unpaid benefits under the KEIP.  Key Employees who voluntarily terminate their employment or who are terminated for cause prior to the Sale Order Date will forfeit any bonus payments under the KEIP.

<b><u>RELIEF REQUESTED</u></b>

28.     By this Motion, the Debtor seeks entry of an order, pursuant to sections 105(a), 363(b) and 503(c)(3) of the Bankruptcy Code, authorizing the Debtor to implement the KEIP, and thereby motivate the Key Employees instrumental to the success of a Qualified Transaction.

<b><u>BASIS FOR RELIEF REQUESTED</u></b>

**A.      <u>Implementing the KEIP is a Sound Exercise of the Debtor's Business Judgment</u>**

29.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  To approve the use of estate property outside the ordinary course of business under Section 363(b)(1), the Second Circuit requires a debtor to show that the decision to use the property was based on the debtor's business judgment.  <u>See</u> <u>In re Chateaugay Corp.</u>, 973 F.2d 141, 143 (2d Cir. 1992) (citing <u>In re Lionel Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (finding that "a judge determining a 363(b) application [must] expressly find from the evidence presented . . . at the hearing a good business reason to grant such application")).

30.     A debtor's showing of a sound business justification need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound

15

business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

Whether or not there are sufficient business reasons to justify a transaction depends upon the

facts and circumstances of each case.  See Lionel Corp., 722 F.2d at 1071; see also Dai-Ichi

Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding

Corp.), 242 B.R. 147, 155 (Bankr. D. Del. 1999) (finding that an employee incentive and

severance program satisfied the business judgment standard because stabilizing attrition and

increasing morale were necessary to a successful restructuring).

31.    Once the debtor has articulated a valid business purpose, a presumption arises that

the debtor's decision was made on an informed basis, in good faith and in the honest belief that

the action was in the best interest of the company.  Official Comm. of Subordinated Bondholders

v. Integrated Res., Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).  To that

end, courts are cautious not to substitute their own business judgment for the debtor's judgment.

See, e.g., Chaney v. Official Comm. of Unsecured Creditors (In re Crystal Apparel, Inc.), 207

B.R. 406, 410-11 (S.D.N.Y. 1997).

32.    In the context of applying the business judgment standard to the approval of a

debtor's key employee incentive plan, bankruptcy courts have considered the following non-

exhaustive factors:

- Is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets and liabilities?

- Is the scope of the plan fair and reasonable, i.e., does it apply to all employees or discriminate unfairly?

- Is the plan consistent with industry standards?

- What process did the debtor use to investigate the need for a plan and determine which employees need to be motivated?

16

- Did the debtor receive independent counsel in performing due diligence and creating and authorizing the incentive compensation?

See In re Dana Corp., 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006) ("Dana II"); see also In re Global Homes Prods., LLC, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (listing factors).  In this case, the Debtor and its Board believe that the proposed KEIP satisfies the requirements of the business judgment standard and conforms to the prevailing practices in this district and others.

(i)   *The KEIP Is Calculated to Achieve a Desired Performance*

33.   The KEIP is designed to incentivize the Key Employees to create a robust and value-producing bidding and sale process.  Key Employees will only receive the Transaction Bonus if a successful Qualified Transaction is consummated, and will only receive the Maximum Transaction Bonus if the value received pursuant to that transaction is in excess of $31.35 million.  Thus, the Key Employees will be incentivized to perform at their maximum capacity to consummate a Qualified Transaction that will be in the best interests of the Debtor's stakeholders.

34.   The Debtor's success in in these cases hinges on the continued performance and leadership of the Key Employees.  To that end, this case is different from those cases in which the court denied an incentive plan tied to sale milestones, where most of the activities required in connection with the sale had already been met.  See In re Hawker Beechcraft, Inc., 479 B.R. 308, 313-14 (Bankr. S.D.N.Y. 2012) (denying employee incentive plan tied to the consummation of a sale transaction with a third-party, where the debtors had already received a substantial offer from an interested party); In re Residential Capital, LLC, 478 B.R. 154, 172 (Bankr. S.D.N.Y. 2012) ("Under the [incentive plan] as proposed, the only thing that KEIP Participants have to do

for their Awards to vest is remain with the Debtors' businesses until the Closing of two Asset Sales that were substantially negotiated pre-petition.").

35.    Here, the proposed KEIP provides necessary incentives to motivate the Key Employees to undertake every possible effort to ensure a Qualified Transaction is consummated that achieves the highest and best price for the Debtor's assets.  Given the complex nature of the Debtor's technological assets, the current legal and regulatory framework in which the assets might be used, and the range of value that the Debtor might receive from potential purchases in a variety of commercial settings, a successful Qualified Transaction will require substantial effort, time and energy from the Key Employees – going well above their normal job functions.  Moreover, these efforts are particularly critical here, where the Debtor has not begun the process of achieving a Qualified Transaction by actively and aggressively marketing its assets to potential interested parties in the Chapter 11 context, and the Debtor does not have any confirmed bids or negotiated transactions as it enters bankruptcy.

36.    The Debtor believes that the KEIP is a targeted incentive program designed to provide the appropriate incentives for the Key Employees to perform at their highest levels in light of the tasks ahead of them.  The activities and efforts required of the Key Employees will most certainly require them "to do more" and "work expeditiously to meet targets outlined in the KEIP" by, among other things, negotiating with customers and creditors, identifying potential purchasers and negotiating a successful Qualified Transaction.  See In re Borders Group, Inc., 453 B.R. 459, 472 (Bankr. S.D.N.Y. 2011).  Moreover, the KEIP target – consummating a Qualified Transaction – will be difficult, and a "reach" for the Key Employees given the legal and regulatory landscape in which the Debtor operates.  See In re Dana Corp., 358 B.R. at 583 (KEIP targets should be a "reach").

(ii)    ***The Cost of the KEIP is Reasonable***

37.     The KEIP provides these incentives at a cost that is reasonable in the context of the Debtor's total assets and liabilities.  Indeed, the KEIP has been carefully tailored to avoid unnecessary or excessive incentive payments.  The maximum payouts that can be earned under the KEIP will at most be 3% of the total value received through a Qualified Transaction, capped at a maximum amount of $940,500.  After payout of the KEIP, that leaves significant value for the benefit of the Debtor's creditors and shareholders.  Indeed, if the maximum amount under the KEIP is earned, the Debtor will have received in excess of $31.35 million in exchange for its assets.

38.     In addition, the incentive amounts provided by the KEIP are, on average, at or below market levels and reasonable in the context of the Debtor's financial position.  See Bloom Dec.¶ 7.  Specifically, the KEIP payments to be made by the Debtor during these Chapter 11 Cases will most likely be between zero (if no sale occurs) and approximately $940,500  if the Debtor closes a Qualified Transaction that produces $31.35 million for creditors and shareholders.

(iii)    ***The KEIP is Fair and Reasonable in Scope, Consistent with Industry Standards, and was Properly Investigated by the Debtor and the Board***

39.     The KEIP is also fair and reasonable in scope.  The KEIP is conservative in nature, focusing only on the remaining Key Employees, whose knowledge, leadership and active participation is indispensable to achieving a successful Qualified Transaction.  Indeed, courts have consistently recognized the need for debtors to implement incentive plans similar to the one proposed herein.  See, e.g., In re Velo Holdings, Inc., 472 B.R. 201 (Bankr. S.D.N.Y. 2012) (approving key employee incentive plan tied to performance goals); In re Calpine Corp., No. 05-60200 (BRL) (Bankr. S.D.N.Y. May 15, 2006) (approving management incentive plan with

amounts of payments tied to performance objectives); see also In re Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. Feb. 21, 2007; May 8, 2007; June 1, 2007; Feb. 26, 2008) (approving incentive plan with payments tied to performance and restructuring objectives); In re New Century TRS Holdings, Inc., Case No. 07-10416 (Bankr. D. Del. May 29, 2007) (order authorizing sale-related incentive pay to senior management); In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (approving the award of "success bonuses" to certain officers and employees as within a debtor's sound business judgment).

40.     The KEIP is also consistent with market practice, in that the compensation structure is consistent with other incentive plans implemented by other corporate chapter 11 debtors.  See Bloom Dec. ¶ 7.  The Debtor further engaged in appropriate efforts in connection with considering the need for a KEIP and the potential structures of a KEIP. The Debtor specifically focused on incentivizing a limited number of Key Employees absolutely necessary to the success of the business and the restructuring.  Moreover, the Debtor's professionals, including its legal and restructuring professionals, advised and assisted the Debtor in designing the KEIP based on market standards.  See Bloom Dec. ¶ 6.  Accordingly, in the exercise of its business judgment, the Debtor properly investigated the need for, and the proper scope of, a KEIP in accordance with advice and counsel from qualified independent advisors.

41.     In light of the foregoing, the Debtor believes that the incentives created by the KEIP are reasonable and appropriate, and approval of the KEIP will motivate the Key Employees, thereby ensuring that value for all parties in interest is maximized.  Accordingly, the approval of the KEIP is in the best interest of the Debtor and its stakeholders.  Therefore, the Debtor respectfully submits that the decision to adopt the KEIP is a sound exercise of its business judgment and a proper use of its resources under Section 363 of the Bankruptcy Code.

**B.     Section 503(c) is Satisfied Because the KEIP is not a Retention or Severance Plan, Meets the "Business Judgment" Standard and is Justified by the Facts and Circumstances of These Cases**

42.     Section 503(c) of the Bankruptcy Code, as amended, provides criteria for courts to use in approving certain types of payments to insiders and "other transfers or obligations that are outside the ordinary course of business."  Section 503(c) is comprised of three elements: (i) a general prohibition of retention plans; (ii) limitations on severance payments; and (iii) standards governing other transfers to managers.  For reasons set forth herein, the KEIP does not implicate any of the limitations set forth in section 503(c) of the Bankruptcy Code. 11 U.S.C. § 503(c).

43.     It is important to note that the amendments to section 503(c) reflect congressional concern over excessive payments to insiders under key employee retention plans.  See In re U.S. Airways, Inc., 329 B.R. 793, 797 (Bankr. E. D. Va. 2005). Senator Ted Kennedy, who proposed section 503(c), stated that his concern was the "glaring abuses of the bankruptcy system by the executives of giant companies like Enron Corp. and WorldCom Inc. and Polaroid Corporation, who lined their pockets, but left thousands of employees and retirees out in the cold."  Dana II, 358 B.R. at 575 (internal citation omitted).  Other members of Congress were concerned that Senator Kennedy's amendment would "prevent responsible companies that needed to retain key employees from reorganizing successfully and suggested that section 503(c) should prevent payments to insiders only in the event of fraud, mismanagement, and conduct contributing to the debtor's insolvency." Id.

(i).     ***Sections 503(c)(1) and 503 (c)(2) Do not Bar the KEIP***

44.     By its plain language, section 503(c)(1) pertains solely to retention plans and section 503(c)(2) addresses only the requirements for severance plans.  Neither provision applies to performance or incentive-based plans.  See Nellson Nutraceutical, Inc., 369 B.R. 787, 804

(Bankr. D. Del. 2007) (finding plan was not retention-based because primary purpose was motivation and section 503(e) was not applicable); Global Homes, 369 B.R. at 787 ("The Court is fully satisfied . . . that Debtors are asking it to approve incentive, not retention plans and, therefore, § 503(c) does not come into play.").  Indeed, this Court has previously held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider whether the payments are permissible under section 503(c)(3), which limits payments made to management and employees, among others, outside the ordinary course, unless such payments are shown to be justified under the facts and circumstances of the chapter 11 case. As one treatise points out, the test in section 503(c)(1) appears to be no more stringent a test than the one courts must apply in approving any administrative expense under 503(b)(1)(A).

Dana II, 358 B.R. at 576.

45.     While sections 503(c)(1) and 503(c)(2) may prohibit, for insiders, "retention" plans and "severance" payments, respectively, nothing in section 503(c) precludes a chapter 11 debtor from offering reasonable compensation or incentives to key employees, including insiders, for their contributions to a debtor's organization.  Id. at 575 (citing In re Werner Holding Co. (DE), Inc., No. 06-10578(KJC) (Bankr. D. Del. Dec. 20, 2006)); see also Nellson Nutraceutical, Inc., 369 B.R. at 804 (holding that the incentive plan on the basis of the facts presented was not retention-based because the primary purpose was to motivate employees and, thus, section 503(c) was not applicable); Global Homes, 369 B.R. at 787 ("The Court is fully satisfied . . . that Debtors are asking it to approve incentive, not retention plans and, therefore, § 503(c) does not come into play.").  The KEIP accomplishes this very result, in that its purpose is to incentivize employees to achieve certain goals on behalf of the Debtor.

46.     Indeed, the KEIP was designed to avoid the limitations expressed in section 503(c)(1)-(2).  That is, the KEIP does not run afoul of section 503(c)(1) because it does not

provide payments to insiders for the purpose of *retention*. As noted, the KEIP only affords payments based on the achievement of a real performance target: consummation of a Qualified Transaction. While it is true that the KEIP may encourage certain employees to remain with the company, that, in and of itself, does not convert the KEIP into a "retention" plan. See Global Homes, 369 B.R. at 786 ("[s]ection 503(e) was not intended to foreclose a chapter 11 debtor from reasonably compensating employees, including 'insiders,' for their contribution to the debtors' reorganization.") (citation omitted). In fact, all successful incentive plans have the indirect benefit of incentivizing an employee to remain with the company. See Global Homes, 369 B.R. at 786 (finding that the proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting, "The fact . . . that all compensation has a retention element" [did] "not reduce the Court's conviction" that the Debtors' primary goal in approving the incentive plans was "to create value by motivating performance"). This benefit, however, does not detract from the primary purpose of the KEIP, which is to provide motivation to the Key Employees to maximize business performance and motivate the workforce to consummate a Qualified Transaction that, ultimately, maximizes recoveries for the Debtor's creditors and shareholders. Id. at 786-87.

47.     Likewise, the KEIP does not violate section 502(c)(2) of the Bankruptcy Code because any severance payments made to the Debtor's remaining insiders are part of a program generally applicable to all full-time employees, and do not exceed 10 times the amount of the mean severance pay given to non-management employees in the preceding calendar year. See 11 U.S.C. § 503(c)(2). The KEIP payments discussed herein, however, are tied to the value achieved through a Qualified Transaction, and are not severance payments to which employees may be entitled simply by leaving the company voluntarily or being terminated during the

timeframe contemplated.  Thus, because it is incentive-based, sections 503(c)(1) and (c)(2) of the

Bankruptcy Code do not apply to the Debtor's KEIP.

> (ii)  ***The Requirements of 503(0(3) Are Satisfied, as Approval of The KEIP
> Within the Sound Business Judgment of the Debtor and Justified Under
> the Facts and Circumstances of This Case***

48.    Section 503(c)(3) precludes payment as an administrative expense of "other

transfers or obligations that are outside the ordinary course of business and not justified by the

facts and circumstances of the case." 11 U.S.C. § 503(c)(3).  This section poses no impediment

to the KEIP.  The standard for approval under that section — the "business judgment" standard

— is essentially the same as the standard for similar transactions under section 363(b)(1) of the

Bankruptcy Code.  See, e.g., Nellson Nutraceutical, Inc., 269 B.R. at 804 (holding that because

section 503(c)(2) did not apply, bonus plans were reviewed under business judgment standard);

Global Homes, 369 B.R. at 787 (same); In re Nobex Corp., No. 05-20050 (MFW) 01/12/06

Hearing Tr, at p. 86-87 (Bankr. D. Del. 2006); In re Riverstone Networks, Inc., No. 06¬10110

(CSS) 03/31/06 Hearing Tr. at p. 32-35 (Bankr. D. Del. 2006).  As discussed above, because the

Debtor has employed proper business judgment in seeking authorization for the KEIP, which is

fair and reasonable, payments under both should be permitted under Section 503(c)(3) of the

Bankruptcy Code.

49.    Thus, as discussed above, the Debtor believes the KEIP satisfies the requirements

under Section 363(b)(1) and, as such, respectfully submits that the KEIP meets the business

judgment standard, is fair and reasonable under the circumstances of these cases and does not run

afoul of section 503(c)(3).

## CONCLUSION

50.     The Debtor respectfully submits that it has satisfied the requirements of Sections 363(b) and 503(c)(3) of the Bankruptcy Code and has established that there is a "good business purpose" for the KEIP.  In developing the KEIP, the Debtor sought outside expertise, considered business performance impact and received approval from the Board. The KEIP is conservative in nature and similar to other plans successfully instituted in other chapter 11 cases.  The KEIP is purely incentive- and performance-based and meets the standard this Court has established in other chapter 11 cases.  In sum, the Debtor believes that because there must be demonstrable increases in the value the Debtor will receive for its assets before any incentive payments are earned under the KEIP, the program will incentivize the Key Employees in a manner that benefits all of the parties in interest.

## MOTION PRACTICE

51.     This Motion includes citations to applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion.  Accordingly, the Debtor submits that this Motion satisfies Rule 9013-1(a) of the Local Rules for the Bankruptcy Court for the Southern District of New York.

## NOTICE

52.     Notice of this Motion has been given to: (i) the Office of the United States Trustee; (ii) those creditors listed on the Debtor's List of Creditors Holding the 40 Largest Unsecured Claims; and (iii) those additional persons that have requested notice pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

53.     No previous motion for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit A, (a) authorizing the implementation of the KEIP as proposed herein, and (b) granting such other further relief as deemed just and proper.

Dated:  November 20, 2014

BROWN RUDNICK LLP

/s/ William R. Baldiga
William R. Baldiga, Esq.
R. Benjamin Chapman, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800

# **EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| Aereo, Inc. | ) Case No. 14-____ ( ___ ) |
| | ) |
| Debtor. | ) |
| | ) |

**ORDER APPROVING DEBTOR'S**
**KEY EMPLOYEE INCENTIVE PLAN**

Upon the motion (the "Motion") of the above-captioned debtor and debtor-in-possession

(the "Debtor") seeking entry of an order, pursuant to 11 U.S.C. §§ 105(a), 363(b) and 503(c),

approving the Debtor's to make certain incentive payments pursuant to the Key Employees

Incentive Plan (the "KEIP," a copy of which is annexed hereto as Exhibit A); and upon the

Rivera Declaration and Bloom Declaration;[1] and it appearing that the relief requested in the

Motion is in the best interests of the Debtor's estate, its creditors and all other parties in interest;

and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant

to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein

being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper in this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and the Debtor having provided appropriate notice of

the Motion and the opportunity for a hearing on the Motion under the circumstances and no other

or further notice need be provided; and the Court having reviewed the Motion and having heard

the statements in support of the relief requested therein at a hearing before the Court (the

"Hearing"); and the Court having determined that the legal and factual bases set forth in the

---

[1]  All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted.

2.      The KEIP, in the form annexed hereto as Exhibit A, is approved in all respects.

3.      The Debtor is authorized, but not obligated, to pay the Key Employees incentive payments earned under the KEIP in accordance with the terms and conditions of the KEIP.

4.      All payments made pursuant to this Order constitute transfers and obligations permitted by 11 U.S.C. § 503(c)(3).

5.      Nothing contained herein is intended or should be construed to create an administrative priority claim on account of obligations owing to the Key Employees.

6.      Nothing in the Motion or this Order, nor as a result of the Debtor's payment of any obligation pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtor or an approval or assumption of any employment or insurance agreement pursuant to 11 U.S.C. § 365.

7.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements the Bankruptcy Rules and Local Bankruptcy Rules are satisfied by such notice.

8.      Notwithstanding Bankruptcy Rules 6004(h), 7062 and 9014 the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

9.      The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

10.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  November __, 2014
          New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**KEIP and Key Employees**

**Exhibit B**
**Aereo, Inc. KEIP**

Maximum Transactional Bonus = lesser of: (a) 50% of annual base salary (Maximum Transaction Bonus); or (b) an employee's respective share of 3% of gross transaction proceeds (calculated as the percentage of an employee's annual base salary as compared to total annual base salaries); to be paid to Key Employees who either (i) remain employed by the Debtor on the date of the closing of the Qualified Transaction, or (ii) are involuntarily terminated without  cause prior to the closing of such Qualified Transaction.

| Name | Title | Annual Base Salary (1) | Roles and Responsibilities | Maximum Transactional Bonus |
|---|---|---|---|---|
| **KEY EMPLOYEES** | | | | |
| **Management** | | | | |
| Kanojia, Chaitanya (Chet) | President and Chief Executive Officer | 200,000 | >> Work with CRO to identify potential acquirers of the company's assets/business in various industries and assist with marketing efforts and soliciting interest<br>>> Advise and/or participate in negotiating terms of potential acquisition of company and/or company's assets<br>>> Facilitate due diligence process and assist potential purchases with same | 100,000 |
| **Business Development and Customer Strategies** | | | | |
| Moulle-Berteaux, Alex | Chief Commercial Officer | 200,000 | >> Advise and support management and CRO in connection with restructuring transaction efforts by providing analysis of product performance/market potential in various applications or settings | 100,000 |
| **Information Technology and Infrastructure** | | | | |
| Lipowski, Joseph | Chief Technology Officer | 160,000 | >> Continue management/maintenance of all information technology, network administration, information and data retention on equipment and networks/databases, and security functions at various facilities as appropriate | 80,000 |
| Helgeson, Michael | Director of User Experience Development | 135,000 | >> Maintain physical equipment and technology to ensure no degradation in performance or functionality | 67,500 |
| Greenleaf, Jonathan | Director of Information Systems | 140,000 | >> Design and implement strategy to consolidate all physical assets into central storage location and return vacated premises to appropriate conditions | 70,000 |
| Loveland, Brian | Director of Infrastructure Operations | 131,000 | >> Work with CRO to inventory and account for all of the Company's physical assets and advise as to potential resale values and strategies, and actively market to potential purchasers on<br>>> Advise as to technology built by Company in connection with due diligence and possible integration support for potential purchaser<br>>> Continue to implement strategy for technical aspects of document and equipment preservation | 65,500 |
| **Finance and Administration** | | | | |
| Rivera, Ramon | Secretary, Treasurer and Chief Financial Officer | 200,000 | >> Continue providing services as CFO<br>>> Provide operational and strategic financial analysis and projections to CRO regarding company's financial positions<br>>> Continue providing accounting oversight and maintenance, preservation and reconciliation of books and records in anticipation of sale of company/company's assets<br><br>>> Assist in handling negotiations and claims issues with vendors/suppliers/utilities | 100,000 |

| Name | Title | Salary | Responsibilities | Amount |
|---|---|---|---|---|
| | | | >> Continue providing maintenance and wind down support of payroll and benefits administration, including ongoing COBRA obligations and administering/winding down 401(k) <br><br>>> Facilitate efforts to consummate sale of company/company's assets | |
| Calabro, Matthew | Director of FP&A and Revenue | 115,000 | >> Continue as acting Assistant Controller and provide support and management functions for VP of Finance and Administration <br><br>>> Facilitate all due diligence requests from potential purchasers <br><br>>> Advise as to tax issues relating to Company | 57,500 |
| **Legal, Government and Public Relations Team** | | | | |
| Cotter, Brenda | General Counsel | 250,000 | >> Continue management of internal legal functions of operating business, including contracting and other issues <br>>> Provide support and advice to Company's restructuring professionals in connection with bankruptcy process, litigation efforts and  proper preservation of assets including equipment; oversee litigation counsel in their continuing role to advise about, supervise and manage document preservation and collection <br>>> Continue to act as legal advisor and internal counsel in connection with outstanding copyright litigation and any related contingent liability <br>>> Continue to provide advice in connection with regulatory matters and interface with governmental agencies in connection with sale efforts <br>>> Oversee with outside counsel legal aspects of patent portfolio and/or document retention | 125,000 |
| Brown, Daniel | Deputy General Counsel | 185,000 | >> Continue management of internal legal functions of operating business, including human resources, vendor agreement and other issues <br>>> Provide support and advice to Company's restructuring professionals in connection with bankruptcy process, litigation efforts and  proper preservation of assets including equipment <br><br>>> Continue to manage outstanding copyright litigation and  any related contingent liability <br><br>>> Continue to provide advice in connection with regulatory matters and interface with governmental agencies in connection with sale efforts | 92,500 |
| Abrams, Virginia Thuy Lam | SVP of Communications and Government Relations | 165,000 | >> Provide public relations support and services for the company in immediate wake of bankruptcy filing and throughout bankruptcy process as needed <br>>> Provide government relations/lobbying support, including by interfacing with FCC as necessary | 82,500 |
| Total | | 1,881,000 | | 940,500 |

(1) Does not reflect the reductions to annual base salaries taken by 5 Key Employees as of November 10, 2014: Chaitanya Kanojia; Alex Moulle-Berteaux; Virginia Thuy Lam Abrams; Joseph Lipowski; and Brian Loveland.

## EXHIBIT C

**Declaration of Lawton W. Bloom**

William R. Baldiga, Esquire
R. Benjamin Chapman, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Proposed Counsel for the*
*Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-_____(___) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

**DECLARATION OF LAWTON W. BLOOM**
**IN SUPPORT OF DEBTOR'S MOTION FOR THE ENTRY OF AN**
**ORDER AUTHORIZING THE KEY EMPLOYEE RETENTION PLAN**

    I, Lawton W. Bloom, declare under penalty of perjury:

    1.    I am a Managing Director with Argus Management Corporation ("Argus"), a firm specializing in provision of turnaround, crisis management, performance improvement and restructuring and accounting services for public and private companies, general creditors, secured parties, acquirers of non-performing companies and judicial bodies. Aereo, Inc. (the "Debtor") has filed a motion requesting authority to retain Argus, with me as Chief Restructuring Officer and Peter Sullivan and Scott Dicus as Assistant Restructuring Officers, *nunc pro tunc* to the Petition Date, to provide the Chief Restructuring Officer and Assistant Restructuring Officer (together, the "CRO") services for the Debtor.

2.       I am familiar with the matters set forth herein and I am authorized to make this declaration on behalf of the Debtor.  I am over the age of 18 and competent to testify.

3.       Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by the Debtor and its counsel and discussions with the Debtor's management.  I submit this Declaration in support of the *Debtor's Motion For Entry Of An Order Approving Key Employee Incentive Plan* (the "Motion"), which has been filed contemporaneously with this Declaration.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## BACKGROUND AND QUALIFICATIONS

4.       I have over 12 years of experience in restructuring and crisis management. With Argus, I have advised over 75 clients across a wide range of industries in connection with transactions including refinancing, recapitalization, debt restructuring and asset divestiture.  I also frequently advise clients on liquidity management, creditor negotiations and balance sheet restructurings, and have served in numerous interim executive roles.

5.       I am acquainted with the Debtor's operations, assets, creditors and business, and have developed relevant understanding of the Debtor and its business, including the current restructuring.

## THE DEBTOR'S KEY EMPLOYEE INCENTIVE PLAN

6.       Prior to the bankruptcy filing, I worked with the Debtor and its counsel to prepare an incentive plan for 11 of the Debtor's remaining employees (the "Key Employees") who are critical to achieving a successful sale of all or substantially all of the Debtor's assets in one or

more transactions to a qualified purchaser(s), a recapitalization or similar restructuring transaction (the "Qualified Transaction") in the context of this Chapter 11 case.

7.    I have reviewed the terms of the KEIP and, based on my review and my professional experience, I have made the following conclusions:

A.    The KEIP is a targeted incentive program designed to provide the appropriate incentives for the Key Employees to perform at their highest levels in light of the tasks ahead of them in consummating a Qualified Transaction;

B.    By providing the Key Employees (as defined in the Motion) with rewards based upon the value received by the Debtor in connection with a Qualified Transaction, the KEIP properly aligns the Key Employees' incentives with the best interests of the Debtor's estate and those of the Debtor's creditors and stakeholders;

C.    The KEIP incentive structure, which is specifically tied to the amount of value received by the Debtor in connection with a Qualified Transaction, is consistent with market practice for similar businesses; and

D.    The incentive amounts provided by the KEIP are, on average, at or below market levels and reasonable in the context of the Debtor's financial position.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 19, 2014

Respectfully submitted,

Lawton W. Bloom

61807439 v9-WorkSiteUS-032209/0001

3