William R. Baldiga, Esquire
R. Benjamin Chapman, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Proposed Counsel for the*
*Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-_____(___) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

**APPLICATION OF THE DEBTOR PURSUANT TO 11 U.S.C. §§ 105(a)**
**AND 363(b) FOR AUTHORITY TO (1) DESIGNATE LAWTON W. BLOOM**
**OF ARGUS MANAGEMENT CORPORATION AS**
**CHIEF RESTRUCTURING OFFICER AND PETER SULLIVAN AND**
**SCOTT DICUS AS ASSISTANT RESTRUCTURING OFFICERS,**
***NUNC PRO TUNC* TO THE CHAPTER 11 PETITION DATE AND**
**(2) APPROVE APPOINTMENT OF SUCH OFFICERS**

The above-captioned debtor and debtor in possession (the "Debtor" or the "Company"),

by and through its undersigned counsel, hereby submits this motion (the "Motion"), pursuant to

sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), for (1)

authority to retain Lawton W. Bloom ("Mr. Bloom") of Argus Management Corporation

("Argus") as Chief Restructuring Officer, and Peter Sullivan as Assistant Restructuring Officer

("Mr. Sullivan"), and Scott Dicus ("Mr. Dicus"), each as an Assistant Restructuring Officer

(together, the "Assistant Restructuring Officers"), *nunc pro tunc* to the Petition Date (defined

below) to provide the Chief Restructuring Officer and Assistant Restructuring Officer (together,

1

the "CRO") for the Debtor; and (2) approve the appointment of such officers.  In support of this Motion, the Debtor relies on the affidavit of Lawton W. Bloom (the "Affidavit"), a copy of which is attached hereto as **Exhibit A**.  In further support of this Motion, the Debtor respectfully states as follows:

**Jurisdiction and Venue**

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363(b) of the Bankruptcy Code and, to the extent applicable, Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

**Background**

3.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

**A.      The Debtor's Business**

4.      As more particularly described in the *Declaration of Ramon A. Rivera,  Secretary, Treasurer, and Chief Financial Officer of Aereo, Inc., in Support of First-Day Motions* (the

"Rivera Declaration")[1] filed contemporaneously herewith, the Debtor is a privately-held New York corporation with headquarters in Boston, Massachusetts. The Debtor is a technology company founded in 2010 that provided subscribers with the ability to record and watch live or "time-shifted" local over-the-air broadcast television on internet-connected devices, such as personal computers, tablet devices, and "smartphones."

5.    The Debtor provided to each subscriber access via the internet to individual remote micro-antennas and a cloud-based digital video recorder ("DVR") that enabled a subscriber to receive and store local television programming broadcast over public airwaves. Subscribers could designate which television programs to record by logging into the Debtor's website and selecting the programming they wanted to record and watch live or later.

6.    In contrast to traditional cable antennas and DVR boxes, which are located in subscribers' homes, the Debtor's individual antennas and hard disks are located in the Debtor's facilities within the local market and were individually made available to subscribers, who could then, using an internet browser, access local broadcast programming with an individual antenna and record it to disk. The Debtor's subscribers could then watch their recordings live or save them for later viewing. Essentially, the Debtor's technology provided a modern, easy-to-use option for consumers to watch over-the-air television without having to install cumbersome home equipment or subscribe to cable packages and bundles. The Debtor's technology also includes a user interface, social networking features, and other features designed to create a compelling consumer experience.

---

[1]    All capitalized terms herein that are not otherwise defined shall have the meaning ascribed to them in the Rivera Declaration.

B.    **Events Leading to Chapter 11**

7.    Beginning in March 2012, various major television broadcasting networks,
including, among others, ABC, CBS, NBC (collectively, the "Broadcasters"),[2] commenced
actions in the United States District Court for the Southern District of New York (the "District
Court") seeking to enjoin the Debtor from allowing consumers to stream to themselves over-the-
air broadcast content while the show was still airing solely on the grounds that such
transmissions were public performances in violation of the Broadcasters' public-performance
rights under the Copyright Act.    After an evidentiary hearing, the District Court denied the
preliminary injunction.    See Am. Broad. Co., Inc. v. Aereo, Inc., 874 F. Supp. 2d 373 (S.D.N.Y.
2012).    The Second Circuit affirmed the District Court's holding.    WNET v. Aereo, Inc., 712
F.3d 676 (2d Cir. 2013), reh'g en banc denied, 722 F.3d 500 (2d Cir. 2013).[3]

---

[2]    The Broadcasters include: American Broadcasting Companies, Inc., Disney Enterprises, Inc., CBS
Broadcasting, Inc., CBS Studios, Inc., NBCUniversal Media, LLC, NBC Studios, LLC, Universal
Network Television, LLC, Telemundo Network Group, LLC, and WNJU-TV Broadcasting, LLC (the
"ABC Plaintiffs"), as well as WNET, Thirteen, Fox Television Stations, Inc., Twentieth Century Fox
Film Corporation, WPIX, Inc., Univision Television Group, Inc., the Univision Network Limited
Partnership and Public Broadcasting Service (the "Fox Plaintiffs").    On May 6, 2013.Aereo filed a
declaratory judgment action against CBS Studios Inc.; CBS Television Licenses, L.L.C. d/b/a
WSBK-TV, WBZ-TV, WJZ-TV; Atlanta Television Station WUPA, Inc. d/b/a WUPA-TV; CBS
Television Stations, Inc. d/b/a WFOR-TV, KCNC-TV; Miami Television Station WBFS, Inc. d/b/a
WBFS-TV; CBS Broadcasting Inc. d/b/a WBBM-TV, WWJ-TV, WCCO, KDKA-TV, KYW-TV;
CBS Stations Group of Texas, Inc. d/b/a KTVT-TV; Television Station KTXA, Inc. d/b/a KTXA-TV;
CBS Operations, Inc. d/b/a WTOG-TV; Detroit Television Station WKBD, Inc. d/b/a WKBD-TV;
Pittsburgh Television Station WPCW, Inc. d/b/a WPCW-TV; Philadelphia Television Station WPSG,
Inc. d/b/a WPSG-TV.

[3]    On July 9, 2013, Hearst Stations, Inc. d/b/a WCVB-TV filed an action against the Debtor in the
United States District Court for the District of Massachusetts (13-cv-11649-NMG), alleging copyright
infringement (including public performance, reproduction, distribution and derivative work claims)
and seeking a preliminary and permanent injunction, declaration of infringement, injunctive relief,
damages and attorneys' fees.    A hearing on the motion for a preliminary injunction, which concerned
all of the asserted claims, was heard on September 18, 2013 and the motion was denied on October 8,
2013.    The plaintiffs appealed to the United States Court of Appeals for the First Circuit (the "First
Circuit").    That appeal was stayed during the Supreme Court proceedings discussed below. Upon the
parties' agreement, all claims in the Hearst case were dismissed without prejudice on August 7, 2014.
In February, 2013, the Debtor was enjoined from operating within the 10th Circuit by the United
States District Court in Salt Lake City, Utah.    Community Television of Utah, LLC et al. v. Aereo,

8.    The Broadcasters appealed to the Supreme Court, which reversed the decisions of the Second Circuit and District Court, holding that the Debtor's transmissions of live broadcasts were essentially like cable company transmissions and were therefore public performances under the Copyright Act.  Am. Broad. Co., Inc. v. Aereo, Inc., 573 U.S. ___, 134 S. Ct. 2498 (2014).

9.    On remand, the District Court granted the Broadcasters' request for a nationwide preliminary injunction preventing use of the Debtor's system for playback while the underlying program was still airing.  See Am. Broad. Co., Inc. v. Aereo, Inc., No. 12-cv-1540, slip op. at 15 (S.D.N.Y. Oct. 23, 2014).  The Debtor has complied with the injunction and stopped permitting any transmissions while the underlying program is airing.  In fact, as a result of the Supreme Court decision, the Debtor, in its business judgment, decided to suspend offering its technology to consumers.  Since then, the Debtor has had no material source of revenue and its business operations have been devoted towards defending against lawsuits by the Broadcasters seeking further and permanent injunctive relief, damages and penalties for alleged copyright infringement.  The Debtor has also been formulating new legal strategies and potential new business models consistent with the Supreme Court's decision.

10.    A number of legal and regulatory issues relating to the Debtor's business may soon be resolved favorably in terms of the ability of the Debtor to use its technology in a viable business opportunity.  First, the Debtor has taken the position that it is entitled to a "compulsory" statutory license under Section 111 of the Copyright Act based on remarks by the Supreme Court during oral argument that the Debtor's operation is essentially identical to that of a cable network.  Thus, the Debtor has filed documents and payments with the United States Copyright

---

Inc., No. 2:13CV910DAK (D. Utah). The Debtor appealed that injunction and that appeal remains pending. KSTU LLC, et al. v. Aereo, Inc., No. 14-4020 (10th Cir.).

Office seeking such a license as a compulsory licensee, which, if accepted, would result in there being no copyright infringement claims against the Debtor.  See 17 U.S.C. § 111(c)(1).

11.     Second, as recently as October 28, 2014, Tom Wheeler, Chairman of the Federal Communications Commission ("FCC"), proposed potential rule changes that would give internet-based broadcasters such as the Debtor the same classification as cable companies.[4] Also, on November 4, 2014, in a speech to  the Mid-Atlantic Venture Association Chairman Wheeler stated:

> "Two weeks ago I proposed to my colleagues that we require of cable operators and broadcasters the same thing that spurred the growth of the satellite video business in the mid-1990s – that competitors should be able to negotiate in good faith for video content, even if it is owned by cable companies and broadcasters . . . . As you know, a startup called Aereo has already proposed doing this [being an over-the-top video competitor], but the broadcasters were able to stop it in court, in part because of the old rules of the FCC. Aereo wasn't the reason for the new rules, but the idea that entrepreneurs should be able to assemble programs to offer consumers choices is something that shouldn't be hindered by the FCC."

See http://www.broadcastingcable.com/news/washington/wheeler-old-fcc-rules-shouldn-t-impede-services-aereo/135351 (last visited Nov. 11, 2015).

12.     If the FCC changes its position, as Chairman Wheeler previewed, then it may also be likely that the U.S. Copyright Office's position regarding compulsory license eligibility for providers of linear broadcast programming via the Internet would shift in the Debtor's favor.  If the FCC elects to permit internet transmission of local linear broadcast channels, then the Debtor, assuming its continued viability, expects to be able to operate within that framework.

13.     However, even though the legal and regulatory framework is shifting in the Debtor's favor, the timing of a decision from the FCC is ultimately uncertain. Thus, during the

---

[4]     Tom Wheeler, Tech Transitions, Video, and the Future, Official FCC Blog (Oct. 28, 2014, 1:48 PM), http://www.fcc.gov/blog/tech-transitions-video-and-future.  It appears from the Chairman's public comments that a Notice of Proposed Rule Making ("NPRM") on this subject is imminent.

several months since the Supreme Court's decision, the Debtor undertook a concerted effort to attract new capital or to effect a sale of its business.  Those efforts have not been successful, in significant part due to the over-hang of the Broadcasters' litigation and potential damage claims. Without current customers or the ability to provide services, the Debtor also dramatically reduced its operational overhead.  On November 12, 2014, the Debtor laid off a majority of its workforce and closed down its business operations in Boston.  As of the Petition Date, the Debtor's reported assets at book value were approximately $20.5 million, and its aggregate recognized liabilities were approximately $4.2 million.

### Relief Requested

14.     By this Application, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and, to the extent applicable, Bankruptcy Rule 2014 and Local Rule 2014-1 of the Local Rules, the Debtor seeks (a) authority to engage Mr. Bloom and Argus to serve as CRO for the Debtor on the terms and conditions set forth in the parties' engagement letter, dated as of November 17, 2014 (the "Engagement Letter"), a copy of which is attached hereto as **Exhibit B** and incorporated herein by reference and (b) authority to appoint Mr. Bloom as Chief Restructuring Officer and Mr. Sullivan and Mr. Dicus, each as an Assistant Restructuring Officer of the Debtor.

### Basis for Relief Requested

A.     **Professional Qualifications**

15.     The Debtor believes that Argus, Mr. Bloom, Mr. Sullivan and Mr. Dicus have considerable experience in matters of this character and are well qualified to serve the Debtor in this case as CRO, based on Argus' expertise and Mr. Bloom, Mr. Sullivan and Mr. Dicus's individual backgrounds.

16.     Argus specializes in the provision of turnaround, crisis management, performance improvement and restructuring and accounting services for public and private companies, general creditors, secured parties, acquirers of non-performing companies and judicial bodies. Prior to the Chapter 11 Petition Date, commencing on November 17, 2014, the Company engaged Argus, as more fully described below.

17.     Mr. Bloom is a principal of Argus and has worked with management teams, creditors, creditors' committees and boards of directors in all aspects of distressed businesses, operational re-engineering and financial restructuring and liquidation.

18.     Mr. Bloom first joined Argus in 1999.  With Argus, he has focused on interim management, asset divestitures, equity placements and turnaround and financial advisory services engagements in a variety of industries including media, construction, manufacturing, debt collections, telecommunications, and industrial contracting.

19.     Mr. Sullivan has significant experience as a senior financial consultant and has been employed by Argus since 2002. While with Argus, he has worked on numerous assignments across a variety of industries such as software consulting, insurance administration, thermal and paper coating manufacturing, office furniture, retail lumber and industrial contracting.

20.     Mr. Dicus joined Argus in 2010.  Since joining, he has worked on assignments across a wide variety of industries including media, construction and manufacturing.

21.     The Debtor believes that the retention of Argus and Mr. Bloom, Mr. Sullivan and Mr. Dicus will be critical to the Debtor's efforts to maximize the value of its estate for the benefit of its creditors.  Furthermore, the Debtor believes that Argus is well-qualified and able to serve the Debtor in a cost-effective, efficient and timely manner.

8

B.    **Services to be Rendered**[5]

22.    The CRO will render, among others, the following services to the Debtor (the "Services"):

(i)    actively managing, in consultation with the Debtor's Board of Directors (the "Board"), including planning for and executing, the Debtor's reorganization efforts in seeking to maximize payments to the Debtor's creditors;

(ii)    managing the marketing and sale of the Debtor's assets including:

(a)    identifying interested parties and/or potential acquirors and contacting such interested parties and/or potential acquirors

(b)    providing information to these parties regarding the Debtor's assets and operations;

(c)    managing negotiations with potential interested parties and acquirors; and

(d)    overseeing the consummation of the sale of assets.

(iii)    overseeing and coordinating various activities related to the Chapter 11 Cases;

(iv)    as appropriate, actively communicating with the Office of the United States Trustee for the Southern District of New York and its professionals, the Court, any official committees that may be formed, individual creditors and creditor groups and other parties-in-interest, as appropriate;

(v)    overseeing the Debtor's staff in the compiling and formatting of data and analyses necessary and appropriate for the Chapter 11 Case; and

(vi)    any and all other activities and/or services as are approved by the Board to be rendered by the CRO, as the Board, may from time to time determine.

23.    The Debtor understands that Argus intends to work closely with other professionals retained by the Debtor to ensure that there is no unnecessary duplication of services performed for or charged to the Debtor's estate.

---

[5]    This summary of the Engagement Letter, including without limitation the description contained herein of Argus' scope of services, compensation and indemnification rights, is provided as a convenience only. To the extent that the summary differs in any way from the terms of the Engagement Letter, the terms of the Engagement Letter shall control.

C.      **Professional Compensation**

24.      Subject to the Court's approval, and in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, orders of this Court and guidelines established by the U.S. Trustee, pursuant to the Engagement Letter, the Debtor requests that Argus will be compensated as follows:

a)      a monthly fee of $50,000 (the "Monthly Fee").  The Monthly Fee shall be payable upon the execution of the Engagement Letter and on each one month anniversary of the execution thereof.   Upon termination of the Engagement Letter, the Monthly Fee for the month of the termination will be pro-rated based on the date of termination;

b)      in addition to the Monthly Fee, the Debtor shall pay Argus a success fee (the "Success Fee") equal to 2% of the Aggregate Compensation received in the Sale of the Debtor's assets (as that term is defined in the Engagement Letter).  The Success Fee shall be reduced by the amount by which the aggregate total Monthly Fees paid to Argus exceed $200,000; and

c)      reimbursement of all reasonable out-of-pocket expenses incurred in discharging its responsibilities under the Engagement Letter, including, but not limited to, direct identifiable travel and lodging, data processing and communication charges, research and courier services upon presentation of an invoice or other similar documentation in accordance with the procedures approved by the Bankruptcy Court.  However, if the aggregate amount of such expenses exceed $2,000 per month.  Argus shall provide notice to the Debtor before incurring further expenses.

25.      The Debtor believes that the overall compensation structure described above is competitive with compensation generally charged by restructuring services firms of similar stature as Argus for similar engagements, both in and out of court, and is straightforward and economical.

D.      **Prepetition Payments to Argus**

26.      Prior to the Petition Date, the Debtor provided Argus a retainer in the amount of $50,000.  Argus seeks to hold the retainer under the Engagement Letter during this chapter 11 case as security for the payment of fees and expenses incurred under the Engagement Letter.

The Debtor also paid the first Monthly Fee of $50,000.  Argus seeks to apply a pro-rated portion of this first Monthly Fee to the prepetition portion of the first month of the engagement.

**E.      Indemnification**

27.      The Debtor will indemnify and hold harmless Argus and its shareholders, directors, officers, managers, employees, contractors, agents and controlling persons (including Mr. Bloom, Mr. Sullivan and Mr. Dicus) (each, an "Indemnified Party") from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to the Engagement Letter, the execution and delivery of the Engagement Letter, services under the Engagement Letter or any matters relating to or arising from the Engagement Letter, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable court of competent jurisdiction, to have resulted from the gross negligence or willful misconduct of the Indemnified Party or Indemnified Parties in respect of whom such liabilities are asserted.  In connection therewith, the Debtor shall advance expenses to the Indemnified Parties as provided in the Engagement Letter upon request.

28.      The Debtor shall add the CRO and will subsequently add any other Indemnified Party as requested by Argus (each, a "Covered Party") to the Debtor's existing director and officer insurance policy or policies.

29.      Both the Debtor and Argus believe that such provisions are customary and reasonable for engagements of this nature in chapter 11 proceedings.

**F.      Relationships to Debtor**

30.      Although not directly applicable, Bankruptcy Rule 2014 requires that an application for retention include specific facts showing the necessity for the employment, the

name of the firm to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation and, to the best of the applicant's knowledge, all of the firm's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.  Fed. R. Bankr. P. 2014.

31.    Although not directly applicable, Bankruptcy Rule 2014 requires that an application for retention include specific facts showing the necessity for the employment, the name of the firm to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation and, to the best of the applicant's knowledge, all of the firm's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the office of the United States Trustee.  Fed. R. Bankr. P. 2014.

32.    As described in detail in the Affidavit, Argus has, among other things, searched its files to determine whether it represents, or has represented, any of the Debtor's creditors or other parties-in-interest in this proceeding or matters wholly unrelated to this proceeding.

33.    To the best of the Debtor's knowledge, and except as disclosed in the Affidavit, Argus has no connection with, and holds no interest adverse to, the Debtor, its creditors, equity security holders, current or former officers and directors, or any other parties-in-interest, or their respective attorneys and accountants, the United States Trustee for the Southern District of New York (the "U.S. Trustee"), or any person employed in the office of the U.S. Trustee in any matter relating to the Debtor or its estate.

34.    Argus has informed the Debtor that it will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new

material facts or relationships are discovered or arise, Argus will supplement its disclosure to the Court.

## Applicable Authority

35.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Additionally, section 105(a) of the Bankruptcy Code allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

36.     This Court should approve the retention and appointment of the CRO, even if outside the ordinary course of business, if the Debtor demonstrates a sound business justification for the transactions. See, e.g., Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); see also In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (citing In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991)); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (D. Del. 1991). Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule has vitality in Chapter 11 cases and shields a debtor's management from judicial second-guessing. See id.; Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of

reasonableness attaches to a debtor's management decisions"). Here, the "sound business justification" test is satisfied.

37.    When supported by sound business judgment, bankruptcy courts in this District have authorized the employment by a debtor of officers pursuant to section 363 of the Bankruptcy Code. See In re Lehman Bros. Holdings, Inc., Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 17, 2008)[Docket No. 2278]; In re PRC, LLC, Ch. 11 Case No. 08-10238 (MG) (Bankr. S.D.N.Y. Feb. 27, 2008) [Docket No. 182]; In re Bally Total Fitness of Greater N.Y., Inc., Ch. 11 Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug 21, 2007)[Docket No. 283]; In re Dana Corp., Ch. 11 Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 29, 2006)[Docket No. 740]; In re Penn Traffic Co., Ch. 11 Case No. 03-22945 (ASH) (Bankr. S.D.N.Y. July 9, 2003) [Docket No. 260]; In re Acterna Corp., Ch. 11 Case No. 03-12837 (BRL) (Bankr. S.D.N.Y. July 9, 2003) [Docket No. 163]; In re Worldcomm, Inc., Ch. 11 Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Dec. 10, 2002)[Docket No. 2263].

38.    Here, the approval of the Engagement Letter and appointment of the CRO is a sound exercise of the Debtor's business judgment. Because of Mr. Bloom, Mr. Sullivan and Mr. Dicus's extensive experience as advisors for troubled companies, the Debtor believes that their retention will greatly facilitate the Debtor's sale, for the benefit of the Debtor's creditors, shareholders and all parties-in-interest.

39.    In view of the foregoing, the Debtor firmly believes that under section 363 of the Bankruptcy Code, the retention of the CRO is appropriate and in the best interests of the Debtor and its estate and creditors.

## **Notice**

40.     Notice of this Application has been given to: (i) the Office of the United States Trustee; (ii) those creditors listed on the Debtor's List of Creditors Holding the 40 Largest Unsecured Claims; and (iii) entities entitled to notice pursuant to Rule 9013-1(b) of the Local Rules.

41.     In light of the nature of the relief requested, the Debtor submits that no further notice is required.

**WHEREFORE,** based on the facts and disclosures above, the Debtor respectfully requests that the Court (1) enter an order in the form annexed hereto authorizing the Debtor to retain Lawton W. Bloom of Argus Management Corporation as Chief Restructuring Officer, and Peter Sullivan and Scott Dicus, each as an Assistant Restructuring Officer pursuant to the terms and conditions set forth in this Application and the Engagement Letter incorporated herein, and (2) grant such other and further relief as is just and proper.

Dated:  November 20, 2014

                                        AEREO, INC.

                                        By: _____
                                            Name: Ramon A. Rivera
                                            Title: Secretary, Treasurer and
                                                   Chief Financial Officer

# EXHIBIT A

**Exhibit A**

**Affidavit of Lawton W. Bloom**

William R. Baldiga, Esquire
R. Benjamin Chapman, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Proposed Counsel for the*
*Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-_____(___) |
| | : | |
| Debtor. | : | |
| | : | |

**AFFIDAVIT OF LAWTON W. BLOOM IN SUPPORT OF**
**DEBTOR'S APPLICATION PURSUANT TO 11 U.S.C. §§ 105(a)**
**AND 363(b) FOR AUTHORITY TO (1) DESIGNATE LAWTON W. BLOOM OF**
**ARGUS MANAGEMENT CORPORATION AS CHIEF RESTRUCTURING**
**OFFICER AND PETER SULLIVAN AND**
**SCOTT DICUS AS ASSISTANT RESTRUCTURING OFFICERS,**
***NUNC PRO TUNC* TO THE CHAPTER 11 PETITION DATE AND**
**(2) APPROVE APPOINTMENT OF SUCH OFFICERS**

|  |  |  |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) ss.: | |
| COUNTY OF NEW YORK | ) | |

LAWTON W. BLOOM, being duly sworn, deposes and says:

1.    I am a principal of Argus Management Corporation ("Argus"), a financial advisory services firm based in Grafton, Massachusetts, with an office in New York, New York. I submit this affidavit on behalf of Argus, pursuant to Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in support of Debtor's Application Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for (1) Authority to Designate Lawton W. Bloom of Argus

Management Corporation as Chief Restructuring Officer and Peter Sullivan and Scott Dicus as

Assistant Restructuring Officers, *Nunc Pro Tunc* to the Chapter 11 Petition Date and (2)

Approval of Appointment of Such Officers, dated November 20, 2014 (the "Application").

Unless otherwise stated, I have personal knowledge of the facts stated herein.

I.      Proposed Compensation.

2.      Subject to the Court's approval, and in accordance with the applicable provisions

of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, orders of this Court

and guidelines established by the U.S. Trustee, pursuant to the Engagement Letter, the Debtor

requests that Argus be compensated as follows:

> d)      a monthly fee of $50,000 (the "Monthly Fee").  The Monthly Fee shall be payable
> upon the execution of the Engagement Letter and on each one month anniversary
> of the execution thereof.  Upon termination of the Engagement Letter, the
> Monthly Fee for the month of the termination will be pro-rated based on the date
> of termination;

> e)      in addition to the Monthly Fee, the Debtor shall pay Argus a success fee (the
> "Success Fee") equal to 2% of the Aggregate Compensation received in the Sale
> of the Debtor's assets (as that term is defined in the Engagement Letter).  The
> Success Fee shall be reduced by the amount by which the aggregate total Monthly
> Fees paid to Argus exceed $200,000; and

> f)      reimbursement of all reasonable out-of-pocket expenses incurred in discharging
> its responsibilities under the Engagement Letter, including, but not limited to,
> direct identifiable travel and lodging, data processing and communication
> charges, research and courier services upon presentation of an invoice or other
> similar documentation in accordance with the procedures approved by the
> Bankruptcy Court.  However, if the aggregate amount of such expenses exceed
> $2,000 per month.  Argus shall provide notice to the Debtor before incurring
> further expenses.

3.      Prior to the Petition Date, the Debtor provided Argus a retainer in the amount of

$50,000.  Argus seeks to hold the retainer under the Engagement Letter during this chapter 11

case as security for the payment of fees and expenses incurred under the Engagement Letter.

The Debtor also paid the first Monthly Fee of $50,000.  Argus seeks to apply a pro-rated portion of this first Monthly Fee to the prepetition portion of the first month of the engagement.

II.    Argus' Connections in this Chapter 11 Case.

4.    In connection with the Debtor's proposed retention of Argus, an extensive review (the "Connections Check") of Argus' clients, adverse parties and related parties (collectively, "Firm Connections") was performed to ascertain whether Argus had any "connection" (as such term is used in Bankruptcy Rule 2014(a)) with the Debtor herein, its creditors, any other party in interest herein, or their respective attorneys or accountants, to the extent any such entities were known at such time (the "Case Parties").

5.    Argus has received a list of the Case Parties, as compiled by the Debtor, attached as **Schedule 1** hereto, and has compared this to Argus's records to determine the existence of any possible conflicts (the "Conflict Check").  The results of this Conflict Check are disclosed herein.  This list was represented by the Debtor to be comprehensive and include the following categories of parties:  the Debtor and its affiliate, officers and directors of the Debtor and its affiliate, creditors, equity holders, landlords, professionals, and other parties-in-interest.

6.    To the best of my knowledge after diligent inquiry, neither Argus, nor any professional associated with or employed by Argus, has any "connection" (as such term is used in Bankruptcy Rule 2014(a)) with the Debtor herein, its creditors, any other party in interest herein, their respective attorneys or accountants, the United States Trustee, or any person employed in the office of the United States Trustee, except to the extent set forth on Schedule 2. Notwithstanding any "connection" set forth on Schedule 2, and except as set forth herein, to the best of my knowledge, any "connection" of Argus to the matched entities are limited to matters unrelated to the Debtor's Chapter 11 Case.

3

7.      Argus has been involved in a number of unrelated cases with various professionals involved in this case, both in adverse and non-adverse roles.

8.      Argus has not and will not represent any of the creditors, investors, potential acquirers, parties in interest, attorneys, financial advisors, accountants or any other entity in connection with this Chapter 11 Case.

9.      Argus has not, does not, and will not represent any of the entities listed above (or their affiliates) in matters related to the Debtor or its Chapter 11 Case.

10.     Argus will file appropriate supplemental disclosure(s) with the Court to the extent that additional information concerning any connections is discovered.

11.     Argus is not a creditor of the Debtor.

12.     Moreover, Argus does not hold or represent an adverse interest to the Debtor's estate.

(the remainder of this page is intentionally blank)

4

Lawton W. Bloom

Sworn to before me this
19th day of November 2014

_____ Notary Public

**ABDULRASHID ABUBAKARI**
**Notary Public - State of New York**
**No. 01AB6275600**
**Qualified in New York County**
**My Commission Expires Jan. 28, 2017**

5

**<u>Schedule 1</u>**

**<u>Case Parties</u>**

(See attached)

| Entity Name | Relationship to Debtor |
|---|---|
| Boston Private Bank & Trust Company | Banking Institution |
| 455 Broadway Realty LLC | Creditor |
| A1 Expert Service, Inc | Creditor |
| Alexander Group, LLC | Creditor |
| Altronics Manufacturing, Inc | Creditor |
| Arena Solutions, Inc. | Creditor |
| Atlantic Metro Communications | Creditor |
| Avnet Embedded | Creditor |
| Bernhard, Jennifer T. | Creditor |
| Bingham McCutchen LLP | Creditor |
| Choice Strategies | Creditor |
| ClickSquared, Inc. | Creditor |
| Constantine Cannon, LLP | Creditor |
| EIT Northeast Operations, LLC | Creditor |
| Evidox Corporation | Creditor |
| ExactTarget, Inc. and Subsidiaries | Creditor |
| Expedient Data Centers | Creditor |
| Facebook, Inc | Creditor |
| Fish & Richardson P.C. | Creditor |
| Frankfurt Kurnit Klein & Selz | Creditor |
| Full Loyal Industrial Ltd (Hong Kong) | Creditor |
| Google Inc. | Creditor |
| Houston & Associates, LLP | Creditor |
| HRM Direct, Inc. | Creditor |
| K2 Engineering Services, Inc. | Creditor |
| Kellogg,Huber,Hansen,Todd,Evans&Figel | Creditor |
| Labor Ready Northeast | Creditor |
| Launch Squad, LLC | Creditor |
| Level 3 Communications | Creditor |
| Levine, Blaszak, Block & Boothby | Creditor |
| Lightower Fiber Networks (fka Sidera Networks LLC) | Creditor |
| NetBase Solutions, Inc | Creditor |
| New Relic, Inc. | Creditor |
| Retals LLC | Creditor |
| RXR SMP OWNER LLC (37-18 Northern Bou) | Creditor |
| Sunbelt Rentals, Inc. | Creditor |
| Tribune Media Services, Inc. | Creditor |
| Turndox Corporation | Creditor |
| Uline | Creditor |
| Underwriters Laboratories | Creditor |
| Verizon | Creditor |
| Verizon Business | Creditor |
| Vertigo | Creditor |

| Entity Name | Relationship to Debtor |
|---|---|
| Vindicia | Creditor |
| Womble Carlyle Sandridge & Rice, LLP | Creditor |
| Abrams, Virginia Thuy Lam | Current Employee |
| Brown, Daniel | Current Employee |
| Burke, Frances | Current Employee |
| Calabro, Matthew | Current Employee |
| Cann, John (David) | Current Employee |
| Cotter, Brenda | Current Employee |
| Greenleaf, Jonathan | Current Employee |
| Helgeson, Michael | Current Employee |
| Huynh, Daisy | Current Employee |
| Kanojia, Chaitanya (Chet) | Current Employee |
| Lipowski, Joseph | Current Employee |
| Loveland, Brian | Current Employee |
| Moulle-Berteaux, Alex | Current Employee |
| Rivera, Ramon | Current Employee |
| Aereo, Inc. | Debtor |
| Aereo Securities Corporation | Debtor Affiliate |
| Argus Management Corporation | Debtor Professional |
| Diller, Barry | Director |
| Jani, Amish | Director |
| Kanojia, Chaitanya | Director |
| Aoun, Adrian | Equity Holder |
| Beveridge, Richard | Equity Holder |
| Bingham, James | Equity Holder |
| Burke, Frances | Equity Holder |
| Cann, John | Equity Holder |
| Chaitanya Kanojia Qualified Annuity Interest Trust | Equity Holder |
| Cherry, Griffin | Equity Holder |
| Chin, Amanda | Equity Holder |
| Cohen, Alexander | Equity Holder |
| Cromwell, Colin | Equity Holder |
| Fallik, Brian | Equity Holder |
| Favaro, Marc | Equity Holder |
| First Round Capital III, L.P. | Equity Holder |
| FirstMark Capital I LP | Equity Holder |
| Freeman, Josh | Equity Holder |
| Gary M. Lauder Revocable Trust | Equity Holder |
| Gordon and Dona Crawford Trust | Equity Holder |
| Greenleaf, Jonathan | Equity Holder |
| Harris, Stephen | Equity Holder |
| Hed, Nevo | Equity Holder |
| Helgeson, Michael | Equity Holder |
| High Line Venture Partners LP | Equity Holder |

2

| Entity Name | Relationship to Debtor |
|---|---|
| Highland Capital Partners VIII Limited Partnership | Equity Holder |
| Highland Capital Partners VIII-B Limited Partnership | Equity Holder |
| Highland Capital Partners VIII-C Limited Partnership | Equity Holder |
| Himalaya Capital Investors LP | Equity Holder |
| Houston Eliseeva LLP | Equity Holder |
| Houston, Grant | Equity Holder |
| IAC (USANi, LLC) | Equity Holder |
| Joseph T. Lipowski and Diane M. Lipowski (as tenants in common) | Equity Holder |
| Kanojia, Atma | Equity Holder |
| Kanojia, Chaitanya | Equity Holder |
| Keval Desai | Equity Holder |
| Lauder Partners | Equity Holder |
| Lipowski, Joseph | Equity Holder |
| Longman, Tracie L. | Equity Holder |
| Loveland, Brian | Equity Holder |
| OldSlip Air Holdings, LLC (fka South Ferry #2 LP) | Equity Holder |
| Pond, Daniel | Equity Holder |
| Records, Jeff | Equity Holder |
| Sallon, Nicholas | Equity Holder |
| Snow, Nicole | Equity Holder |
| Sullivan, Michelle | Equity Holder |
| SV Angel II-Q, L.P. | Equity Holder |
| Tracie L. Longman Qualified Annuity Interest Trust | Equity Holder |
| Wiesenthal, Robert S. | Equity Holder |
| Atlantic Specialty Insurance Company | Insurance Companies |
| Chubb | Insurance Companies |
| US Risk, Inc. | Insurance Companies |
| 455 Broadway Realty | Lessor |
| 56 7th Ave LLC | Lessor |
| Acumen Capital Partners | Lessor |
| C7 Data Centers | Lessor |
| Expedient | Lessor |
| Quality Technology Services Holdings LLC | Lessor |
| Retals | Lessor |
| Vanderbilt Associates Owners LP | Lessor |
| American Broadcasting Companies, Inc. | Litigation Party |
| CBS Broadcasting Inc. | Litigation Party |
| CBS Studios Inc. | Litigation Party |
| Disney Enterprises, Inc. | Litigation Party |
| Fox Television Stations, Inc. | Litigation Party |
| NBC Studios, LLC | Litigation Party |
| NBCUniversal Media, LLC | Litigation Party |
| Public Broadcasting Service | Litigation Party |

| Entity Name | Relationship to Debtor |
|---|---|
| Telemundo Network Group LLC | Litigation Party |
| Twentieth Century Fox Film Corporation | Litigation Party |
| Universal Network Television, LLC | Litigation Party |
| Univision Television Group, Inc. | Litigation Party |
| WNET | Litigation Party |
| WNJU-TV Broadcasting LLC | Litigation Party |
| WPIX, Inc. | Litigation Party |
| Amegadzie, Delanyo KT | Other Employee |
| Armand, Diana | Other Employee |
| Bingham, James | Other Employee |
| Brown, Eric | Other Employee |
| Brown, Fitzroy | Other Employee |
| Bulli, Daniel | Other Employee |
| Cannata, Teressa | Other Employee |
| Castiglia, Kevin | Other Employee |
| Cherry, William (Griffin) | Other Employee |
| Coleman, Erin C. | Other Employee |
| Crespo, Ramon | Other Employee |
| Curtis, Matthew A. | Other Employee |
| Dean, Rebecca | Other Employee |
| Dowd, Adam | Other Employee |
| Ennis, Kevin | Other Employee |
| Espinoza, Casey L. | Other Employee |
| Fischmann, Hans | Other Employee |
| Fitzgerald, Stephen | Other Employee |
| Gavini, Katherine | Other Employee |
| Georgeou, Elaine | Other Employee |
| Grady, Jeffrey | Other Employee |
| Hall, Andrew | Other Employee |
| Hamilton, James | Other Employee |
| Harney, Timothy | Other Employee |
| Harris, Stephen | Other Employee |
| Hartz, Amy L. | Other Employee |
| Hed, Nevo | Other Employee |
| Hoffman, Philip | Other Employee |
| Hunt, Phillip | Other Employee |
| Huschka, Jane C. | Other Employee |
| Jones, Casey | Other Employee |
| Jones, Ryan | Other Employee |
| Kaminsky, Alexa J. | Other Employee |
| King, Joshua | Other Employee |
| Lee, Tuen Hung | Other Employee |
| Lie, Cherry | Other Employee |
| Loring-Smith, Sean | Other Employee |

| Entity Name | Relationship to Debtor |
|---|---|
| Lunny, Samual | Other Employee |
| Mackay, Eva | Other Employee |
| Mailly, Caitlin | Other Employee |
| Mandragona, Rachel | Other Employee |
| Manganiello, Claire E. | Other Employee |
| Marcero, Alan | Other Employee |
| Mastrogiacomo, Angela C. | Other Employee |
| McKay, Matthew | Other Employee |
| Metro, Andrew | Other Employee |
| Millet, Stephen | Other Employee |
| Molloy, Philip | Other Employee |
| Murray, Stephen | Other Employee |
| Nguyen, Hien | Other Employee |
| Palmer, Quinten | Other Employee |
| Panchal, Rahul M. | Other Employee |
| Phelps, Kyle | Other Employee |
| Pond, Daniel T | Other Employee |
| Pope, Brian N. | Other Employee |
| Prudent, Ronald | Other Employee |
| Reisterer, Colin | Other Employee |
| Riccardi, Jason | Other Employee |
| Rodriguez, Aaron | Other Employee |
| Sallon, Nicholas | Other Employee |
| Sheehan, Emily K. | Other Employee |
| Smith, Jessica | Other Employee |
| St. Onge, Madelaine J. | Other Employee |
| Story, Nathaniel | Other Employee |
| Sylvester, Michael | Other Employee |
| Thompson, Patrick | Other Employee |
| Thornton-Clark, Alex | Other Employee |
| Vidolova, Teodora | Other Employee |
| Wachter, Anthony E. | Other Employee |
| Webb, Jennifer | Other Employee |
| Westbrook, John | Other Employee |
| White, Robert | Other Employee |
| Williams, Christopher | Other Employee |
| Young, Duncan N. | Other Employee |
| Andy Velez-Rivera | SDNY U. S. Trustee |
| Susan D. Golden | SDNY U. S. Trustee |

## <u>Schedule 2</u>

Argus has retained Brown Rudnick in the past in connection with an unrelated litigation matter.

Argus and Brown Rudnick either currently or historically have worked together in the following unrelated matters:

1) Argus currently provides financial advisory services with respect to an unrelated dispute where Brown Rudnick is special outside counsel;

2) Argus currently serves as Chief Restructuring Officer and a member of the board of directors in a restructuring matter where Brown Rudnick is special counsel;

3) Argus is retained as an expert witness where Brown Rudnick is counsel to a Plan Trustee;

4) In or around 2012, Brown Rudnick represented an unrelated client in connection with restructuring and related issues.  In that case Brown Rudnick recommended Argus, and Argus was retained as financial/restructuring advisor; and

5) Argus formerly served as Chief Restructuring Officer in the HMP Services Holding Sub III, LLC, et al. and Partsearch Technologies, Inc. Chapter 11 cases in the District of Delaware and the Southern District of New York, respectively, in which Brown Rudnick, LLP was retained as co-counsel to the Debtors.

# EXHIBIT B

# ARGUS MANAGEMENT CORPORATION

**BOSTON • NEW YORK • CHICAGO • MANCHESTER • TAMPA • BOCA RATON**

November 17, 2014

**Via Email Only**

Mr. Chaitanya Kanojia
CEO
Aereo, Inc.
280 Summer Street, 4th Floor
Boston, MA 02210

Re:    Engagement Letter

Dear Chet,

This is to confirm that we, Argus Management Corporation, a Massachusetts corporation ("we" or "Argus"), have been engaged by you, Aereo, Inc. a New York corporation ("you" or the "Company") to work with you to guide the Company through its bankruptcy with primary responsibility for effecting a sale of the Company's assets by providing the Services described below on the terms and conditions described herein, including by providing Lawton Bloom to be engaged by you as the Company's Chief Restructuring Officer (the "CRO"), and by providing Peter Sullivan and Scott Dicus to be engaged by you as the Company's Assistant Restructuring Officers to assist the CRO (the "AROs" or if individually, the "ARO").

Please confirm your acceptance of this letter, together with the General Terms and Conditions set forth on Schedule 1 hereto (this letter, together with Schedule 1 hereto, the "Agreement"), by delivering a countersigned copy of this Agreement together with the Retainer Amount and other documentation described in Section 4 below.  Terms not defined in this letter shall have the meaning ascribed to them in the attached Schedule 1.

1.    **Services.**

(a)    The Company hereby retains Argus to provide Services described herein during the Term and Argus shall provide the CRO to serve as the Company's Interim Chief Restructuring Officer reporting directly to the Company's Board of Directors (the "Board").  The CRO shall provide, and shall assume the following responsibilities and and provide the following services under the direction of the Board (the "Services"):

(i)    Managing the marketing and sale of the Company's assets including:

a.    Identifying interested parties and or potential acquirors and contacting such interested parties and/or potential acquirors;

b.    providing information to these parties regarding the Company's assets and operations.

**Corporate:** 15 Keith Hill Road, Suite 100, Grafton, MA 01519, Office (508) 839-1828, Fax (508) 839-6665

        c. managing negotiations with potential interested parties and acquirors; and

        d. overseeing the consummation of a Sale or Sales.

(ii)    Overseeing and coordinating various activities related to the Chapter 11 Cases;

(iii)   as appropriate, actively communicating with the Office of the United States Trustee for the Southern District of New York and its professionals, the Court, any official committees that may be formed, individual creditors and creditor groups and other parties-in-interest;

(iv)   overseeing Company staff on the compiling and formatting of data and analyses necessary and appropriate for the Chapter 11 Cases; and

The CRO will use and supervise the AROs and other Argus staff in the performance of the responsibilities under this engagement.

Argus shall not have any obligation or responsibility to the Company to provide financial advisory, management, or investment banking services except for the purpose expressly set forth herein, or to provide any tax, legal or other specialist advice. The Company confirms that it will rely on its own counsel, accountants, and similar expert advisors for legal, accounting, tax and other similar advice. If the Company seeks services from Argus that are not specified hereunder, such services will be provided only upon further agreement among Argus, the Company, and, if required, upon further order of the Bankruptcy Court.

Following the execution of this Agreement, the Board will have a Board meeting and take the approriate steps to ratify the agreement.

## 2. **Compensation**

(a) As compensation for the Services provided hereunder by Argus, the Company shall pay Argus (incluing any and all other Argus representatives) a monthly fee of $50,000 (the "Monthly Fee"). The Monthly Fee shall be payable upon the execution of this Agreement and on each one month anniversary of the execution thereafter. Upon termination of this agreement, the Monthly Fee for the month of the termination will be pro-rated based on the date of termination.

The Company shall reimburse Argus for all reasonable out-of-pocket expenses incurred in discharging its responsibilities under this Agreement. However, if the aggregate amount of such expenses exceed $2,000 per month, Argus will provide notice to the Company before incurring further expenses.

(b) In addition to the Monthly Fee, the Company shall pay Argus a success fee (the "Success Fee") equal to 2% of the Aggregate Consideration received in a Sale or Sales of the Company's assets.



As used in this Agreement, the term "Sale" shall mean, in one or a series of transactions: (a) a sale or acquisition by which all or a portion of the Company's assets are directly or indirectly sold or transferred; (b) a merger, consolidation, or other business combination by which all or a significant portion of the Assets are directly or indirectly sold or transferred to, or combined with, another entity; (c) a disposition of all or a portion of the Company's assets by means of a disposition to one or more entities of all or a portion of any issued and outstanding equity securities or any other issued and outstanding securities of the Company by its existing security holders; or (d) any transaction similar to any of (a) through (c). For the avoidance of doubt: (i) any of (a) through (d) is a Sale whether or not pursuant to 11 U.S.C. § 101 et. seq., as from time to time amended, and any other current or future federal statute or regulation that may be applicable to a restructuring or liquidation of the Company (11 U.S.C. § 101 et. seq. and those other statutes and regulations are referred to herein generically as the "Bankruptcy Code") and whether or not pursuant to section 363 of the Bankruptcy Code or a plan of reorganization or liquidation; (ii), solely with respect to the Company's assets, any of (a) through (d) is a Sale even if such Sale is pursuant to any "credit bid"; and (iii) any of (a) through (d) is a Sale whether or not achieved directly or indirectly by means of a sale, transfer or other disposition of all or a portion of the business or existing equity or securities of the Company.

"Aggregate Consideration" means, with respect to any and all Sales, the total of (i) all consideration paid or payable, or otherwise distributed, to, or received, directly or indirectly, by the Company, its Bankruptcy estate, its creditors and/or security holders of the Company (together the "Company Parties") in connection with such Sale(s) including all (a) cash, securities and other property, (b) Company debt assumed, satisfied, or paid by a purchaser (including, without limitation, the amount of any indebtedness, securities or other property "credit bid" in any Sale and any other indebtedness and obligations, including tax claims that will actually be paid, satisfied, or assumed by a purchaser from the Company or the security holders of the Company, but excluding, for the avoidance of doubt, any fee to be paid to Argus) and (c) amounts placed in escrow and deferred, contingent, royalty and installment payments ("Deferred Payments") (provided, however, that the cash portion of Aggregate Consideration must be sufficient to pay all of Argus's compensation hereunder). If the cash portion of Aggregate Consideration is not sufficient to pay all of Argus's compensation hereunder, then Argus' compensation will be paid if, and when, the non-cash portion of the Aggregate Consideration is converted to cash).
Any portion of the Success Fee that is related to Deferred Payments will be paid to Argus if and when the Deffered Payments are actually received by the Company Parties. The Success Fee shall be reduced by the amount by which the aggregate total Monthly Fees paid to Argus exceed $200,000.

For purposes of valuing consideration included in Aggregate Consideration other than cash payable at closing: (a) the assumption of any indebtedness for borrowed money will be valued at the unpaid principal amount of such assumed liability; (b) any securities (other than a promissory note) will be valued at the time of the closing of the Sale (without regard to any restrictions on transferability) as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the 10

trading days immediately prior to the closing of the Sale; (ii) if such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a 10-trading-day period immediately before the closing of the Sale; and (iii) if such securities have not been traded before the closing of the Sale, the value of such securities shall be as mutually agreed in good faith by the Company and Argus; and (e) any assets other than cash or the assets described in the foregoing clauses shall be valued as mutually agreed in good faith by the Company and Argus. Except as specifically set forth herein, no fee payable to any other person, by either Seller or any other party, shall reduce or otherwise affect any fee payable hereunder to Argus.

In the event that the Company consummates a Sale within 12 months following the Term or termination of this Agreement (the "Tail"), Argus shall be paid the full Success Fee as described above unless the Agreement is terminated by Argus pursuant to the terms of Section 3 below. Notwithstanding anything to the contrary herein, there shall be no Success Fee payable to Argus if the Company terminates this agreement (a) prior to filing for bankruptcy; (b) prior to Argus undertaking, at Company's request, substantial activity in connection with a sale of some or all of Aereo's assets and/or business; and (c) within 45 days of the date hereof.

(c)  Upon execution of this Agreement, the Company shall pay Argus a retainer of $50,000 (the "Retainer Amount"). Argus is granted a security interest in the Retainer Amount to secure payment of all fees, expenses, indemnification obligations of the Company and other amounts due hereunder. To the extent that the Retainer Amount is not applied to unpaid fees and expenses and such other amounts, the Retainer Amount shall be returned to the Company promptly upon the later of: (a) the date that is twelve months after the termination of this Agreement under Section 3 hereof; or (b) if any claims arise against Argus that are eligible for indemnification, the final resolution of such claims. It is understood that the Retainer Amount may be used by Argus to fund the indemnification provisions hereunder. The foregoing provision relating to the return of the Retainer Amount shall survive the termination of this Agreement or completion of Argus' services to the Company.

## 3.    **Term and Termination.**

This Agreement shall be effective commencing on the date hereof, subject to satisfaction of the Conditions Precedent, and shall continue until the date specified in a written notice from the Company or Argus to the other party of its intent to terminate this Agreement (the "Term"), which termination date shall not be less than twenty-four (24) hours after the effective time of such notice if sent by the Company and shall not be less than seven (7) days notice if sent by Argus. No termination of this Agreement shall affect the Company's indemnity obligations or other obligations to pay Argus, the CRO, or any of the other Argus Parties as provided hereunder.



4.   **Conditions Precedent.**

Argus' obligation to provide services to the Company is subject to the conditions precedent (the "Conditions Precedent") that Argus shall have received the following documents and other items, duly executed where appropriate by authorized representatives of the Company:

(a)  this Agreement;

(b)  evidence satisfactory to Argus that the execution, delivery and performance of this Agreement by the Company have been duly authorized by all necessary corporate or other action;

(c)  (i)  evidence satisfactory to Argus that the indemnification provided for herein in favor of the Indemnified Persons (as defined below) has been approved and has been duly authorized by all necessary corporate or other action, including, without limitation, written evidence of approval of the terms hereof by the Board;

(ii)  copies of the Company's organization documents, including without limitation, its articles or certificate of incorporation, by-laws, operating agreement, certificate of formation, or partnership agreement, as applicable;

(iii)  copies of any indemnification agreement provided generally to officers of the Company;

(iv)  a copy of the D&O Policy; and

~~(v)~~

(d)  the cash payment of the Retainer Amount to Argus.

5.   **Retention in Bankruptcy Court Proceedings.**

The Company agrees that it will use best efforts to obtain prompt authorization from the Bankruptcy Court to retain Argus on the terms and conditions set forth in this Agreement under the provisions of 11 U.S.C. §363. The Company shall supply Argus with a draft of the application and proposed retention order authorizing Argus' retention sufficiently in advance of the filing of such application and proposed order to enable Argus and its counsel to review and comment thereon. The Company acknowledges that it believes that Argus general restructuring experience and expertise and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Sale, that the value to the Company of Argus's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent fees are reasonable under the standard set forth in section 328(a), regardless of the number of hours to be expended by Argus' professionals in the performance of the services to be provided hereunder.

6.      **Notices.**

All notices to be sent pursuant to this Agreement shall be in writing (including facsimiles), shall be given or made to the party to which such notice is required or permitted to be given or made under this Agreement at the address or the facsimile number set forth below, and (unless otherwise specified herein) shall be deemed delivered on receipt if sent by facsimile or delivered by hand, or three (3) business days after mailing. All mailed notices shall be by registered or certified mail, postage prepaid.

     (a) if to the Company, to the address set forth above; and

     (b) if to Argus, to Argus Management Corporation, 15 Keith Hill Road, Suite 100, Grafton, Massachusetts 01519, John G. Haggerty, President, Fax: (508) 839-6665;

or to such other address as any party may from time to time designate for itself by notice in writing given to the other parties hereto.

IN WITNESS WHEREOF, the parties hereto, or their duly authorized representatives, have executed this Agreement under seal effective as of the day and year first above written.

AEREO, INC.                                      ARGUS MANAGEMENT CORPORATION.

By: _____        By: _____

Name: RAMON A. RIVERA              Name: Lawton Bloom

Title: VP FINANCE                         Title: Managing Director

## SCHEDULE 1

### General Terms and Conditions

1. These General Terms and Conditions are incorporated within the letter to which they are attached and such letter and this Schedule 1, together, constitute the "Agreement."

2. Argus Parties. The term "Argus Parties", as used in the Agreement, shall refer to Argus and its affiliates and direct and indirect subsidiaries, together with each of their respective directors, officers, employees, contractors, agents, independent contractors, representatives, attorneys, direct and indirect shareholders, control persons, principals, partners, members, successors, and assigns, as well as, for the avoidance of doubt, the CRO and ARO.

3. Confidentiality.

   (a) Argus shall not intentionally disclose the Company's Confidential Information. Further, Argus will use the Confidential Information only for the purpose of providing Services to the Company pursuant to this Agreement. Confidential Information shall be utilized only to the extent that it is necessary for Argus to perform the Services under this Agreement, and that it is: (i) disclosed to Argus by the Company, its directors, officers, employees, representatives, and agents; (ii) acquired by Argus from any inspection of the Company's property in connection with this Agreement; or (iii) information produced by Argus, from Confidential Information, in connection with providing services to the Company under this Agreement. Further, Argus shall report to the Board on a regular basis on any significant communication with a creditor of the Company and advise as to the substance of and the person involved in such communication. Notwithstanding anything to the contrary, Argus will abide by and comply with any and all extant protective orders, other orders of the Court as well as all legal requirements regarding document preservation and/or third party obligations regarding documents.

   (b) "Confidential Information" shall include all customer lists, prospect lists, employee lists, trade secrets, intellectual property rights, all compilations of information prepared by Company or its outside agents or auditors, contracts, minutes of the Board or of shareholder meetings, or any other information known to the Company in which the Company has a reasonable expectation of confidentiality, or which if disclosed, would or may cause material financial harm to the Company or extend information to the Company's competitors that may be used against the Company to its detriment. Confidential Information shall not include information that is: (i) now or subsequently becomes generally known or available by publication, commercial or otherwise, through no fault of Argus, its employees, agents, or independent contractors; (ii) already known by any Argus Party at the time of the disclosure, provided that such information did not come from a source known by such Argus Party to be bound by a confidentiality agreement with the Company, or from a source that was otherwise prohibited from disclosing such information under a contractual, legal or fiduciary obligation; (iii) becomes available to any Argus Party on a non-confidential basis from a source other



than the Company, provided that, to such Argus Party's knowledge, the source was not prohibited from disclosing such information to such Argus Party under a contractual, legal or fiduciary obligation to the Company; (iv) independently developed by any Argus Party primarily from information that is not Confidential Information; (v) information that the Company and any Argus Party agree, orally or in writing, may be disclosed; (vi) information that is reasonably expected to be disclosed as part of the performance of the Services or (vii) information that any Argus Party reasonably believes, after consultation with its attorneys, it must disclose pursuant to applicable law, or regulatory or administrative process, including stock exchange rules.

(c) Argus may make reasonable disclosures of Confidential Information: (i) to third parties in connection with the performance of its Services under this Agreement provided that such disclosures shall be made pursuant to a confidentiality agreement if the CRO determines, in his sole discretion, that a confidentiality agreement should be in place and that the form and substance of such confidentiality agreement is satisfactory; or (ii) in connection with any dispute between Argus and Company under or concerning this Agreement. If Argus receives any request by order, subpoena, or other legal process to produce any Confidential Information, then unless otherwise prohibited by law or process, Argus will use its best efforts to provide the Company with timely notice of such request. At the Company's request and expense, and unless otherwise prohibited by law or against a recommendation by Argus' counsel, and without relinquishing or modifying Argus' authority to disclose information under the terms of this Agreement, Argus will cooperate reasonably with the Company in actions that the Company deems necessary or appropriate under the circumstances to protect the confidentiality of the Confidential Information.

(d) Notwithstanding the foregoing, Argus may not cite the performance of the services that it has provided hereunder to client and prospective clients as an indication of Argus' experience, unless Argus and the Company specifically agree otherwise in writing.

4.  Conflicts of Interest.  Argus, the CRO, and the other Argus Parties may provide services to other persons, firms or corporations, including direct or indirect competitors, suppliers, or customers of the Company, provided such services do not interfere with the performance of the Services or are directly adverse to the Company's interests.

5.  Financial Data Reliance.

(a) The Company agrees and acknowledges that while Argus' and CRO's work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof. Furthermore, the circumstances of Argus' and CRO's services hereunder, may cause their advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, during the term of this Agreement, Argus and the CRO will not express any opinion on or provide any other form of insurance respecting the Company's financial statements.

(b) The Company acknowledges that in rendering its services under this Agreement, Argus and the CRO will be using and relying upon the information provided by the Company



and its directors, officers, employees, representatives and agents. Under any of the foregoing circumstances, the Company agrees that Argus and the CRO shall have no duty to verify independently the reliability, accuracy or completeness of such information. The Company also agrees that Argus, the CRO, and the other Argus Parties shall incur no liability to the Company or any individual or other entity that may arise if any such information proves to be unreliable, inaccurate or incomplete.

(c) Certain documents, data, and information available to Argus and the CRO will be based upon the Company's information, processes, and systems. As a consequence, Argus, the CRO, and the Argus Parties cannot guarantee the intended or unintended results or consequences of Argus' and the CRO's work product.

6. Use of Argus's Work Product by Company.   The Company acknowledges that all information, whether written or oral, created, prepared, or compiled by Argus or the CRO in connection with this Agreement is intended solely for the benefit and use of the Company. No other individual or entity shall be entitled to rely on such information for any purpose. Without limiting the foregoing, the Company shall not (and shall not authorize any other individual or entity to) use Argus' or the CRO's name or to make available to third parties any information created, prepared, or compiled by Argus or the CRO under this Agreement for any reason, including obtaining or extending credit, offering or selling securities or other assets, or in any representations to third parties without Argus' or the CRO's prior written consent.   It is also expressly agreed that notwithstanding the above restrictions upon the Company's dissemination and use of information and work product, Argus, the CRO, and the other Argus Parties shall have no responsibility or liability relating directly or indirectly to such disclosure (whether authorized or unauthorized) by the Company concerning any information created, prepared, or compiled, in whole or in part, by Argus, or the CRO pursuant to this Agreement, which may be disclosed only after prior written approval by Argus or the CRO or as required by applicable law, or regulatory or administrative process, including stock exchange rules.   The foregoing provisions shall not be construed or interpreted to prohibit references to Argus' engagement or the CRO's appointment under this Agreement in required public filings or court documents.

7. Indemnification and Related Provisions; Directors and Officers Insurance.

(a) At all times, both before and after the termination of this Agreement, and to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter allow, the Company agrees to indemnify and hold harmless Argus, the CRO, and the other Argus Parties (collectively, the "Argus Indemnified Persons") for, from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to this Agreement, the execution and delivery of this Agreement, the provision of Services under this Agreement or any matters relating to or arising from this Agreement, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction, to have resulted from the gross negligence or willful misconduct of the Argus Indemnified Person or Argus Indemnified Persons in respect of whom such liabilities are asserted.   In connection therewith, the Company shall advance expenses to the Argus Indemnified Persons as



provided in this Agreement upon request. To the extent that such expenses have not been reimbursed by the Company, Argus may be reimbursed from the Retainer Amount.

(b)  At all times, both before and after the termination of this Agreement, and to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter allow, the Argus Parties agree to indemnify and hold harmless Aereo, along with its employees, officers, directors and agents (collectively, the "Aereo Indemnified Persons") for, from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to Argus's gross negligence or willful misconduct with respect to its obligations under this Agreement.

(c)  Upon execution of this Agreement, the Company agrees that it shall use its best efforts to confirm that the CRO and any other Argus Party providing services to the Company as requested by Argus (each, a "Covered Person") are covered by the Company's existing Directors and Officers Insurance Policy or Policies (together, the "D&O Policy") and will notify its insurance carrier for each such policy to send copies of all documentation and other communications regarding the D&O Policy to Argus at the address applicable under Section 5 of the attached letter. Upon any cancellation or non-renewal of the D&O Policy, the Company shall exercise its rights (and hereby irrevocably authorizes Argus to exercise such right on the Company's behalf) to extend the claim period for a one-year "discovery period" and the Company shall pay any additional premiums required as a result thereunder. The Company agrees that each Covered Person shall be either a corporate agent or corporate officer (as determined by Argus) of the Company for purposes of the indemnification provisions of the Company's organizational documents or any other indemnification agreement in favor of corporate agents or corporate officers and, as such, shall be entitled to indemnification under such provisions, such indemnification to be in addition to, and not in lieu of, any other indemnification provided for under this Agreement and the D&O Policy.

(d)  In no event shall the Company or any of its affiliates or direct or indirect subsidiaries have the right to revoke this or any other indemnification provision in this Agreement. The indemnification provisions and the liability limitation provisions hereof are irrevocable and shall survive the termination or completion of Argus' services to the Company or the breach of this Agreement by Argus.

(e)  Notwithstanding any other provision of this Agreement, to the extent that any Indemnified Person is a witness or defendant in any proceeding, it is expressly agreed that the indemnification provided for herein shall include compensation by the Company at such Indemnified Person's customary hourly rates as well as all expenses actually incurred by said Indemnified Person or on said Indemnified Person's behalf in connection therewith.

8.  Limitation on Liability.

**Corporate:** 15 Keith Hill Road, Suite 100, Grafton, MA 01519, Office (508) 839-1828, Fax (508) 839-6665



(a) Argus, the CRO, and the other Argus Parties shall have no responsibility or liability to the Company under this Agreement (nor any responsibility or liability for any deductible under any applicable insurance coverage), except that Argus may be responsible for actual damages that shall have been determined by a final non-appealable order of a court of competent jurisdiction to have resulted from the fraud, gross negligence or willful misconduct of Argus. Without limiting the generality of the foregoing, in no event shall Argus, the CRO, or the other Argus Parties be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind; provided further that Argus shall have no liability to the Company for damages in excess of the amount of fees, expenses and other amounts incurred by Argus and reimbursed by the Company pursuant to this Agreement.

(b) In no event shall Aereo, its employees, officers, directors or agents be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

9. Non-Solicitation. For a period of twelve (12) months after the later of: (a) the completion of all Services to be provided by Argus under this Agreement; or (b) termination of this Agreement, the Company, including any affiliates thereof, shall not hire, retain or utilize (other than through Argus) the services of any current or former Argus Party who provided Services under this Agreement, including, without limitation, the CRO. The Company agrees and acknowledges that Argus' remedy at law for any breach of the provisions of this Section would be inadequate and that for any breach of such provisions Argus will, in addition to such other remedies as may be available to it at law or in equity, be entitled to injunctive relief and to enforce its rights by an action for specific performance to the extent permitted by law.

10. Appointment as Officer. Other than with respect to appointment of the CRO and the AROs as officers of Company in writing, and otherwise in accord with the provisions of this Agreement, nothing in this Agreement is intended to create, or shall be deemed or construed to create a fiduciary relationship between: (i) the Company, including without limitation, the Company's directors, officers, members, managers, partners, control persons, shareholders, employees, representatives, agents, or creditors, on the one hand; and (ii) Argus and the other Argus Parties (other than the CRO ), on the other hand.

11. Company's Joint and Several Liability; Contractual Right of Setoff in Favor of Argus. If the Company consists of one or more subsidiaries, affiliates or entities, then the Company's obligations under this Agreement shall be joint and several obligations of each subsidiary, affiliate or entity comprising the "Company." Each such subsidiary, affiliate or entity shall execute this Agreement, but such liability shall be joint and several whether or not such subsidiary, affiliate or entity does execute this Agreement. Without limiting any other remedy that may be available to Argus under this Agreement or applicable law, where the "Company" under this Agreement consists of more than one subsidiary, affiliate or entity, then Argus shall have against each such subsidiary, affiliate or entity a right of setoff (notwithstanding any lack of mutuality) under which Argus may set off against any claim



against Argus by any entity comprising the Company group, all of the claims that Argus may have against any or all entities that comprise the Company.

12. Attorneys' Fees and Expenses.

    (a) The Company shall reimburse Argus for all costs and expenses, including attorneys' fees and expenses, incurred by Argus to approve retention and compensation, and to enforce this Agreement, including, but not limited to any indemnity provision of this Agreement. This obligation to pay Argus' attorneys' fees and expenses shall apply whether such fees and expenses are incurred during trial or appeal, or in arbitration, a bankruptcy case, or otherwise. If so required, Argus shall additionally be entitled to reimbursement of reasonable legal expenses associated with any required court approval of this Agreement or enforcement of provisions of this Agreement, including, but not limited to, fee applications. The Company shall reimburse Argus for all such expenses upon presentation of the invoice for the same supported by appropriate documentation or from the Retainer Amount as provided in this Agreement.

    (b) Argus shall reimburse Company for all costs and expenses, including attorneys' fees and expenses, incurred by Company to enforce this Agreement, including, but not limited to any indemnity provision of this Agreement. This obligation to pay Company's attorneys' fees and expenses shall apply whether such fees and expenses are incurred during trial or appeal, or in arbitration, a bankruptcy case, or otherwise.

13. Severability. The parties agree that each provision contained in this Agreement shall be treated as a separate and independent clause, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses herein. Moreover, if one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity or subject so as to be unenforceable at all, such provision or provisions shall be construed by the appropriate judicial body by limiting and reducing it or them, so as to be enforceable to the extent compatible with applicable law.

14. Assignment. This Agreement shall inure to the benefit of and be binding upon the Company and Argus, the CRO, and the other Argus Parties, and their respective successors, executors, administrators, heirs and permitted assigns. Neither party may assign this Agreement, or any interest herein, without the prior written consent of the other parties. It is anticipated that, at the Company' request, Argus or the CRO may review information relating to, or may interact with, affiliates or direct or indirect subsidiaries of the Company, but no such activity shall constitute the engagement by such other entities of either Argus or CRO.

15. Waivers. No term or condition of this Agreement shall be deemed to have been waived, nor shall there be any estoppel against the enforcement of any provision of this Agreement, except by written instrument of the party charged with such waiver or estoppel. No such written waiver shall be deemed to be a continuing waiver unless specifically stated in such written instrument.

16. Authority. In order to induce Argus to enter into this Agreement, the Company represents and warrants to Argus that as of the date of this Agreement: (i) the Company has full power,



authority and legal right to execute, deliver and perform its obligations under this Agreement, (b) the Company has taken all necessary actions to authorize the execution, delivery and performance of this Agreement, (iii) this Agreement has been duly executed and delivered on behalf of the Company by an individual who is authorized to execute this Agreement on behalf of the Company; and (iv) this Agreement constitutes the legal, valid, and binding obligation of the Company.

17. Governing Law; Jurisdiction.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York (excluding its rules regarding choice of law).  The United States District Court for the Southern District of New York and the appropriate courts of the State of New York sitting in New York County shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Agreement and any matter arising from it.  The parties submit to the jurisdiction of such courts and irrevocably waive any rights that they may have to object to any action being brought in these courts, to claim that the action has been brought in an inconvenient forum or to claim that those courts do not have jurisdiction.

18. Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

19. Headings.    The headings of sections and paragraphs herein are included solely for convenience of reference and shall not affect the meaning or construction of any of the provisions hereof.

20. Entire Agreement; Modification.  This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof.  No modifications of any provisions of this Agreement shall be made unless made in writing and signed by the parties hereto. This Agreement amends, restates, supersedes and replaces all other and earlier agreements, whether written or oral, regarding the Company's retention of Argus or the CRO.

61807423 v1-WorkSiteUS-032209/0001

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-_____(___) |
| | : | |
| Debtor. | : | |
| | : | |

## ORDER GRANTING DEBTOR'S APPLICATION PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) FOR AUTHORITY TO (1) DESIGNATE LAWTON W. BLOOM OF ARGUS MANAGEMENT CORPORATION AS CHIEF RESTRUCTURING OFFICER AND PETER SULLIVAN AND SCOTT DICUS AS ASSISTANT RESTRUCTURING OFFICERS NUNC PRO TUNC TO THE CHAPTER 11 PETITION DATE AND (2) APPROVE THE APPOINTMENT OF SUCH OFFICERS

Upon the Debtor's application (the "Application")[1] pursuant to 11 U.S.C. §§ 105(a) and 363(b) for (a) authority to (1) Designate Lawton W. Bloom of Argus Management Corporation as Chief Restructuring Officer and Peter Sullivan and Scott Dicus as Assistant Restructuring Officers, *Nunc Pro Tunc* to the Chapter 11 Petition Date and (2) Approve the Appointment of Such Officers; the Court finds that jurisdiction over this matter is proper and that notice of the Application and the hearing thereon was sufficient under the circumstances, and upon the record herein after due deliberation thereon, good and sufficient cause exists for the relief granted herein:

It is hereby **ORDERED, ADJUDGED AND DECREED** that:

The Application is **GRANTED** to the extent set forth herein.

1.    The Debtor is authorized to designate Lawton W. Bloom of Argus Management Corporation ("Argus") as Chief Restructuring Officer and Peter Sullivan and Scott

---

[1]    Unless the context indicates otherwise, capitalized terms not defined herein shall have the meaning ascribed to them in the Application.

Dicus as Assistant Restructuring Officers of the Debtor, on the terms described in the Application and the Engagement Letter.

2.    Argus and its affiliates shall not act in any other capacity than that described in the Application and the Engagement Letter in connection with the above-captioned case.

3.    In the event the Debtor seeks to have Argus personnel assume executive officer positions that are different than the position disclosed in the Application and the Engagement Letter, or to materially change the terms of the engagement by either (i) modifying the functions of personnel, (ii) adding new personnel, or (iii) altering or expanding the scope of the engagement, a motion to modify the retention shall be filed.

4.    No principal, employee or independent contractor of Argus and its affiliates shall serve as a director of the above-captioned Debtor during the pendency of the above-captioned case.

5.    The Debtor is permitted to indemnify those persons serving as executive officers on the same terms as provided to the Debtor's other officers and directors under the corporate bylaws and applicable state law, along with insurance coverage under the Debtor's D&O policy.

6.    There shall be no indemnification of Argus or its affiliates except as set forth in the Application and the Engagement Letter.

7.    Except to the extent otherwise provided herein, Argus shall file fee applications for interim and final allowance of compensation and reimbursement of expenses pursuant to Bankruptcy Code sections 330 and 331, the Bankruptcy Rules, Local Bankruptcy

Rules, orders of this Court, and the U.S. Trustee's guidelines for compensation and reimbursement of expenses.

8.    Argus and its professionals shall be excused from any requirement to maintain detailed time records in connection with the services rendered pursuant to the Engagement Letter; provided, however, that Argus will nonetheless maintain daily records, in summary format, which shall indicate the total hours incurred by each professional for each day, in one half hour (.5) increments, and a brief description of the nature of the work performed, and present such records together with its fee applications.

9.    All requests by Argus for the payment of indemnification as set forth in the Application and/or Engagement Letter shall be made by means of an application to the Court and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Application and/or Engagement Letter and is reasonable under the circumstances of the litigation or settlement in respect of which indemnity is sought, provided however, that in no event shall Argus be indemnified in the case of its own gross negligence or willful misconduct.

10.    In the event that Argus seeks reimbursement from the Debtor for attorneys' fees and expenses in connection with the payment of an indemnity claim pursuant to the Application and/or Engagement Letter, the invoices and supporting time records for the attorneys' fees and expenses shall be included in Argus's own applications, both interim and final, and these invoices and time records shall be subject to the Amended Guidelines, the UST Guidelines and the approval of the Bankruptcy Court pursuant to Sections 330 and 331 of the Bankruptcy Code without regard to whether such attorney[s] have been retained under Section

3

327 of the Bankruptcy Code, and without regard to whether such attorneys' services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

11.     Argus shall disclose any and all facts that may have a bearing on whether the firm, its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtor, its creditors, or other parties in interest.  The obligation to disclose identified in the foregoing sentence is a continuing obligation.

Dated: _____, 2014          _____

United States Bankruptcy Judge

61806699

4