Hearing Date and Time:  To be determined
Objection Deadline:  December 15, 2014 at 4:00 p.m. ET

William R. Baldiga, Esquire
R. Benjamin Chapman, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Proposed Counsel for the*
*Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-13200 (SHL) |
| | : | |
| Debtor. | : | |
| | : | |

**NOTICE OF MOTION REGARDING DEBTOR'S MOTION FOR ENTRY**
**OF AN ORDER (I) APPROVING BIDDING PROCEDURES IN CONNECTION**
**WITH THE PROPOSED SALE(S) OF CERTAIN OR SUBSTANTIALLY**
**ALL OF THE DEBTOR'S ASSETS AND OTHER POTENTIAL TRANSACTIONS;**
**(II) ESTABLISHING CERTAIN RELATED DEADLINES; AND**
**(III) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the annexed motion, dated November 21,

2014 (the "Motion"), of the debtor and debtor-in-possession (the "Debtor") in the above-

captioned Chapter 11 case (the "Chapter 11 Case"), to approve the Debtor's bidding procedures

in connection with the proposed sale(s) of certain or substantially all of the Debtor's assets and

other potential transactions, all as more fully set forth in the Motion, will be held before the

Honorable Sean H. Lane, United States Bankruptcy Judge for the United States Bankruptcy

Court for the Southern District of New York (the "Bankruptcy Court") at One Bowling Green,

New York, New York  10004, Courtroom 701 at a date and time to be determined.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Motion must comply with the Federal Rules of Bankruptcy Procedures and the Local Rules of the Bankruptcy Court, must be set forth in a writing describing the basis therefore and must be filed with the Bankruptcy Court electronically in accordance the General Order M-399, by registered users of the Bankruptcy Court's electronic case filing system (the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties in interest, in Portable Document Format (PDF), Word Perfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and served upon each of the following so as to be actually received no later than **4:00 p.m. on December 15, 2014** (the "Objection Deadline"): (i) attorneys for the Debtor, Brown Rudnick LLP, 7 Times Square, New York, New York  10036, Attn: William R. Baldiga, Esq.; and (ii) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 10006, New York, New York 10014, Attn:  Susan D. Golden, Esq. and Andy Velez-Rivera, Esq.

Dated: November 21, 2014
       New York, New York              Respectfully submitted,

                             By: <u>/s/ William R. Baldiga</u>
                                 William R. Baldiga, Esquire
                                 R. Benjamin Chapman, Esquire
                                 BROWN RUDNICK LLP
                                 Seven Times Square
                                 New York, NY 10036
                                 (212) 209-4800

                                 *Proposed Counsel for the*
                                 *Debtor and Debtor-in-Possession*

61815143

**Hearing Date and Time:  To be determined**
**Objection Deadline:  December 15, 2014 at 4:00 p.m. ET**

William R. Baldiga, Esquire
R. Benjamin Chapman, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Proposed Counsel for the*
*Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-13200 (SHL) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING**
**PROCEDURES IN CONNECTION WITH THE PROPOSED SALE(S) OF CERTAIN**
**OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AND OTHER POTENTIAL**
**TRANSACTIONS; (II) ESTABLISHING CERTAIN RELATED DEADLINES;**
**AND (III) GRANTING RELATED RELIEF**

The debtor and debtor-in-possession (the "Debtor") in the above-captioned Chapter 11

case (the "Chapter 11 Case"), by and through its undersigned counsel, hereby moves the Court

(the "Motion") pursuant to sections 105 and 363 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of

New York (the "Local Rules"), for entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"), (i) approving bidding procedures (the "Bidding Procedures") in

connection with the proposed sale(s) of certain or substantially all of the assets of the Debtor's

estate and other potential transactions, (ii) establishing certain related deadlines, and (iii) granting related relief.  In support of this Motion, the Debtor respectfully states as follows:

### Preliminary Statement

1.      The Debtor is in the midst of preliminary discussions with interested parties in connection with, among other opportunities, the Debtor's sale of certain or substantially all of the estate's assets.  The Debtor believes that it is necessary set a definitive timeline and procedures to most effectively attract bidders for the purchase of assets or any other transaction, and to do so as quickly as possible so as to maximize the value of this estate.  By filing this Motion, the Debtor seeks to establish a process to elicit bids for the estate's assets or other potential transactions in order to attain the highest and best value for the benefit of all of the Debtor's stakeholders.  The Debtor believes that promptly putting such a process in place will inure to the greatest benefit of the Debtor's stakeholders.

### Jurisdiction and Statutory Predicates

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

3.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code.

### Background

5.      On November 20, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this

2

Chapter 11 Case and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

### A.   The Debtor's Business

6.      As more particularly described in the *Verified Declaration of Ramon A. Rivera, Secretary, Treasurer, and Chief Financial Officer In Support of First-Day Motions*, dated November 20, 2014 [D.I. 7] (the "<u>Rivera Declaration</u>"),[1] the Debtor is a privately-held New York corporation with headquarters in Boston, Massachusetts.  The Debtor is a technology company founded in 2010 that provided subscribers with the ability to record and watch live or "time-shifted" local over-the-air broadcast television on internet-connected devices, such as personal computers, tablet devices, and "smartphones."

7.      The Debtor provided to each subscriber access via the internet to individual remote micro-antennas and a cloud-based digital video recorder ("<u>DVR</u>") that enabled a subscriber to receive and store local television programming broadcast over public airwaves. Subscribers could designate which television programs to record by logging into the Debtor's website and selecting the programming they wanted to record and watch live or later.

8.      In contrast to traditional cable antennas and DVR boxes, which are located in subscribers' homes, the Debtor's individual antennas and hard disks are located in the Debtor's facilities within the local market and were individually made available to subscribers, who could then, using an internet browser, access local broadcast programming with an individual antenna and record it to disk.  The Debtor's subscribers could then watch their recordings live or save them for later viewing.  Essentially, the Debtor's technology provided a modern, easy-to-use

---

[1]     All capitalized terms herein that are not otherwise defined shall have the meaning ascribed to them in the Rivera Declaration.

3

option for consumers to watch over-the-air television without having to install cumbersome home equipment or subscribe to cable packages and bundles. The Debtor's technology also includes a user interface, social networking features, and other features designed to create a compelling consumer experience.

### B. Events Leading to Chapter 11

9.       Beginning in March 2012, various major television broadcasting networks, including, among others, ABC, CBS, NBC (collectively, the "Broadcasters"),[2] commenced actions in the United States District Court for the Southern District of New York (the "District Court") seeking to enjoin the Debtor from allowing consumers to stream to themselves over-the-air broadcast content while the show was still airing solely on the asserted grounds that such transmissions were public performances under the Copyright Act. After an evidentiary hearing, the District Court denied the preliminary injunction, finding that the Debtor's technology which enabled consumer transmission via individual antennas and DVR recordings did not constitute a public performance under the Copyright Act. See Am. Broad. Co., Inc. v. Aereo, Inc., 874 F. Supp. 2d 373 (S.D.N.Y. 2012). The Second Circuit affirmed the District Court's holding.

---

[2]  The Broadcasters include: American Broadcasting Companies, Inc., Disney Enterprises, Inc., CBS Broadcasting, Inc., CBS Studios, Inc., NBCUniversal Media, LLC, NBC Studios, LLC, Universal Network Television, LLC, Telemundo Network Group, LLC, and WNJU-TV Broadcasting, LLC (the "ABC Plaintiffs"), as well as WNET, Thirteen, Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, WPIX, Inc., Univision Television Group, Inc., the Univision Network Limited Partnership and Public Broadcasting Service (the "Fox Plaintiffs"). On May 6, 2013, Aereo filed a declaratory judgment action against CBS Studios Inc.; CBS Television Licenses, L.L.C. d/b/a WSBK-TV, WBZ-TV, WJZ-TV; Atlanta Television Station WUPA, Inc. d/b/a WUPA-TV; CBS Television Stations, Inc. d/b/a WFOR-TV, KCNC-TV; Miami Television Station WBFS, Inc. d/b/a WBFS-TV; CBS Broadcasting Inc. d/b/a WBBM-TV, WWJ-TV, WCCO, KDKA-TV, KYW-TV; CBS Stations Group of Texas, Inc. d/b/a KTVT-TV; Television Station KTXA, Inc. d/b/a KTXA-TV; CBS Operations, Inc. d/b/a WTOG-TV; Detroit Television Station WKBD, Inc. d/b/a WKBD-TV; Pittsburgh Television Station WPCW, Inc. d/b/a WPCW-TV; Philadelphia Television Station WPSG, Inc. d/b/a WPSG-TV.

4

WNET v. Aereo, Inc., 712 F.3d 676 (2d Cir. 2013), reh'g en banc denied, 722 F.3d 500 (2d Cir. 2013).[3]

10.    The Broadcasters appealed to the Supreme Court, which reversed the decisions of the Second Circuit and District Court, holding that the Debtor, in transmitting live broadcasts, was essentially performing as a traditional cable network for the purposes of the Copyright Act. Am. Broad. Co., Inc. v. Aereo, Inc., 573 U.S. __, 134 S. Ct. 2498 (2014).

11.    On remand, the District Court granted the Broadcasters' request for a nationwide preliminary injunction preventing use of the Debtor's system for playback while the underlying program was still airing.  See Am. Broad. Co., Inc. v. Aereo, Inc., No. 12-cv-1540, slip op. at 15 (S.D.N.Y. Oct. 23, 2014).  The Debtor has complied with the injunction and stopped permitting any transmissions while the underlying program is airing.  In fact, as a result of the Supreme Court decision, the Debtor, in its business judgment, decided to suspend offering its technology to consumers.  Since then, the Debtor has had no material source of revenue and its business operations have been devoted towards defending against lawsuits by the Broadcasters seeking further and permanent injunctive relief, damages and penalties for alleged copyright

---

[3] On July 9, 2013, Hearst Stations, Inc. d/b/a WCVB-TV filed an action against the Debtor in the United States District Court for the District of Massachusetts (13-cv-11649-NMG), alleging copyright infringement (including public performance, reproduction, distribution and derivative work claims) and seeks a preliminary and permanent injunction, declaration of infringement, injunctive relief, damages and attorneys' fees.  A hearing on the motion for a preliminary injunction, which concerned all of the asserted claims, was heard on September 18, 2013 and the motion was denied on October 8, 2013.  The plaintiffs appealed to the United States Court of Appeals for the First Circuit (the "First Circuit").  That appeal was stayed during the Supreme Court proceedings discussed below. Upon the parties' agreement, all claims in the Hearst case were dismissed without prejudice on August 7, 2014. In February 2014, the Debtor was enjoined from operating within the 10th Circuit by the United States District Court in Salt Lake City, Utah.  Community Television of Utah, LLC et al. v. Aereo, Inc., No. 2:13CV910DAK (D. Utah 2013). The Debtor appealed that injunction and that appeal remains pending. KSTU LLC, et al. v. Aereo, Inc., No. 14-4020 (10th Cir. 2014).

5

infringement.  The Debtor has also been formulating new legal strategies and potential new business models consistent with the Supreme Court's decision.

12.     A number of legal and regulatory issues relating to the Debtor's business may soon be resolved favorably in terms of the ability of the Debtor to use its technology in a viable business opportunity.  First, the Debtor has taken the position that it is entitled to a "compulsory" statutory license under Section 111 of the Copyright Act based on remarks by the Supreme Court during oral argument that the Debtor's operation is essentially identical to that of a cable network.  Thus, the Debtor has filed documents and payments with the United States Copyright Office seeking such a license as a compulsory licensee, which, if accepted, would result in there being no copyright infringement claims against the Debtor.  See 17 U.S.C. § 111(c)(1).

13.     Second, as recently as October 28, 2014, Tom Wheeler, Chairman of the Federal Communications Commission ("FCC"), proposed potential rule changes that would give internet-based broadcasters such as the Debtor the same classification as cable companies.[4] Also, on November 4, 2014, in a speech to the Mid-Atlantic Venture Association Chairman Wheeler stated:

> "Two weeks ago I proposed to my colleagues that we require of cable operators and broadcasters the same thing that spurred the growth of the satellite video business in the mid-1990s – that competitors should be able to negotiate in good faith for video content, even if it is owned by cable companies and broadcasters . . . . As you know, a startup called Aereo has already proposed doing this [being an over-the-top video competitor], but the broadcasters were able to stop it in court, in part because of the old rules of the FCC. Aereo wasn't the reason for the new rules, but the idea that entrepreneurs should be able to assemble programs to offer consumers choices is something that shouldn't be hindered by the FCC."

---

[4] Tom Wheeler, Tech Transitions, Video, and the Future, Official FCC Blog (Oct. 28, 2014, 1:48 PM), http://www.fcc.gov/blog/tech-transitions-video-and-future.  It appears from the Chairman's public comments that a Notice of Proposed Rule Making ("NPRM") on this subject is imminent.

See http://www.broadcastingcable.com/news/washington/wheeler-old-fcc-rules-shouldn-t-impede-services-aereo/135351 (last visited Nov. 11, 2015).

14.     If the FCC changes its position, as Chairman Wheeler previewed, then it may also be likely that the U.S. Copyright Office's position regarding compulsory license eligibility for providers of linear broadcast programming via the Internet would shift in the Debtor's favor.  If the FCC elects to permit internet transmission of local linear broadcast channels, then the Debtor, assuming its continued viability, expects to be able to operate within that framework.

15.     However, even though the legal and regulatory framework is shifting in the Debtor's favor, the timing of a decision from the FCC is ultimately uncertain.  Thus, during the several months since the Supreme Court's decision, the Debtor undertook a concerted effort to attract new capital or to effect a sale of its business.  Those efforts have not been successful, in significant part due to the over-hang of the Broadcasters' litigation and potential damage claims. Without current customers or the ability to provide services, the Debtor also dramatically reduced its operational overhead.  On November 12, 2014, the Debtor laid off a majority of its workforce and closed down its business operations in Boston.  As of the Petition Date, the Debtor's reported assets at book value were approximately $20.5 million, and its aggregate recognized liabilities were approximately $4.2 million.

16.     The Debtor also has a so-called net loss carryover for Federal tax purposes of approximately $90 million to $100 million.  That tax attribute may also be an asset that some parties would find of significant value in connection with a reorganization or other transaction that would preserve the future use of that attribute under applicable law.

7

**Relief Requested**

17.     By this Motion, the Debtor requests entry of an order: (i) approving the Bidding Procedures; (ii) establishing certain related deadlines (the "Sale Milestones"); and (iii) granting related relief.  The Debtor requests and proposes, as the Court's calendar permits, the following timeline (all capitalized terms as defined herein and all times are prevailing Eastern Time):

a.     Final Bid Deadline of February 13, 2015 at 5:00 p.m.

b.     Auction on February 17, 2015 at 10:00 a.m.

c.     Transaction Objection Deadline of February 17, 2015 at 5:00 p.m.

d.     Hearing to Approve Sale on February 20, 2015, or as soon thereafter as this Court's calendar permits.

**Marketing Process**

18.     The Bidding Procedures would enable the Debtor, its CRO and its retained professionals to initiate a marketing process and reach out to parties that may be interested in purchasing some or all of the Debtor's assets, including strategic purchasers.  The Debtor intends to continue to enter into appropriate confidentiality agreements, in its business judgment and discretion, with parties in interest and make available relevant due diligence information.

**Proposed Bidding Procedures**

19.     The Debtor intends to elicit bids (i) for certain or substantially all of the estate's assets or (ii) for alternative proposals for reorganization, including, without limitation, the ability to consummate a transaction that would permit the Debtor, in its business discretion, to decide to sponsor a plan of reorganization that permits the successful bidder to acquire all of the stock in the reorganized Debtor as an alternative to purchasing the Debtor's assets (each, or any other or

similar transaction approved by the Debtor, a "Transaction").[5]  The Debtor recognizes that it may receive (i) various combinations of bids for portions of the estate's assets; (ii) bids for substantially all of the estate's assets; and (iii) other alternative proposals.  Thus, the Debtor has purposely built in flexibility into the proposed Bidding Procedures so that all possibilities can be considered on the same timeline for the benefit of all of the Debtor's stakeholders.

20.    The proposed Bidding Procedures set forth the parameters for which the Debtor will consider bids and proposals for a Transaction for certain (or all) of the estate's assets or with the Debtor's estate.  In addition, the proposed Bidding Procedures: (i) establish certain deadlines for bids and proposals; (ii) define requirements for qualified bids and proposals; (iii) set an auction date; and (iv) set hearing dates in connection with the approval of bids or proposals.  The proposed Bidding Procedures also provide for, in accordance with the Debtor's business judgment, (a) the selection of a Stalking Horse (as defined below); and (b) the ability of the Debtor to provide for a breakup fee (the "Break Up Fee") of up to three percent (3.0%) of the total value of the Stalking Horse Bid (as defined below), plus an expense reimbursement to be determined in the Debtor's discretion, but in any event not to exceed $500,000.  In the event the Debtor selects a Stalking Horse, and as described in greater detail in the proposed Bidding Procedures, the Debtor will file a supplemental notice with the Court identifying the Stalking Horse and the terms of the Stalking Horse Bid, including any Break Up Fee, and providing parties in interest with the opportunity to object.

_____

[5]  Provided, of course, that any order approving such Transaction shall not in any way constitute an order confirming any chapter 11 plan, as such confirmation is expressly contingent on the parties' compliance with all disclosure and confirmation requirements of the Bankruptcy Code and entry of a separate confirmation order by this Court in due course.

9

21.      Upon the selection of one or more Successful Bidders (as defined below), the Debtor will file a supplemental disclosure (the "Supplemental Disclosure") to describe the particular Transaction or Transactions for which the Debtor seeks this Court's approval.  The Debtor hereby requests that the Court now set (i) a hearing for approval of the Successful Bids (as defined below) for February 20, 2015 (or a date thereafter as soon as the Court's calendar permits) (the "Transaction Hearing"); and (ii) an objection deadline in connection with the Successful Bids and the contemplated Transactions of on or before 5:00 p.m., prevailing Eastern Time, on February 17, 2015 (the "Transaction Objection Deadline").  At the Transaction Hearing, the Debtor will request that the Court enter an order: (i) approving (a) the Successful Bid(s), (b) the applicable Transaction documents, and (c) the proposed assumption and assignment of any assumed contract; and (ii) authorizing the Debtor to consummate the proposed Transaction(s).

22.      Following entry of an order approving the Bidding Procedures (the "Bidding Procedures Order"), the Debtor and its CRO, with the assistance of the Debtor's professionals, intends to continue to prepare and make available information regarding the Debtor and the Bidding Procedures to parties in interest.  The Debtor believes that a robust marketing process and entry of the Bidding Procedures Order will maximize the value of the estate.

23.      To optimally and expeditiously solicit, receive and evaluate bids and proposals in a fair and transparent manner, the Debtor has developed and proposed the Bidding Procedures, annexed hereto as **Exhibit 1** to **Exhibit A**, to govern this process.  The Bidding Procedures are designed to encourage all parties in interest to put their best bids or proposals forward and

enhance the value of the Debtor's estate.  The essential points of the Bidding Procedures are as

follows:[6]

a.      Assets to be Sold:  The assets (the "Assets") to be offered for sale, as an entirety
        or in one or more lots, consist of certain or substantially all of the estate's assets,
        including, without limitation, all intellectual property, inventory, equipment,
        interests in contracts or leases, accounts and payment intangibles associated with
        any of the Assets.

b.      Consideration of Bids:  The Assets will be offered for sale separately, in one or
        more combinations and as a whole.  The Debtor may consider bids or other
        proposals (each, a "Bid") for (i) all of the Assets in a single bid from a single
        bidder or multiple bids from multiple bidders for Assets in any combination, and
        (ii) any alternative restructuring option, including, without limitation, the ability
        to consummate a transaction that would permit the Debtor, in its business
        discretion, to decide to sponsor a plan of reorganization that permits the
        successful bidder to acquire all of the stock in the reorganized Debtor as an
        alternative to purchasing the Debtor's assets.  The Debtor, in its business
        judgment, shall determine the Successful Bidder (as defined below) based on,
        among other things, but not limited to, the number of Assets purchased, the
        assumption of certain liabilities, the purchase price for the Assets, the bidder's
        ability to close, and the value to the Debtor's estate of the proposed Transaction.

c.      Bid Deadline:  All Bids must be served upon and actually received by the Debtor
        and its counsel on or before 5:00 p.m., prevailing Eastern Time, on February 13,
        2015 (the "Bid Deadline").

d.      Qualified Bid Requirements:  The Debtor will determine, subject to the Bidding
        Procedures and the requirements below, whether a Bid is a Qualified Bid and,
        ultimately, a Successful Bid (as those terms are defined below).  The Debtor may,
        in its business judgment, modify any Bidding Procedures before the
        commencement of the Transaction Hearing in order to maximize the benefit to the
        estate of the Transaction process as a whole.  Any party that desires to submit a
        Bid must do so in writing as follows:

        i.      A Bid must clearly set forth any conditions for closing and state that the
                Bid is irrevocable as set forth below;

---

[6]      This summary and any other summary provided in this Motion are qualified in their entirety by
the Bidding Procedures annexed to **Exhibit A** as **Exhibit 1**.  All capitalized terms that are used in
any summary but not otherwise defined in the Motion shall have the meanings set forth in the
Bidding Procedures.  To the extent there are any conflicts between any summary and the Bidding
Procedures, the terms of the Bidding Procedures shall govern.

ii.     A Bid must constitute a good faith, bona fide offer to enter into a Transaction;

iii.    A Bid must clearly set forth the consideration to be paid;

iv.     A Bid must identify with particularity each and every condition to closing;

v.      A Bid must identify with particularity (i) the executory contracts and unexpired leases for which assumption and assignment is required, and (ii) the liabilities and accruals to be assumed;

vi.     A Bid must be "as is where is" and not be conditioned on any contingency, including, but not limited to, obtaining or completing any of the following: (i) a due diligence investigation; (ii) any material adverse change; (iii) financing; (iv) shareholder, board of directors or other approval; and (v) regulatory approvals of any kind;

vii.    A Bid must include evidence, including financial statements (or such other form of financial disclosure and credit-quality support or enhancement reasonably acceptable to the Debtor) sufficient in the Debtor's business judgment to establish the financial wherewithal of the bidder to complete the contemplated Transaction and, to the extent the bidder will rely upon the financial wherewithal of an affiliate, bid partner, or other sponsor (each, a "Sponsor"), evidence sufficient to establish the financial wherewithal and intent of the Sponsor to provide appropriate financial support;

viii.   A Bid must contain such financial and/or other information that will allow the Debtor to make a reasonable determination as to the bidder's financial and other capabilities to consummate the Transaction contemplated, including such financial information and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtor to allow the Debtor to serve on counterparties to any contracts or leases being assigned in connection with the proposed sale that have requested, in writing, such information;

ix.     A Bid must disclose the identity of the bidder's organization, including confirmation that the Bid is made as principal for the bidder's account and, if not, the basis upon which the bidder is acting and the identities of all other participants (if any);

x.      A Bid must include evidence of authorization and approval from the bidder's shareholders, board of directors or any other necessary approval with respect to the submission, execution, delivery and closing of the Transaction;

12

xi.    A Bid must include a cashier's check or be accompanied by a wire transfer payable or delivered to the Debtor, Debtor's counsel or other agreed upon escrow agent, in an amount equal to ten percent (10%) of the consideration to be paid as a good-faith deposit (the "<u>Deposit</u>");

xii.    A Bid must state that the bidder is willing to consummate and fund the proposed Transaction by no later than five (5) business days after the Transaction Hearing;

xiii.    A Bid must state that it remains irrevocable until the earlier of (a) the first business day following the consummation of the Transaction and (b) the twentieth (20th) day after entry of an order by the Bankruptcy Court approving a Transaction; and

xiv.    A Bid must disclose any agreements or understanding between the bidder and any third party with respect to the subject Assets or with respect to any possible Transaction involving the Debtor.

e.    <u>Evaluation of Qualified Bids</u>:  The sufficiency of any submitted Bid will be at the discretion of the Debtor in accordance with the exercise of its business judgment. The Debtor shall promptly as practicable notify each bidder which has (i) returned a signed confidentiality agreement; (ii) timely submitted the information and documentation listed above in ¶ 14(d)(i)-(xiv); and (iii) financial qualifications satisfactory to the Debtor whether or not it has been selected as a qualified bidder (each, a "<u>Qualified Bidder</u>") and whether or not its Bid is a "<u>Qualified Bid</u>."

f.    <u>Stalking Horse Bids</u>:  The Debtor reserves the right to enter into one or more asset purchase or other agreements with any interested party for certain or substantially all of the Assets and designate that party as a stalking horse (the "<u>Stalking Horse</u>") subject to the terms herein.  The Debtor may offer a Break Up Fee to the Stalking Horse.  The Debtor is under no obligation to choose a Stalking Horse or offer a Break Up Fee for any of the Assets.  There may not be more than one Stalking Horse for any particular estate Asset.

In the event the Debtor selects a Stalking Horse, the Debtor may offer bid protections, including a Break Up Fee not to exceed three percent (3.0%) of the total value of the Stalking Horse Bid), plus, as determined in the Debtor's discretion, expenses incurred not to exceed $500,000.  If the Debtor designates a Stalking Horse, the Debtor will file a supplemental notice (the "<u>Stalking Horse Notice</u>") with the Court identifying the Stalking Horse and the term of the Stalking Horse Bid, including the terms and conditions for payment of any Break Up Fee and submitting the asset purchase or other agreement entered into with the Stalking Horse (the "<u>APA</u>").  Any party wishing to object to the Debtor's designation of the Stalking Horse shall have five (5) days from the filing of the Stalking Horse Notice (but in any event not later than the Transaction Objection deadline) to file an objection thereto (the "<u>Objection</u>") with the Court and serve

13

the same on the Debtor and its counsel and other parties as required by the Court or applicable law.  In the event an Objection is filed and such Objection cannot be resolved consensually, the Debtor will seek to schedule a hearing with the Court for approval of the Stalking Horse and the Stalking Horse Bid, including payment of any Break Up Fee.  If no Objections to the Stalking Horse Notice are filed and served, the Stalking Horse and Stalking Horse Bid, including payment of any Break Up Fee, shall be deemed approved by the Court, without the need for further Court order.  In the event that the Debtor designates a Stalking Horse, the Stalking Horse Bid will be a Qualified Bid.

In the event that the Debtor designates a Stalking Horse, before or after the Bid Deadline, the Debtor reserves the right, in its business judgment, to require any other bidders to submit an executed asset purchase or other agreement blacklined to show changes from the APA as a pre-condition to selecting a bidder as a Qualified Bidder or allowing such bidder to continue to participate in the Auction.

g.   <u>Withdrawal of Assets for Sale</u>:  The Debtor reserves the right, in its business judgment, to withdraw any asset for sale.

h.   <u>Auction</u>:  The auction (the "<u>Auction</u>") will be conducted for the Assets or any alternative transactions on February 17, 2015 at 10:00 a.m., prevailing Eastern Time, (the "<u>Auction Date</u>") at the offices of Brown Rudnick LLP, Seven Times Square, New York, New York  10036.  The Assets shall be sold free and clear of all liens, claims and encumbrances to the fullest extent allowed under section 363(f) of the Bankruptcy Code, provided, however, that any valid and perfected liens shall attach to the proceeds of the Assets with the same validity, force and effect.

The Auction may be adjourned or cancelled as the Debtor deems appropriate in its business judgment.  Reasonable notice of such adjournment and the time and place for the resumption of the Auction or cancellation shall be given to all bidders.

i.   <u>Selection of Successful Bid or Bids</u>:  At the conclusion of the Auction, and subject to Court approval following the Auction, the successful Bid or Bids shall be selected and announced by the Debtor (the "<u>Successful Bid</u> or <u>Bids</u>") and the backup Bid or Bids, if any, shall be selected and announced by the Debtor (the "<u>Backup Bid</u> or <u>Bids</u>").

Within thirty-six (36) hours of completion of the Auction, the parties that made the Successful Bid or Bids (each, a "<u>Successful Bidder</u>") and the parties that made the Backup Bid or Bids, if any, shall complete and sign all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid or Bids and the Backup Bid or Bids, if any, were made.

14

j.    Backup Bids:  If the Successful Bidder fails to consummate the Transaction,
breaches the executed agreement or otherwise fails to perform, the Debtor may
consummate the proposed Transaction with the next highest or best bid(s)
received (such bid or bids, the "Backup Bid" and the party(ies) submitting the
Backup Bid, the "Backup Bidder(s)", which hereafter shall be included in the
definition of "Successful Bidder") without the need for further Court approval.
The Backup Bid(s) shall remain open until the earlier of (a) the first business day
following the consummation of the Transaction and (b) the twentieth (20th) day
after entry of an order by the Bankruptcy Court approving a Transaction.

k.    Supplemental Disclosure and Transaction Hearing:  The Debtor will file the
Supplemental Disclosure to describe the particular Transaction or Transactions
for which the Debtor seeks the Court's approval.  The Transaction Hearing will be
conducted by this Court no later than on February 20, 2015 or as soon as possible
thereafter as the Court's calendar permits.  At the Transaction Hearing, the Debtor
will request that the Court enter an order: (i) approving (a) the Successful Bid(s),
(b) the applicable Transaction documents, and (c) the proposed assumption and
assignment of any assumed contract; and (ii) authorizing the Debtor to
consummate the proposed Transaction(s).  At the Transaction Hearing, the Court
shall also determine any ancillary issues to any proposed Transaction pursuant to
section 365 of the Bankruptcy Code in connection with the assumption and
assignment of any executory contracts or unexpired leases.

l.    "As Is, Where Is":  The proposed transfer of any of the Debtor's Assets will be on
an "as is, where is" basis and without representations and warranties of any kind,
nature or description by the Debtor, the Debtor's estate or any of its agents or
representatives, except to the extent set forth in the applicable Transaction
documents of each Successful Bidder as executed by the Debtor and approved by
the Court.  Except as otherwise provided in the applicable Transaction documents
of each Successful Bidder as executed by the Debtor and approved by the Court,
all of the Debtor's right, title and interest in and to the respective Asset will be
transferred free and clear of all pledges, liens, security interests, encumbrances,
claims, charges, options and interests in accordance with section 363 of the
Bankruptcy Code.  Any other claim, lien or encumbrance, as set forth in the
applicable Transaction documents of each Successful Bidder as executed by the
Debtor and approved by the Court, will attach to the net proceeds of the sale of
the particular Asset.

m.    Reservation of Rights:  The Debtor reserves the right to reject all Bids and to
request no approvals of any kind by the Court or to any Transaction at such time.

15

**Basis for Relief Requested**

I.    **The Relief Sought in the Bidding Procedures Order is in the Best Interests of the Debtor's Estate and Should be Approved**

24.    A Debtor-in-Possession's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate or considering potential restructuring transactions.    See, e.g., The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [11 U.S.C. § 363], courts require the debtor to show that a sound business purpose justifies such actions."); In re Electroglas, Inc., No. 09-12416 (PJW), 2009 Bankr. LEXIS 4994, at *8 (Bankr. D. Del. Oct. 20, 2009) (approving debtors' sale to bidders as valid exercise of debtors' business judgment); In re Verasun Energy Corp., Case No. 08-12606 (BLS), 2009 Bankr. LEXIS 4685, at *8-9 (Bankr. D. Del. Feb. 19, 2009) (approving debtors' bidding procedures motion and granting debtors deference in selecting appropriate bidder at auction); In re Integrated Res., Inc., 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and that the transaction is in good faith"); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that "the court would defer to the trustee's judgment so long as there is a legitimate business justification").

16

25.      The paramount goal in any proposed sale of property of the estate is to maximize

the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65

(8th Cir. 1997) (noting that in bankruptcy sales, "a primary objective of the Code [is] to enhance

the value of the estate at hand"); see also In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa.

1998) (stating that the "purpose of procedural bidding orders is to facilitate an open and fair

public sale designed to maximize value for the estate."); Integrated Res., 147 B.R. at 659 ("It is a

well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such

sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting

Cello Bay Co. v. Champion Int'l Corn (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131

(Bankr. N.D. Ga. 1988)); John J. Jerome & Robert D. Drain, Bankruptcy Court is Newest Arena

for M&A Action, N.Y.L.J., June 3, 1991 at 8, col. 4 (hereinafter Jerome & Drain, M&A Action)

("When conducting an asset sale, the ultimate responsibility of the debtor, and the primary focus

of the bankruptcy court, is the maximization of the value of the assets sold.").  In overseeing an

asset sale subject to an auction process, the bankruptcy court walks a tightrope between:

> [O]n the one hand, providing for an orderly bidding process, recognizing the
> danger that absent such a fixed and fair process bidders may decline to participate
> in the auction; and, on the other hand, retaining the liberty to respond to differing
> circumstances so as to obtain the greatest return for the bankrupt estate.

In re Fin. News Network, Inc., 980 F.2d 165, 166 (2d Cir. 1992).  Because this Court must

perform this difficult balancing act, "a bankruptcy judge's broad discretionary power in

conducting the sale of a debtor's assets should not be narrowed by technical rules mindlessly

followed" that "reduce the broad discretion and flexibility a bankruptcy court must necessarily

have to enhance the value of the estates before it."  Id. at 169 (citations omitted).

17

26.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  See, e.g., In re GPX Int'l Tire Corp., No. 09-20170, 2009 WL 8032836, at *3 (Bankr. D. Mass. Nov. 2, 2009), order modified by 2009 WL 8032838 (Bankr. D. Mass. Nov. 13, 2009) (noting that a stalking horse bid will promote bidding); Integrated Res., 147 B.R. at 659 (noting such procedures and break up fees "encourage bidding and [] maximize the value of the debtor's assets"); In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) (stating that the "purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates."); Jerome & Drain, M&A Action, at 8, col. 4 (noting such procedures "help to provide an adequate basis by which to compare offers").

27.     The Debtor believes that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the best and highest offers and proposals available under the circumstances.  The proposed Bidding Procedures will allow the Debtor to conduct the marketing process and Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who will offer the best bid and who can demonstrate the ability to close a Transaction.  The Debtor believes that the Bidding Procedures will encourage competitive bidding, that they are consistent with other procedures previously approved by this and other Districts, and are appropriate under the circumstances and the relevant standards governing auction proceedings and bidding incentives in bankruptcy

18

proceedings.  See, e.g., In re Middlebrook Pharmaceuticals, Inc., No. 10-11485 (MFW), 2010 WL 3493075, at *1 (Bankr. D. Del. 2010) (noting prior approval of competitive bidding procedures); GPX, 2009 WL 8032836, at *4-12 (same); Integrated Res., 147 B.R. at 659 (same); 995 Fifth Ave., 96 B.R. at 28; see also In re BearingPoint, Inc., No. 09-10692 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving similar procedures); In re Silicon Graphics, Inc., No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (same); In re Steve & Barry's Manhattan LLC, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (same); In re Fortunoff Fine Jewelry & Silverware, LLC, No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 15, 2008) (same).

## II.    The Proposed Process for the Debtor to Designate a Stalking Horse and Provide a Break Up Fee Should be Approved

28.    The Debtor seeks authority to designate a Stalking Horse and offer customary bid protections, including a Break Up Fee, as part of the Bidding Procedures.  In the event the Debtor designates a Stalking Horse, that party will subject their bid to higher and better offers, and likely will request the enticement of a Break Up Fee if the Stalking Horse loses at auction or otherwise to another bidder.  The use of a stalking horse in a public auction process for sales pursuant to Section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by locking in a price "floor" before exposing an asset to auction.  As a result, stalking horse bidders virtually always require break up fees and other forms of bid protections as an inducement for holding their offer open while it is exposed to overbids in an auction process.  Thus, the use of bid protections, including break up fees, has become an established practice in chapter 11 cases.

29.     Bankruptcy courts have approved bidding incentives, similar to the Break Up Fee, under the business judgment rule, which proscribes judicial second-guessing of the actions of a company taken in good faith and in the exercise of honest judgment.  See, e.g., In re Nortel Networks, Inc., No. 09-10138 (KG), 2011 WL 1661524, at *4 (Bankr. D. Del. May 2, 2011) (approving break up fee of $25,000,000); GPX, 2009 WL 8032836, at *3 (approving a break up fee of $900,000 and a $1 million expense reimbursement for certain assets); GPX, 2009 WL 8032838, at *2 (approving a break up fee of $350,000 or a $350,000 expense reimbursement for certain other assets); see also BearingPoint, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a break up fee of approximately 3% of the purchase price); Silicon Graphics, No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (approving a break up fee of approximately 3% of the purchase price); Steve & Barry's, No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving a break up fee of 2% of the purchase price); Fortunoff, No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving a break up fee of approximately 2.8% of the purchase price); In re GT Brands Holdings LLC, Case No. 05-15167 (SCC) (Bankr. S.D.N.Y. July 29, 2005) (approving a break up fee of 3.13% of the purchase price); In re Allegiance Telecom, Inc., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2004) (approving a break up fee of 2.05% of the purchase price and a $5 million expense reimbursement); In re Twinlab Corp., Case No. 03-15564 (RDD) (Bankr. S.D.N.Y. Sept. 26, 2003) (approving a break up fee of 3.9% of the purchase price and a $1 million expense reimbursement).

30.     Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives such as this one under the "business judgment rule" standard, and it is well established in this district that courts consider whether (i) the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation, (ii) the fee hampers, rather than

20

encourages, bidding, and (iii) the amount of the fee is unreasonable relative to the proposed purchase price.  See Integrated Res., 147 B.R. at 657-8 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing and in the exercise of honest judgment); see also In re Metadyne Corp., 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009).  The Debtor submits that the Break-Up Fee passes muster under each of these three factors.

31.    *First*, the Debtor and its professionals are negotiating with any and all bidders including any potential Stalking Horse which dispenses of any notion of self-dealing or non-arms length negotiations under the circumstances.  *Second*, the Debtor believes, based on its reasoned business judgment, that the presence of the Break Up Fee would enhance its ability to maximize value without chilling bidding.  The presence of a Break Up Fee would first and foremost point to the existence of a contractually-committed bidder at price believed to be fair and reasonable while providing the upside opportunity that the Debtor could potentially receive a higher or otherwise better offer which, absent such a bid floor, might not have otherwise been realized. See In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking").  *Third*, the Debtor believes, based on its reasoned business judgment, that the amount of the Break Up Fee would be reasonable and appropriate relative to any proposed Transaction and the commitments made and resources expended by any Stalking Horse.

32.    The Debtor believes that its ability to designate a Stalking Horse and allowance of a Break Up Fee would be beneficial to the Debtor's estate and its creditors, as a Stalking Horse Bid would establish a floor for further bidding and potentially increase the value to be received

21

by the Debtor's estate.  The proposed Bidding Procedures provide that parties will receive the Stalking Horse Notice which will disclose the Debtor's designation of a Stalking Horse, including the terms of any Break Up Fee.  Parties will have an opportunity to object to the Debtor's designation of a Stalking Horse and payment of a Break Up Fee.  If a party chooses to object within five (5) days from the filing of the Stalking Horse Notice and such Objection cannot be resolved consensually, the Debtor will seek approval of the Stalking Horse and Break Up Fee by scheduling a hearing with the Court based on its availability.  If no Objections to the Stalking Horse Notice are received, the Stalking Horse and Break Up Fee, shall be deemed approved by the Court, without need for further Court order.  Further, if the Break Up Fee were to be paid, it will be because the Debtor has received a higher or otherwise superior offer. Additionally, the proposed Break Up Fee will be well within the range of such fees approved by this and other courts.

33.    Thus, the proposed Bidding Procedures are reasonable, appropriate and within the Debtor's sound business judgment under the circumstances because the Bidding Procedures are designed to maximize the value to be received by the Debtor's estate.

**Authority and Compliance with Local Bankruptcy Rule 6004-1**

34.    As noted above, the Debtor seeks authority to enter into a Transaction, subject to Court approval, which may result in a sale of certain or substantially all of the estate's assets. Generally, courts have approved a sale of estate assets if the sale and sale process represents an exercise of reasonable business judgment.  See In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); see also Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Thomas McKinnon Secs., Inc., 120 B.R. 301, 307-08 (Bankr. S.D.N.Y. 1990); In re Coastal Indus., Inc., 63 B.R. 361, 367 (Bankr. N.D. Ohio 1986); In re Baldwin United Corp., 43 B.R. 888, 905

(Bankr. S.D. Ohio 1984).  Subsequent to the approval of the Bidding Procedures and the other relief requested herein, the Debtor shall serve all creditors and other parties in interest, pursuant to Bankruptcy Rules 2002 and 6004, Bankr. S.D.N.Y. R. 6004-1, a notice (the "Notice of Intended Transaction and Bidding Procedures"), in substantially the form attached hereto as **Exhibit B**, which shall attach the Bidding Procedures Order and the Bidding Procedures.  The Debtor submits that service of the Notice of Intended Transaction and Bidding Procedures is good and sufficient notice under the circumstances and allows the Debtor to maintain a timeline which seeks to maximize value to the Debtor's stakeholders.  Further, the Debtor submits that it is in compliance with Bankr. S.D.N.Y. R. 6004-1 governing the sale of estate assets, if the Transaction set for approval by the Court during the Transaction Hearing and as will be set forth in the Supplemental Disclosure, is a sale of certain or substantially all of the estate's assets.

35.      For the reasons discussed herein, the Debtor has determined, in its business judgment that the proposed Bidding Procedures and related timeline is in the best interests of the estate and its creditors.  Therefore, the Debtor seeks Court approval of the relief requested herein.

## **No Prior Request**

36.      No previous motion for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully request a that the Court enter an order, in substantially the form attached hereto as **<u>Exhibit A</u>**: (i) approving the Bidding Procedures; (ii) establishing certain related deadlines; and (iii) granting related relief.

Dated: November 21, 2014
      New York, New York                   Respectfully submitted,

                           By: <u>/s/ William R. Baldiga</u>
                              William R. Baldiga, Esquire
                              R. Benjamin Chapman, Esquire
                              BROWN RUDNICK LLP
                              Seven Times Square
                              New York, NY 10036
                              (212) 209-4800

                              *Proposed Counsel for the*
                              *Debtor and Debtor-in-Possession*

**Hearing Date and Time:  To be determined**
**Objection Deadline:  December 15, 2014 at 4:00 p.m. ET**

## Exhibit A

## Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-13200 (SHL) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

**ORDER (I) APPROVING BIDDING PROCEDURES; (II) ESTABLISHING CERTAIN
RELATED DEADLINES; AND (III) GRANTING RELATED RELIEF**

Upon consideration of the *Debtor's Motion for Entry of an Order (I) Approving Bidding
Procedures in Connection with the Proposed Sale(s) of Certain or Substantially All of the
Debtor's Assets and Other Proposals; (II) Establishing Certain Related Deadlines; and (III)
Granting Related Relief* (the "Motion"),[1] all as more fully set forth in the Motion; and the Court
finding that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334,
(ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (iii) notice of the Motion
was sufficient under the circumstances and that no other or further notice need be provided; the
Court having determined that the legal and factual bases set forth in the Motion and upon the
record created at the hearing on the Motion and the entire record and proceedings in this case,
establish just cause for the relief granted herein; and the Court having determined that the relief
sought in the Motion is in the best interests of the Debtor's estate, creditors and other parties-in-
interest; and after due deliberation and sufficient cause appearing therefore, it is **HEREBY
ORDERED THAT**:

1.      The Motion is **GRANTED** to the extent provided herein.

---

[1]      Capitalized terms not otherwise defined in this Order shall bear the meaning ascribed thereto in
the Motion or the Bidding Procedures, as applicable.

2.      All objections to the Motion that have not been withdrawn, waived, settled or specifically addressed in this Order and all reservations of rights included in such objections, are overruled in all respects on the merits and denied.

3.      The Bidding Procedures attached hereto as **<u>Exhibit 1</u>** are hereby approved.

4.      If no objections to a Stalking Horse Notice are received, such Stalking Horse and Stalking Horse Bid, including payment of any Break Up Fee, shall be deemed approved by the Court, without need for further Court order.

5.      The following dates and deadlines, as may be necessary under the Bidding Procedures as further described therein and as may be modified at the discretion of the Debtor, in consultation with the Court as to hearing dates only, are set by the Court in connection with the Motion (all times are prevailing Eastern Time):

a.      Final Bid Deadline of February 13, 2015 at 5:00 pm.

b.      Auction on February 17, 2015 at 10:00 a.m.

c.      Transaction Objection Deadline of February 17, 2015 at 5:00 p.m.

d.      Hearing to approve Sale on February 20, 2015 at _____ a.m./p.m.

6.      The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

7.      Under the circumstances, notice of the Motion, any Supplemental Disclosure or other disclosure required under and as set forth in this Order or the Motion is sufficient and good notice pursuant to Federal Rules of Bankruptcy Procedure 2002 and 6004 or otherwise.  Further, the form of the Notice of Intended Transaction and Bidding Procedures is approved and service of the Notice of Intended Transaction and Bidding Procedures is deemed sufficient and good notice pursuant to Federal Rules of Bankruptcy Procedure 2002 and 6004 or otherwise.

8.      Notwithstanding Federal Rule of Bankruptcy Procedure 6004 or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

9.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

_____

United States Bankruptcy Judge

Dated: _____
       New York, New York

## **Exhibit 1**

**Bidding Procedures**

William R. Baldiga, Esquire
R. Benjamin Chapman, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Proposed Counsel for the*
*Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-13200 (SHL) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

**BIDDING PROCEDURES FOR CERTAIN OR SUBSTANTIALLY ALL**
**OF THE DEBTOR'S ASSETS AND OTHER PROPOSALS**

        Set forth below are the bidding procedures (the "Bidding Procedures") that shall govern the sale of certain or substantially all of the assets owned and operated by the debtor in the above-captioned case (the "Debtor") and alternative proposals for reorganization (each, a "Transaction").[1]

I.        Assets to be Sold

        The assets (the "Assets") to be offered for sale, as an entirety or in one or more lots, consist of certain or substantially all of the estate's assets, including, without limitation, all intellectual property, inventory, equipment, interests in contracts or leases, accounts and payment intangibles associated with any of the Assets.

II.        Consideration of Bids

        Without limiting the foregoing, the Assets will be offered for sale in one or more combinations and as a whole.  The Debtor may consider bids or other proposals (each, a "Bid")

---

[1]        Capitalized terms not defined herein have the meaning ascribed in the *Debtor's Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Proposed Sale(s) of Certain or Substantially All of the Debtor's Assets and Other Proposals; (II) Establishing Certain Related Deadlines; and (III) Granting Related Relief.*

for (i) all of the Assets in a single bid from a single bidder or multiple bids from multiple bidders for Assets in any combination, and (ii) any alternative restructuring option, including, without limitation, the ability to consummate a transaction that would permit the Debtor, in its business discretion, to decide to sponsor a plan of reorganization that permits the successful bidder to acquire all of the stock in the reorganized Debtor as an alternative to purchasing the Debtor's assets.  The Debtor, in its business judgment, shall determine the Successful Bidder (as defined below) based on, among other things, but not limited to, the number of Assets purchased, the assumption of certain liabilities, the purchase price for the Assets, the bidder's ability to close and the value to the Debtor's estate of the proposed Transaction.

The Assets that are offered for sale shall be sold pursuant to section 363 of the Bankruptcy Code free and clear of all liens and other interests in such Assets with certain exceptions which exceptions are to be assumed under any asset purchase agreement or satisfied at closing from the cash proceeds received in connection with the purchase of such Assets, provided, however, that any valid and perfected liens shall attach to the proceeds of the Assets with the same validity, force and effect.

III.    Marketing Process and Due Diligence

The Debtor, pursuant to its business judgment, has and will continue to provide confidential information regarding the Assets and the Debtor to potential purchasers and proponents (the "Initial Information").  Before receiving Initial Information, each potential purchaser or proponent must execute a confidentiality agreement, in a form satisfactory to the Debtor.  The Debtor may, but is not obligated to, furnish any due diligence information after the Bid Deadline (as defined below) for Qualified Bids (as defined below) or to any party that the Debtor determines.

IV.    Bid Deadlines

Final Bids:  All Bids must be served upon and actually received by the Debtor and Debtor's counsel on or before 5:00 p.m., prevailing Eastern Time, on February 13, 2015 (the "Bid Deadline").  Bids must be sent to: (i) the Debtor, Attn: Brenda Cotter, Esq., Aereo, Inc., 280 Summer Street, 4th Floor, Boston, MA 02210; (ii) the Debtor's CRO, Lawton Bloom, Argus Management Corporation, 234 Fifth Avenue, 5th Floor, New York, NY 10001; and (iii) counsel to the Debtor, Brown Rudnick LLP, Attn: William R. Baldiga, Seven Times Square, New York, NY 10036.  The Debtor may extend the Bid Deadline for the delivery of Bids once or successively, without further notice and for one or more bidders, as the case may be.

V.    Qualified Bid Requirements

The Debtor will determine, subject to the Bidding Procedures and the requirements below, whether a Bid is a Qualified Bid and, ultimately, a Successful Bid (as those terms are defined below).  The Debtor may, in its business judgment, modify any Bidding Procedures before the commencement of the Transaction Hearing in order to maximize the benefit to the estate of the Transaction process as a whole.

Any party that desires to submit a Bid must do so in writing as follows:

a.      A Bid must clearly set forth any conditions for closing and state that the Bid is irrevocable as set forth below;

b.      A Bid must constitute a good faith, bona fide offer to enter into a Transaction;

c.      A Bid must clearly set forth the consideration to be paid;

d.      A Bid must identify with particularity each and every condition to closing;

e.      A Bid must identify with particularity (i) the executory contracts and unexpired leases for which assumption and assignment is required, and (ii) the liabilities and accruals to be assumed;

f.      A Bid must be "as is where is" and not be conditioned on any contingency, including, but not limited to, obtaining or completing any of the following: (i) a due diligence investigation; (ii) any material adverse change; (iii) financing; (iv) shareholder, board of directors or other approval; and (v) regulatory approvals of any kind;

g.      A Bid must include evidence, including financial statements (or such other form of financial disclosure and credit-quality support or enhancement reasonably acceptable to the Debtor) sufficient in the Debtor's business judgment to establish the financial wherewithal of the bidder to complete the contemplated Transaction and, to the extent the bidder will rely upon the financial wherewithal of an affiliate, bid partner, or other sponsor (each, a "Sponsor"), evidence sufficient to establish the financial wherewithal and intent of the Sponsor to provide appropriate financial support;

h.      A Bid must contain such financial and/or other information that will allow the Debtor to make a reasonable determination as to the bidder's financial and other capabilities to consummate the Transaction contemplated, including such financial information and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code in a form requested by the Debtor to allow the Debtor to serve on counterparties to any contracts or leases being assigned in connection with the proposed sale that have requested, in writing, such information;

i.      A Bid must disclose the identity of the bidder's organization, including confirmation that the Bid is made as principal for the bidder's account and, if not, the basis upon which the bidder is acting and the identities of all other participants (if any);

j.      A Bid must include evidence of authorization and approval from the bidder's shareholders, board of directors or any other necessary approval with respect to the submission, execution, delivery and closing of the Transaction;

k.   A Bid must include a cashier's check or be accompanied by a wire transfer payable or delivered to the Debtor, Debtor's counsel or other agreed upon escrow agent, in an amount equal to ten percent (10%) of the consideration to be paid as a good-faith deposit (the "Deposit");

l.   A Bid must state that the bidder is willing to consummate and fund the proposed Transaction by no later than five (5) business days after the Transaction Hearing;

m.   A Bid must state that it remains irrevocable until (a) the first business day following the consummation of the Transaction and (b) the twentieth (20th) day after entry of an order by the Bankruptcy Court approving a Transaction; and

n.   A Bid must disclose any agreements or understanding between the bidder and any third party with respect to the subject Assets or with respect to any possible Transaction involving the Debtor.

Notwithstanding anything to the contrary in these procedures, the Debtor shall have the right, in its business judgment, to consider Bids that do not conform to one or more of the requirements set forth in these procedures and to deem such Bids as Qualified Bids (as defined below).

Notwithstanding anything to the contrary in these procedures, the Bid of the Successful Bidder (as defined below) must remain irrevocable in accordance with the terms of the Transaction documents executed by the Successful Bidder.  All other Bids must be irrevocable until the earlier to occur of (i) twenty five (25) days after entry of a Transaction Order (as defined below) and (ii) closing of the Transaction in accordance with the Successful Bid (as defined below).

Notwithstanding anything to the contrary in these procedures, the Debtor also reserves the right, in its business judgment, to reject any and all Bids, including Qualified Bids.

VI.   Evaluation of Qualified Bids

Pursuant to its business judgment, the Debtor may request additional information from a potential bidder to better evaluate the bidder's ability to consummate a Transaction and to fulfill its obligations in connection therewith, and such bidder shall be obligated to provide such information as a pre-condition to selecting a bidder as a Qualified Bidder (as defined below) or allowing such bidder to continue to participate in the Auction (as defined below).

The sufficiency of any submitted Bid will be at the discretion of the Debtor in accordance with the exercise of his business judgment.  The Debtor shall promptly as practicable notify each bidder which has (i) returned a signed confidentiality agreement; (ii) timely submitted the information and documentation listed above in section V(a)-(m); and (iii) financial qualifications satisfactory to the Debtor whether or not it has been selected as a qualified bidder (each, a "Qualified Bidder") and whether or not its Bid is a "Qualified Bid."

The submission of the information and documentation listed above in section V(a)-(m) will be deemed to be the bidder's consent for the Debtor and its advisors to share any

information submitted by the bidder to any landlord with respect to a nonresidential real property lease and any non-debtor party to an executory contract to be assigned to such bidder. Any bidders submitting Bids will bear their own expenses in connection with the Transaction, regardless of whether the Transaction is approved, in accordance with the terms of the Transaction documents, subject to the Debtor's right to designate a Stalking Horse (as defined below).

## VII.    Stalking Horse Bids

The Debtor reserves the right to enter into one or more asset purchase or other agreements with any interested party for certain or substantially all of the Assets and designate that party as a stalking horse (the "Stalking Horse") subject to the terms herein. The Debtor may offer a break up fee (the "Break Up Fee") to the Stalking Horse. The Debtor is under no obligation to choose a Stalking Horse or offer a Break Up Fee for any of the Assets. There may not be more than one Stalking Horse for any particular estate Asset.

In the event the Debtor selects a Stalking Horse, the Debtor may offer bid protections, including a Break Up Fee not to exceed three percent (3.0%) of the total value of the Stalking Horse Bid, plus expenses incurred not to exceed $500,000. If the Debtor designates a Stalking Horse, the Debtor will file a supplemental notice (the "Stalking Horse Notice") with the Court identifying the Stalking Horse and the term of the Stalking Horse Bid, including the terms and conditions for payment of any Break Up Fee and submitting the asset purchase or other agreement entered into with the Stalking Horse (the "APA"). Any party wishing to object to the Debtor's designation of the Stalking Horse shall have five (5) days from the filing of the Stalking Horse Notice (but in any event not later than the Transaction Objection Deadline) to file an objection (the "Objection") with the Court and serve the same on the Debtor and its counsel and other parties as required by the Court or applicable law. In the event an Objection is filed and such Objection cannot be resolved consensually, the Debtor will seek to schedule a hearing with the Court for approval of the Stalking Horse and the Stalking Horse Bid, including payment of any Break Up Fee. If no Objections to the Stalking Horse Notice are filed and served, the Stalking Horse and Stalking Horse Bid, including payment of any Break Up Fee, shall be deemed approved by the Court, without the need for further Court order.

In the event that the Debtor designates a Stalking Horse, the Stalking Horse Bid will be a Qualified Bid.

In the event that the Debtor designates a Stalking Horse, before or after the Bid Deadline, the Debtor reserves the right, in its business judgment, to require any other bidders to submit an executed asset purchase or other agreement blacklined to show changes from the APA as a pre-condition to selecting a bidder as a Qualified Bidder or allowing such bidder to continue to participate in the Auction.

## VIII.    Auction

The auction (the "Auction") will be conducted for the Assets or any alternative transactions on February 17, 2015 at 10:00 a.m., prevailing Eastern Time, (the "Auction Date")

at the offices of Brown Rudnick LLP, Seven Times Square, New York, NY 10036. The Assets shall be sold free and clear of all liens, claims and encumbrances to the fullest extent allowed under section 363(f) of the Bankruptcy Code, provided, however, that any valid and perfected liens shall attach to the proceeds of the Assets with the same validity, force and effect.

The Debtor, in accordance with its business judgment, may conduct the Auction in any manner and upon any terms and conditions the Debtor believes will achieve the maximum value for the Debtor's estate. If an auction is held, the Debtor shall promulgate rules regarding any such action as it deems appropriate, including, but not limited to, rules governing minimum starting bids, minimum overbids and subsequent bids.

Only Qualified Bidders may bid at the Auction. If multiple Qualified Bids are received, each Qualified Bidder (or its duly authorized representative) shall have the right to continue to improve its Qualified Bid at the Auction.

If a Stalking Horse is selected and no Qualified Bids are received for the Assets (or no Stalking Horse is selected and only one Qualified Bid is received for the Assets), the Debtor may determine that the Stalking Horse Bid or the Qualified Bid, as applicable, is the Successful Bid (as defined below) and seek Court approval of the relevant Transaction documents without conducting the Auction. If the Debtor determines that there is no Successful Bid for a particular Asset, the Debtor may decide to not sell that Asset at the Auction.

The Auction may be adjourned or cancelled as the Debtor deems appropriate in its business judgment. Reasonable notice of such adjournment and the time and place for the resumption of the Auction or cancellation shall be given to all bidders.

IX.    Selection of Successful Bid or Bids

At the conclusion of the Auction, and subject to Court approval following the Auction, the successful Bid or Bids shall be selected and announced by the Debtor (the "Successful Bid or Bids") and the backup Bid or Bids, if any, shall be selected and announced by the Debtor (the "Backup Bid or Bids").

Within thirty-six (36) hours of completion of the Auction, the parties that made the Successful Bid or Bids (each, a "Successful Bidder") and the parties that made the Backup Bid or Bids, if any, shall complete and sign all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid or Bids and the Backup Bid or Bids, if any, were made.

The Debtor reserves the right to base the selection of the Successful Bid and Backup Bid on the following factors, among others: (i) the number of Assets purchased, (ii) the assumption of certain liabilities, (iii) the purchase price for the Assets, (iv) the bidder's ability to close, and (v) the value to the Debtor's estate of the proposed Transaction.

The Debtor, in accordance with its business judgment, may (i) reject any Bid (including a Stalking Horse Bid) that is (a) inadequate or insufficient, (b) not in conformity with the

requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of sale, or (c) contrary to the best interests of the Debtor, its estate and creditors; and/or (ii) refuse to consider any Bid that fails to comply with the Bidding Procedures or any other procedures established by the Debtor.

X.      Backup Bids

        If the Successful Bidder fails to consummate the Transaction, breaches the executed agreement or otherwise fails to perform, the Debtor may consummate the proposed Transaction with the next highest or best bid(s) received (such bid or bids, the "Backup Bid" and the party(ies) submitting the Backup Bid, the "Backup Bidder(s)", which hereafter shall be included in the definition of "Successful Bidder") without the need for further Court approval.   The Backup Bid(s) shall remain open until the earlier of (a) the first business day following the consummation of the Transaction and (b) the twentieth (20th) day after entry of an order by the Bankruptcy Court approving a Transaction.

XI.     Damages for Failure to Close

        If the Successful Bidder fails to consummate the Transaction in accordance with the terms of its Successful Bid and applicable Transaction documents: (i) the Debtor will retain the Deposit of such bidder, to the extent provided by the applicable Transaction documents, and (ii) the Debtor will maintain the right to pursue all available remedies against such bidder.

        Notwithstanding anything to the contrary in these procedures, the Deposit of the Successful Bidder will be retained by the Debtor in accordance with the terms of the Transaction documents executed by the Successful Bidder.  Deposits of all other bidders will be retained by the Debtor until the earlier to occur of (i) twenty-five (25) days after entry of a Transaction Order (as defined below) and (ii) closing of the Transaction in accordance with the Successful Bid.

XII.    Supplemental Disclosure and Transaction Hearing

        Upon the selection of one or more Successful Bidders, the Debtor will file a supplemental disclosure (the "Supplemental Disclosure") to describe the particular Transaction or Transactions for which the Debtor seeks the Court's approval.  The Debtor will seek to have the Court set (i) a hearing for approval of the Successful Bids for February 20, 2015, or as soon thereafter as the Court's calendar permits) (the "Transaction Hearing"); and (ii) an objection deadline in connection with the Successful Bids and the contemplated Transactions of on or before 5:00 p.m., prevailing Eastern Time, on February 17, 2015 (the "Transaction Objection Deadline").  At the Transaction Hearing, the Debtor will request that the Court enter an order (the "Transaction Order"): (i) approving (a) the Successful Bid(s), (b) the applicable Transaction documents, and (c) the proposed assumption and assignment of any assumed contract; and (ii) authorizing the Debtor to consummate the proposed Transaction(s).  At the Transaction Hearing, the Court shall also determine any ancillary issues to any proposed Transaction pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of any executory contracts or unexpired leases.

XIII.   "As Is, Where Is"

The proposed transfer of any of the Debtor's Assets will be on an "as is, where is" basis and without representations and warranties of any kind, nature or description by the Debtor, the Debtor's estate or any of its agents or representatives, except to the extent set forth in the applicable Transaction documents of each Successful Bidder as executed by the Debtor and approved by the Court.  Except as otherwise provided in the applicable Transaction documents of each Successful Bidder as executed by the Debtor and approved by the Court, all of the Debtor's right, title and interest in and to the respective Asset will be transferred free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests in accordance with section 363 of the Bankruptcy Code.  Any other claim, lien or encumbrance, as set forth in the applicable Transaction documents of each Successful Bidder as executed by the Debtor and approved by the Court, will attach to the net proceeds of the sale of the particular Asset.

Each bidder will be deemed to acknowledge and represent that it (i) has had an opportunity to conduct such due diligence regarding the Debtor and the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any information or documents, including, without limitation, executory contracts and unexpired leases in making its Bid; and (iii) did not rely upon or receive any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, with respect to the Transaction, or to the completeness of any information provided in connection with the Transaction or the Auction, except as expressly stated in the applicable Transaction documents.

XIV.   Reservation of Rights

Notwithstanding the Debtor's determination of a Stalking Horse and/or receipt of any Qualified Bids for any particular Transaction, the Debtor may continue to negotiate and solicit Bids.  The Debtor reserves the right to enter into agreements for the sale of any of the Assets, either individually or as part of a package prior to an Auction, without further notice to any party, which agreements, if any, will be subject to higher or otherwise better Bids at the Auction (including evaluation on a package or individual basis).  The Debtor retains the right to withdraw one or more Assets from the sale, including in connection with a package offer, up to the date of the Auction or Transaction Hearing.  Formal approval of a Bid will not occur unless and until the Court enters an order approving and authorizing the Debtor to consummate the contemplated Transaction pursuant to such Bid.  The Debtor reserves the right to reject all Bids and to request no approvals of any kind by the Court or to any Transaction at such time.

The Debtor reserves the right to implement additional procedural rules provided that such additional rules are not inconsistent with these Bidding Procedures.

*          *          *          *          *

**<u>Exhibit B</u>**

**Notice of Intended Transaction and Bidding Procedures**

William R. Baldiga, Esquire
R. Benjamin Chapman, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

*Proposed Counsel for the*
*Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-13200 (SHL) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

**NOTICE OF INTENDED SALE OF PROPERTY,**
**SOLICITATION OF OFFERS, DEADLINE FOR SUBMITTING**
**OBJECTIONS, RELATED DEADLINES AND HEARING DATE**

TO CREDITORS AND PARTIES IN INTEREST:

NOTICE IS HEREBY GIVEN[1] pursuant to 11 U.S.C. §§ 363 and 365, Fed. R. Bankr. P.

2002(a)(2) and 6004 and Bankr. S.D.N.Y. R. 6004-1 that the above-captioned debtor (the

"Debtor"), intends to elicit bids (i) for certain or substantially all of the estate's assets or (ii) for

alternative proposals of reorganization (each, a "Transaction"), all upon the terms and conditions

set forth in this Notice.  Significant dates and deadlines (described in detail herein and in the

attached) are as follows (all times are prevailing Eastern Time):

      a.      Final Bid Deadline of February 13, 2015 at 5:00pm.

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Bidding
Procedures Order or Bidding Procedures, as the case may be.

      b.      Auction on February 17, 2015 at 10:00 a.m.

      c.      Transaction Objection Deadline of February 17, 2015 at 5:00 p.m.

      d.      Hearing to approve Sale on February 20, 2015 at _____ a.m./p.m.

NOTICE IS HEREBY GIVEN, and as more fully described in the attached bidding procedures (the "Bidding Procedures") in connection with any proposed Transaction as approved by the Court in the attached order (the "Bidding Procedures Order"), as follows:[2]

1.      DESCRIPTION OF PROPERTY TO BE SOLD:  The assets (the "Assets") to be offered for sale, as an entirety or in one or more lots, consist of certain or substantially all of the estate's assets, including, without limitation, all intellectual property, inventory, equipment, interests in contracts or leases, accounts and payment intangibles associated with any of the Assets.

2.      CONSIDERATION OF BIDS:  The Assets will be offered for sale in one or more combinations and as a whole.  The Debtor may consider bids or other proposals (each, a "Bid") for (i) all of the Assets in a single bid from a single bidder or multiple bids from multiple bidders for Assets in any combination, and (ii) any alternative restructuring option, including, without limitation, the ability to consummate a transaction that would permit the Debtor, in its business discretion, to decide to sponsor a plan of reorganization that permits the successful bidder to acquire all of the stock in the reorganized Debtor as an alternative to purchasing the Debtor's assets.  The Debtor, in its business judgment, shall determine the Successful Bidder based on, among other things, but not limited to, the number of Assets purchased, the assumption of certain liabilities, the purchase price for the Assets, the bidder's ability to close and the value to the Debtor's estate of the proposed Transaction.  The Assets that are offered for sale shall be sold

---

[2]    This summary and any other summary provided in this Notice are qualified in their entirety by the Bidding Procedures annexed hereto.  To the extent there are any conflicts between any summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

pursuant to section 363 of the Bankruptcy Code free and clear of all liens and other interests in such Assets with certain exceptions which exceptions are to be assumed under any asset purchase agreement or satisfied at closing from the cash proceeds received in connection with the purchase of such Assets, provided, however, that any valid and perfected liens shall attach to the proceeds of the Assets with the same validity, force and effect.

3.    <u>BID DEADLINES</u>:  Bids must be sent to: (i) the Debtor, Attn: Brenda Cotter, Esq., Aereo, Inc., 280 Summer Street, 4th Floor, Boston, MA 02210; (ii) the Debtor's CRO, Attn:  Lawton Bloom, Argus Management Corporation, 234 Fifth Avenue, 5th Floor, New York, NY 10001; and (ii) counsel to the Debtor, Brown Rudnick LLP, Attn: William R. Baldiga, Seven Times Square, New York, NY  10036.  The Debtor may extend the Bid Deadline for the delivery of Bids once or successively, without further notice and for one or more bidders, as the case may be.

4.    <u>THE AUCTION</u>:  The auction (the "<u>Auction</u>") will be conducted for the Assets or any alternative transactions on February 17, 2015 at 10:00 a.m., prevailing Eastern Time, (the "<u>Auction Date</u>") at the offices of Brown Rudnick LLP, Seven Times Square, New York, NY 10036.  The Auction may be adjourned or cancelled as the Debtor deems appropriate in its business judgment.  Reasonable notice of such adjournment and the time and place for the resumption of the Auction or cancellation shall be given to all bidders.

5.    <u>SUPPLEMENTAL DISCLOSURE AND TRANSACTION OBJECTIONS</u>: Upon the selection of one or more Successful Bidders, the Debtor will file a supplemental disclosure (the "<u>Supplemental Disclosure</u>") to describe the particular Transaction or Transactions for which the Debtor seeks the Court's approval.  A party in interest shall have until 5:00 p.m., prevailing Eastern Time, on February 17, 2015 to file an objection to the Supplemental

Disclosure, the Successful Bids and the contemplated Transactions (the "Transaction Objection Deadline") in writing with the Clerk, United States Bankruptcy Court, One Bowling Green, New York, New York  10004-1408.  A copy of any objection shall be served upon the Debtor's undersigned counsel.  Any objection to the Transaction must state with particularity the grounds for the objection and why the Transaction should not be authorized.  Objections shall be governed by Fed. R. Bankr. P. 9014.

6.   TRANSACTION HEARING:  The hearing for approval of the Successful Bids is scheduled to take place on February 20, 2015 __:__ a.m./p.m. (the "Transaction Hearing") before the Honorable Sean H. Lane, United States Bankruptcy Judge, Courtroom No. 701, United States Bankruptcy Court, One Bowling Green, New York, New York  10004-1408.  Any party who has filed an objection is expected to be present at the hearing, failing which the objection may be overruled.  The Court may take evidence at any hearing on approval of a Transaction to resolve issues of fact.  If no objection is timely filed, the Court, in its discretion, may cancel the scheduled hearing and approve the Transaction without hearing.

Any questions concerning the Debtor's contemplated Transactions, this Notice or the Bidding Procedures may be addressed to the undersigned.

Dated: November __, 2014
       New York, New York                      Respectfully submitted,


                                        By: _____
                                              William R. Baldiga, Esquire
                                              R. Benjamin Chapman, Esquire
                                              BROWN RUDNICK LLP
                                              Seven Times Square
                                              New York, NY 10036
                                              (212) 209-4800

                                              *Proposed Counsel for the*
                                              *Debtor and Debtor-in-Possession*