William R. Baldiga, Esquire
R. Benjamin Chapman, Esquire
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
(212) 209-4800

*Counsel for the Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AEREO, INC., | : | Case No. 14-13200 (SHL) |
| | : | |
| Debtor. | : | |
| | : | |
| AEREO, INC., | : | Adv. Proc. No. 15-_____ (SHL): |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AMERICAN BROADCASTING | : | |
| COMPANIES, INC.; DISNEY | : | |
| ENTERPRISES, INC.; CBS | : | |
| BROADCASTING, INC.; CBS STUDIOS, | : | |
| INC.; NBCUNIVERSAL MEDIA, LLC; | : | |
| NBC STUDIOS, LLC; UNIVERSAL | : | |
| NETWORK TELEVISION, LLC; | : | |
| TELEMUNDO NETWORK GROUP, LLC; | : | |
| WNJU-TV BROADCASTING, LLC; WNET; | : | **COMPLAINT** |
| THIRTEEN; FOX TELEVISION | : | |
| STATIONS, INC.; TWENTIETH | : | |
| CENTURY FOX FILM CORPORATION; | : | |
| WPIX, INC.; UNIVISION TELEVISION | : | |
| GROUP, INC.; THE UNIVISION | : | |
| NETWORK LIMITED PARTNERSHIP; | : | |
| PUBLIC BROADCASTING SERVICE, | : | |
| FOX BROADCASTING COMPANY; OPEN | : | |
| 4 BUSINESS PRODUCTIONS LLC; | : | |
| WLIW LLC; KUTV LICENSEE, LLC; and | : | |
| KSTU, LLC, | : | |
| Defendants. | : | |
| | : | |

Plaintiff Aereo, Inc. ("Aereo"), as debtor and debtor-in-possession (the "Debtor") in the above-captioned Chapter 11 case, files this complaint against Defendants, American Broadcasting Companies, Inc., Disney Enterprises, Inc., CBS Broadcasting, Inc., CBS Studios, Inc., NBCUniversal Media, LLC, NBC Studios, LLC, Universal Network Television, LLC, Telemundo Network Group, LLC, WNJU-TV Broadcasting, LLC, WNET, Thirteen, Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, WPIX, Inc., Univision Television Group, Inc., the Univision Network Limited Partnership and Public Broadcasting Service (collectively, the "New York Broadcasters") and Fox Broadcasting Company, Open 4 Business Productions LLC, WLIW LLC, KUTV Licensee, LLC and KTSU, LLC (collectively, the "Creditor Broadcasters") (the New York Broadcasters and the Creditor Broadcasters, collectively, the "Broadcasters"), alleging as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this adversary proceeding against the New York Broadcasters for violations of the Donnelly Act, N.Y. Gen. Bus. Law. § 340(1), and tortious interference with prospective economic advantage, and against all the Broadcasters for equitable subordination pursuant to 11 U.S.C. § 510(c) and disallowance of their claims.

2.      As described in further detail in this Complaint, the New York Broadcasters have undertaken and pursued a concerted campaign of tortious conduct to stifle and extinguish lawful competition in the relevant markets for consumer access to audiovisual content.

3.      Among other things, the New York Broadcasters have aggressively pursued litigation strategies that are objectively baseless and intended only to injure the Debtor by unnecessarily increasing the Debtor's litigation expenses and prevent or substantially interfere with the Debtor's ability to sell its video storage and streaming technology and other assets so that those assets could not be used in lawful competition with the Broadcasters.

2

4.     Specifically, the Debtor's innovative technology and assets are suitable for a broad range of lawful uses that are competitive with the Broadcasters' businesses.  To prevent such competition, the New York Broadcasters embarked on an objectively baseless campaign to permanently enjoin the Debtor from liquidating its assets and to enjoin potential purchasers of those assets from competing lawfully with the Broadcasters.  The New York Broadcasters pursued this campaign for permanent injunctive relief even after the Debtor repeatedly represented that it would not seek to reorganize and re-enter the market.  The New York Broadcasters further sought to extend the demanded injunction to any purchaser of the Debtor's assets, regardless of who the purchaser might be or for what purpose the purchaser may use the assets.

5.     The New York Broadcasters' efforts to chill the sale of the Debtor's assets continued through the auction itself and were, unfortunately, successful, as described more fully below.

6.     The New York Broadcasters' strategy was and is objectively baseless.  The fundamental protections of the Bankruptcy Code afforded to the Debtor include a period of respite from such wasteful litigation over prepetition conduct – conduct that ceased months prior to the filing.  The Bankruptcy Code also provides the Debtor with the ability to sell its assets for the best price possible in an open and fair process, free and clear of the New York Broadcasters' prepetition claims against the Debtor.  The Debtor's video storage and streaming technology and related assets have numerous substantial and valuable lawful uses but, through their campaign of sham litigation, the New York Broadcasters caused numerous well-capitalized potential purchasers to decline to participate in the auction of the Debtor's assets.  The New York Broadcasters' conduct has thus harmed competition in the market for consumer access to audiovisual content, interfered with the Debtor's and its estate's prospective economic

3

advantage, chilled bidding and otherwise interfered with the bankruptcy auction process, and

substantially reduced the value of the Debtor's estate for all constituents.

7.      The New York Broadcasters' filing of baseless motions seeking relief to which

they are not entitled has unfairly injured those remaining unsecured creditors who seek the best

possible dividend to maximize the proceeds available to pay the creditors' claims.  The equities

demand that the costs of the New York Broadcasters' improper litigation tactics should not be

borne by innocent creditors.  Accordingly, the New York Broadcasters' conduct, including their

baseless and wrongful litigation activities intended only to prevent the Debtor's assets from

being used in lawful competition with the New York Broadcasters, constitutes inequitable

conduct that entitles the Debtor to equitable subordination of the New York Broadcasters' claims

for statutory copyright damages under 11 U.S.C. § 510(c).

8.      Subordination of the Broadcasters' statutory damages claims, which comprise all

or substantially all of the Broadcasters' claims in this case, is equitable under the circumstances

of this particular case for the additional reason that the Broadcasters' statutory copyright

damages are punitive and non-compensatory in nature.  Indeed, the New York Broadcasters long

ago expressly and repeatedly disclaimed any claim to compensation for any actual damages, and

they affirmatively refused to produce the requested evidence of such actual, compensable harm.

Now, in their proofs of claim, the New York Broadcasters and the Creditor Broadcasters (each of

which is believed to be either owned by, commonly owned with, or affiliated with a New York

Broadcaster) make clear beyond any doubt that the statutory damages they seek are primarily

punitive in nature.  To the extent that any of the Broadcasters' non-compensatory claims are

allowed, they ultimately will be borne by the remaining unsecured creditors, who hold

compensatory, non-penalty claims and actually contributed value to the Debtor.  It would be

thoroughly inequitable to dilute the remaining unsecured creditors' recovery because of these non-compensatory claims.

## THE PARTIES

9.      Plaintiff Aereo Inc. is a privately-held New York corporation with headquarters in Boston, Massachusetts.  Aereo provided subscribers with the ability to record and watch live or "time-shifted" (i.e., delayed) local over-the-air broadcast television on Internet-connected devices, such as personal computers, tablet devices, and "smartphones."

10.     Upon information and belief, defendant American Broadcasting Companies, Inc. is a Delaware corporation with its principal place of business at 77 West 66th Street, New York, New York.

11.     Upon information and belief, defendant Disney Enterprises, Inc. is a Delaware corporation with its principal place of business at 500 S. Buena Vista Street, Burbank, California.

12.     Upon information and belief, defendant CBS Broadcasting Inc. is a New York corporation with its principal place of business at 51 West 52nd Street, New York, New York.

13.     Upon information and belief, defendant CBS Studios Inc. is a Delaware corporation with its principal place of business at 51 West 52nd Street, New York, New York.

14.     Upon information and belief, defendant NBCUniversal Media LLC ("NBCU") is a Delaware limited liability company with its principal place of business at 30 Rockefeller Plaza, New York, New York.

15.     Upon information and belief, defendant NBC Studios, LLC is a New York limited liability company with its principal place of business at 100 Universal City Plaza, Universal City, California.

16.      Upon information and belief, defendant Universal Network Television, LLC is a Delaware limited liability company with its principal place of business at 100 Universal City Plaza, Universal City, California.

17.      Upon information and belief, defendant Telemundo Network Group LLC is a Delaware limited liability company with its principal place of business at 2290 West 8th Avenue, Hialeah, Florida.

18.      Upon information and belief, defendant WNJU-TV Broadcasting LLC is a Delaware corporation with its principal place of business at 2290 West 8th Avenue, Hialeah, Florida.

19.      Upon information and belief, defendant WNET is a New York corporation with its principal place of business at 825 8th Avenue, New York, New York.

20.      Upon information and belief, defendant THIRTEEN is a New York corporation with its principal place of business at 825 8th Avenue, New York, New York.

21.      Upon information and belief, defendant Fox Television Stations, Inc. ("Fox Television") is a Delaware corporation with its principal place of business at 1121 Avenue of the Americas, 21st Floor, New York, New York.

22.      Upon information and belief, defendant Twentieth Century Fox Film Corporation ("Twentieth Century Fox Film") is a Delaware corporation with its principal place of business at 10201 West Pico Boulevard, Los Angeles, California.

23.      Upon information and belief, defendant WPIX, Inc. is a Delaware corporation with its principal place of business at 220 East 42nd Street, New York, New York.

24.      Upon information and belief, defendant Univision Television Group, Inc. is a Delaware corporation with its principal place of business at 5999 Center Drive, Los Angeles, California.

25.     Upon information and belief, defendant Univision Network Limited Partnership is a Florida partnership with its principal place of business at 9405 NW 41st Street, Miami, Florida.

26.     Upon information and belief, defendant Fox Broadcasting Company ("FBC") is a Delaware corporation with its principal place of business at 10201 West Pico Boulevard, Los Angeles, California.  Upon information and belief, FBC, Twentieth Century Fox Film and Fox Television are sister corporations which are commonly owned.

27.     Upon information and belief, defendant KSTU, LLC ("KSTU") is a Delaware limited liability company with its principal place of business at 5020 Amelia Earhart Dr., Salt Lake City, Utah.  Upon information and belief, KSTU is a Fox affiliate.

28.     Upon information and belief, Defendant KUTV Licensee, LLC ("KUTV") is a Nevada limited liability company with its principal place of business at 299 S. Main Street, Suite 150, Salt Lake City, Utah.  Upon information and belief, KUTV is a CBS affiliate.

29.     Upon information and belief, WLIW LLC ("WLIW") is a Delaware limited liability company with its principal place of business at 825 8th Avenue, New York, New York. Upon information and belief, WLIW is a WNET affiliate.

30.     Upon information and belief, Open 4 Business Productions LLC ("O4B") is a Delaware limited liability company with its principal place of business at 100 Universal City Plaza, Universal City, California.  Upon information and belief, O4B is a subsidiary of NBCU.

## JURISDICTION

31.     On November 20, 2014 (the "Petition Date"), Aereo filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code (the "Petition").

32.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 1334(b) and 1334(e).  The claims alleged in this complaint are core proceedings under 28 U.S.C. § 157(b)(2).  Pursuant to 28 U.S.C. §§ 157(a) and 157(b)(1) and the

United States District Court for the Southern District of New York's reference of proceedings to the Bankruptcy Court, this Court may exercise subject matter jurisdiction in this case.  In accordance with Local Bankruptcy Rule 7008-1, Plaintiff consents to the entry of final orders and judgment by this Court if it is determined that this Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

33.    This Court has personal jurisdiction over Defendants because they are located in this district; engage in regular, continuous, and systematic activity within this state and judicial district; and have purposefully availed themselves of the benefits of doing business in and litigating in this state and judicial district by among other things, filing litigation in this district against the Debtor and/or filing claims in the Debtor's chapter 11 case.

34.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District, and Defendants may be found in this District, and pursuant to 28 U.S.C. § 1409(a) because this is a proceeding arising under title 11 or arising in or related to a case under title 11.

## FACTUAL BACKGROUND

### The Prepetition Copyright Litigation

35.    In March 2012, the New York Broadcasters commenced two actions in the United States District Court for the Southern District of New York (the "District Court") seeking, among other things, to enjoin the Debtor from offering its innovative individual antenna, DVR, and streaming technology (the "Aereo Technology") to consumers to enable them to receive over-the-air broadcast content while the show was still airing.  The actions were consolidated in December 2012 (the "New York Copyright Case").  The New York Broadcasters contended that the Debtor provided infringing "public performances" by allowing individual consumers to use

the Debtor's individual antenna, DVR, and streaming technology to receive over-the-air broadcast content. Relying on a line of controlling precedent, the District Court denied the preliminary injunction, finding that the Debtor did not "publicly perform" the Broadcasters' content within the meaning of the Copyright Act by providing individual antennas and DVR recording capability to consumers. See Am. Broad. Co., Inc. v. Aereo, Inc., 874 F. Supp. 2d 373 (S.D.N.Y. 2012). The Second Circuit affirmed the District Court's holding, finding that the District Court had properly applied its earlier decisions to reject the New York Broadcasters' claims. WNET v. Aereo, Inc., 712 F.3d 676 (2d Cir. 2013), reh'g en banc denied, 722 F.3d 500 (2d Cir. 2013).

36.     After losing in the District Court, two additional lawsuits were filed in Massachusetts and Utah. Two defendants in this action, FBC and KUTV, were plaintiffs in the Utah action. Upon information and belief, the predecessor-in-interest to defendant KSTU was also a plaintiff in the Utah action.

37.     Following their loss in the Second Circuit, the New York Broadcasters petitioned the United States Supreme Court for certiorari, asking that Court to overturn the Second Circuit's decision and its precedents. In a decision that broke new legal ground, the Supreme Court reversed the Second Circuit, holding that with respect to "live" or contemporaneous viewing by consumers, the Debtor was essentially analogous to a cable company and therefore "publicly performed" the works that consumers chose to view by means of the Aereo Technology. Am. Broad. Co., Inc. v. Aereo, Inc., 134 S. Ct. 2498 (2014).

38.     Immediately following the Supreme Court's decision, the Debtor, in its business judgment, decided to suspend all services to consumers. Since then, the Debtor has had no material source of revenue.

39.     Nevertheless, on remand, the New York Broadcasters urged the District Court to apply the Supreme Court's new interpretation of the Copyright Act and enter a nationwide preliminary injunction to prevent the Debtor from allowing consumers to use the Aereo Technology for playback of copyrighted over-the-air broadcast content while the underlying content was still airing.  The District Court entered the requested injunction.  See Am. Broad. Co., Inc. v. Aereo, Inc., No. 12-cv-1540, slip op. at 15 (S.D.N.Y. Oct. 23, 2014).  The Debtor has complied with the injunction in all respects.

40.     During the several months since the Supreme Court's decision, the Debtor attempted to formulate new legal strategies and potential new business models consistent with the Supreme Court's decision.  It also invested considerable energy and resources in efforts to attract new capital or to effect an out-of-court sale of its business.  Those efforts were unsuccessful.

41.     On November 12, 2014, the Debtor laid off a majority of its workforce.  Since then, its business operations have been devoted exclusively to selling its assets for the benefit of its creditors and shareholders.  The Debtor has also been forced to defend against prepetition lawsuits and postpetition motion practice by the New York Broadcasters, who continue to pursue further and permanent injunctive relief and penalties for alleged copyright infringement.

42.     On November 20, 2014, the Debtor filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code (the "Petition").

43.     On November 21, 2014, the Debtor filed a Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Proposed Sale(s) of Certain or Substantially All of the Debtor's Assets and Other Potential Transactions; (II) Establishing Certain Related Deadlines; and (III) Granting Related Relief [Docket No. 15] (the "Bidding Procedures Motion").  In the Bidding Procedures Motion, the Debtor proposed to hold an auction

as quickly as possible to sell all or substantially all of the Aereo Technology and other assets at the highest price possible.

## Relevant Markets

44.     The relevant product markets in which to evaluate the New York Broadcasters' anticompetitive conduct include one or more of the following: consumer access to audiovisual content; consumer access to television programming; consumer access to audiovisual content over the Internet; and consumer access to television programming over the Internet.

45.     The relevant geographic market is the New York market.

## The Broadcasters' Sham Litigation, Tortious Interference, and Inequitable Conduct

46.     Beginning almost immediately after the filing of the Petition, the New York Broadcasters began a concerted and baseless campaign in this Court and the District Court to obtain a permanent injunction against the Debtor and possible purchasers of its assets.  The New York Broadcasters pursued this scheme for illegitimate and anticompetitive purposes.

47.     Among other things, the New York Broadcasters sought to prevent the Debtor from selling, and to discourage potential buyers from purchasing, the Aereo Technology and using it to compete with the New York Broadcasters.  The New York Broadcasters also intended to, and did, force the Debtor to expend its limited resources fighting moot and unnecessary legal battles, thereby exhausting the Debtor's assets to the detriment of its general unsecured creditors.

48.     On December 11, 2014, the New York Broadcasters filed a Motion for Relief from Stay Pursuant to 11 U.S.C. § 362(d) [Docket No. 47] ("Motion for Relief from Stay") in which they sought relief from the automatic stay in the Copyright Case in order to continue their objectively baseless efforts to obtain a permanent injunction against the Debtor and any party who would purchase the Debtor's assets.

11

49.    The New York Broadcasters' Motion for Relief from Stay presented no authority for the proposition that the New York Broadcasters could legally obtain a permanent injunction not only against the Debtor but also against any party who purchased the assets of the estate. Indeed, 11 U.S.C. § 363(f) entitles the Debtor to sell its assets free and clear of any such claims.

50.    The New York Broadcasters also argued that they were entitled to relief from stay to obtain a permanent injunction on the utterly false characterization that the Aereo Technology can only be "used to infringe [the New York Broadcasters'] copyrights." Motion for Relief from Stay at 12.  The New York Broadcasters ignored the substantial non-infringing uses of the Aereo Technology.  The only legal authority the Broadcasters cited to support their argument was a single bankruptcy case involving inherently illicit counterfeit compact discs.

51.    To this day, the New York Broadcasters have never presented a shred of evidence, either in connection with their Motion for Relief from Stay or at any other time, that the Aereo Technology and other assets can be used only to infringe the New York Broadcasters' copyrights, or that any potential or hypothetical purchasers intended to purchase the Debtor's assets to infringe a copyright.  Obviously, if a purchaser of the Debtor's assets were to engage in the future in some hypothetical infringing conduct, the New York Broadcasters could sue the purchaser.  But the New York Broadcasters' attempts to obtain some preemptive and highly chilling relief based on conjectural scenarios is without any basis in law, and are intended only for improper and anticompetitive purposes described in this Complaint.

52.    Indeed, the New York Broadcasters have conspicuously failed even to ask the Court to hold a hearing on their Motion for Relief from Stay.  The New York Broadcasters' unwillingness to have that motion heard is further evidence that they made that Motion not to obtain a ruling, but only to cast a shadow over and prevent the sale of the Debtor's assets, so that those assets would not be used to compete with the New York Broadcasters.

53.     On December 12, 2014, the New York Broadcasters also filed a Motion to Withdraw Reference of the Stay Relief Motion and Sale Motion [Docket No. 48; Case No. 1:14-cv-09829-AJN (S.D.N.Y. Dec. 16, 2014), Docket No. 1] ("Motion to Withdraw Reference").  In that Motion, they argued that a relief from the stay was necessary because of their phantom fears that the Debtor could attempt to reorganize and re-engage in allegedly infringing activities – notwithstanding the Debtor's repeated representations to the Court that it would not do so – and because some hypothetical but yet unknown purchaser could conceivably attempt to use the Debtor's assets to engage in hypothetically infringing conduct.

54.     In fact, the Debtor has repeatedly represented – in open court and in multiple written submissions – that it will not reorganize or resume operation of its business.  See Objection of the Debtor to the Broadcasters' Motion to Withdraw Reference of the Stay Relief Motion and Sale Motion [Case No. 1:14-cv-09829-AJN (S.D.N.Y. Dec. 16, 2014); Docket No. 14] at 2, 5, 7, 13; Notice of Filing of Revised Bidding Procedures [Docket No. 62] at 2; Debtor's Response and Opposition to the Broadcasters' Motion to Stay or Objection to Bidding Procedures Motion [Docket No. 72] at 5.

55.     Indeed, the Debtor even filed a motion with the Court to allow it to make a Rule 68 offer of judgment to the New York Broadcasters, an offer that would forever prohibit the Debtor from conducting business of any kind.  See Debtor's Motion for Entry of an Order Pursuant to Federal Rules of Bankruptcy Procedure 7068 and 9014(c) Directing that Rule 7068 Apply to Specified Proceedings [Docket No. 166] ("Motion for Offer of Judgment").  Rather than consent to the filing of that offer of judgment and obviate their purported concern, the New York Broadcasters actually objected to the Motion for Offer of Judgment on purely procedural grounds.  The obvious inference that would be drawn by any potential asset purchaser from the

New York Broadcasters' opposition is that the Broadcasters will take every measure to maintain the anticompetitive shadow they have placed over the Debtor's assets.

56.    The New York Broadcasters also filed a Motion to Stay or Continue Sale Motion, or Alternatively, Objection to the Sale Motion [Docket No. 60] ("Motion to Stay") in which they again argued that the sale of the Debtor's assets must be stayed, to allow them to pursue a judgment in the Copyright Case "***before any court should be allowed to sell assets that have only one apparent use – to infringe the Broadcasters' copyrighted works***." Se̲e̲ Motion to Stay at 6 (emphasis added).

57.    The New York Broadcasters' characterization of the Aereo Technology, which was the premise underlying their Motion to Stay, was knowingly false.  From this premise, however, the New York Broadcasters nevertheless argued that the District Court should enter a permanent injunction that would extend to purchasers of the Debtor's assets.  Once again, the New York Broadcasters presented no evidence whatsoever that the Debtor's assets have no legitimate uses and can only be used to infringe copyrights.

58.    To the contrary, the only evidence – uncontroverted by the New York Broadcasters – is that the Debtor's assets have numerous legitimate, non-infringing and valuable uses in the hands of a purchaser.  Se̲e̲ Declaration of Joseph Lipowski in Support of Debtor's Response and Opposition to the Broadcasters' Motion to Stay or Objection to Bidding Procedures Motion [Docket No. 74] at ¶¶ 14-19.  At a hearing on December 19, 2014, the Debtor made Mr. Lipowski, its Chief Technology Officer, available to the New York Broadcasters for cross-examination concerning his Declaration.  The New York Broadcasters simply declined to cross-examine the Debtor's witness, and they did not offer a witness or other evidence to rebut this evidence at any time.

14

59.     Rather, during the December 19, 2014 hearing, the New York Broadcasters were forced to reluctantly acknowledge that there were legitimate, non-infringing uses of the Debtor's assets.  As the Court stated:

> So again, in balancing that harm, I balance it against the broadcasters' concerns about the use of these assets, and certainly I know the broadcasters have cited the Audiofidelity case. In that case it's clear that the items in question that were counterfeit CDs were unlawful. So the result there is not surprising at all. The bankruptcy judges say you can't sell something that is in fact -- the actual existence of them is a violation of the law.  The evidence I have here is to the contrary, that there's evidence of possible uses for these assets. ***And in fact, the broadcasters somewhat acknowledge such, saying that there might be sales of these assets to which they don't object.***

Dec. 19 Hrg. Tr. at 121:20-122:7 (emphasis added).

60.     Notwithstanding this finding, the New York Broadcasters still continued to pursue their efforts to obtain a permanent injunction that would bind purchasers of the Debtor's assets.

61.     In addition to being factually false, the New York Broadcasters' arguments were and are legally baseless.  No law entitles the New York Broadcasters to an injunction against purchasers of the Debtor's assets in a bankruptcy sale.  Indeed, controlling bankruptcy law is plainly to the contrary.

62.     Laying bare their true illicit and anticompetitive intentions, the New York Broadcasters offered to permit the asset sale to proceed expeditiously (including to withdraw their Motion for Relief from Stay, Motion to Withdraw Reference, and Motion to Stay), and thus maximize the proceeds from the asset sale, but only if the Debtor ***consented*** to a permanent injunction that would bind subsequent purchasers.  The New York Broadcasters' representatives repeated this threat in numerous conversations, and they have consistently vowed that the New York Broadcasters will continue to oppose the Debtor's efforts to sell the Aereo Technology unless the Debtor agrees to such a legally unsupportable and chilling injunction.

15

63.    On February 20, 2015, having been troubled by the New York Broadcasters'

objection to the Debtor's motion for leave to make an offer of judgment, the Court, in response

to the New York Broadcasters' argument that their involvement in these proceedings "can add

value to the estate," admonished the New York Broadcasters not to interfere with the auction.

Specifically, the Court recognized that although the New York Broadcasters had a right to

protect their copyrighted material, they "don't have a right to do it in a way that chills an auction

or chills value.  And I will police that to my dying breath, because that's my job."  Feb. 20 Hrg.

Tr. at 18:18-20.

### The Auction

64.    In December 2014, the Debtor arranged for its assets, including the Aereo

Technology, to be made available for inspection by potential purchasers.  Over a two-month

period, several dozen potential purchasers entered into non-disclosure agreements with the

Debtor and conducted due diligence on the assets.  During the course of this period, several of

the potential purchasers expressed concern regarding the consequences of purchasing the

Debtor's content-delivery assets given the Broadcasters' conduct, and especially their extensive

prepetition and postpetition litigation against the Debtor.

65.    On February 24, 2015, the auction to sell all or substantially all of the Debtor's

assets began.  Notably absent from the auction were almost all major cable, satellite, Internet and

content companies.  These entities were among the companies that had previously reviewed the

Debtor's assets but declined to submit a bid in the auction.

66.    In the days leading up to the Debtor's February 24 auction, the Debtor repeatedly

reached out to the New York Broadcasters to try to mitigate the chilling effects of the

Broadcasters' prior conduct.  The Debtor specifically requested that the New York Broadcasters

agree, ahead of the auction, to a "clean" form of sale order, so that the Debtor could work with

16

potential bidders in the days leading up to the auction to reassure them that a bidder could in fact

purchase the Debtor's assets free and clear of injunctive relief relating to the Debtor's prepetition

activities. These efforts by the Debtor (with the active support and assistance of the Official

Creditors' Committee appointed in this case (the "Official Committee") were critical, as at least

one very important bidder had specifically demanded such comfort from the Debtor as a

condition to its bid in any amount.

67.    The Debtor's mitigation efforts failed. In fact, the New York Broadcasters

informed the Debtor, the day before the auction, that:

> At a minimum, however, we are going to want a provision in the order that states
> that the assets are not being transferred or assigned free and clear of any
> prospective claims of infringement against such transferee of Broadcasters'
> Copyrighted Programming, including without limitation under the Supreme
> Court's decision in the Supreme Court decision and the Opinion and Order of
> Judge Nathan dated October 23, 2014 in cases 12-cv-1540 and 12-cv-1543 in the
> United States District Court, Southern District of New York.

E-mail from Catherine L. Steege, Jenner & Block LLP, Counsel for the New York Broadcasters,

to William R. Baldiga, Brown Rudnick LLP, Counsel for the Debtor and Debtor-in-Possession

(Feb. 23, 2015, 7:01 PM).

68.    Notwithstanding the failure of its mitigation efforts, the Debtor convened its

auction on February 24. However, soon after the start of the auction, the Debtor realized that the

New York Broadcasters had succeeded in causing the auction to be severely chilled. In a last-

ditch effort, during the auction, the Debtor and the Official Committee together met with the

New York Broadcasters to plead with them to relent on these demands and specifically told them

that, if they refused to do so, the Debtor and the Official Committee feared that there would be

little or no competitive bidding at the auction as to the Debtor's most valuable assets, with very

significant harm caused to the estate. The New York Broadcasters conferred, but declined to

withdraw that demand.  A critical bidder thereupon immediately left the auction, and there was

no further competitive bidding at the auction except as to minor assets.

69.     The critical bidder having left the auction, the Debtor's technology was sold off

piecemeal: the Debtor's patents were sold to RPX Corp., a company specializing in defensive

patent acquisitions, for $225,000; the Debtor's trademarks, domain names and customer lists

were sold to TiVo Inc. for $1,000,000; and portions of Aereo's equipment was sold to Alliance

Technology Solutions, Inc. for $320,000.  Upon information and belief, the total proceeds of the

auction of the Aereo Technology was far lower than could have been obtained from a single

entity which intended to use the Aereo Technology for consumer access to audiovisual content.

For instance, the value of the Debtor's patents is highest when owned by an entity actually

practicing the technology disclosed in those patents.  The piecemeal sale of the Debtor's assets,

forced by the lack of bidders, severely reduced their overall value.

70.     The New York Broadcasters knew that the forms of injunction and sales order

that they were demanding would discourage or prevent many potential purchasers from buying

the Aereo Technology and competing with the New York Broadcasters.  The New York

Broadcasters specifically intended this result, and the intended result was achieved.

71.     Simply put, there was and is no good faith basis, objective or subjective, legal or

factual, for the New York Broadcasters' repeated and relentless use of the legal process to chill

the Debtor's sale efforts.

72.     Rather, the New York Broadcasters pursued their legal strategies and made their

repeated filings and demands, which were bereft of any legal or factual basis, solely to injure the

Debtor, scare off any potential purchasers, interfere with the sale of the Debtor's assets, and

burden the Debtor's estate with the costs of the New York Broadcasters' unnecessary litigation.

**The Broadcasters' Claims for Non-Compensatory Statutory Damages**

73.    Early in the New York Copyright Case, the New York Broadcasters made the calculated decision not to seek to recover monetary damages as compensation for any actual harm that they allegedly suffered from the Debtor's activities.  The New York Broadcasters elected instead to seek statutory damages under 17 U.S.C. § 504(c)(1).  That statute allows a successful copyright owner "to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually . . . in an amount of not less than $750 or more than $30,000 as the court considers just."  If the infringement was willful, "the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000."  17 U.S.C. § 504(c)(2).

74.    During the Copyright Case, the New York Broadcasters refused to produce damages-related documents requested by the Debtor on the grounds that the New York Broadcasters sought only statutory, and not actual, damages.  The New York Broadcasters confirmed this election on several occasions in the Copyright Case.

75.    It has long been established that, as a matter of copyright law, statutory damages (even when not enhanced for willful infringement) are not solely compensatory but also have a punitive component, to punish the infringement and deter future infringement.

76.    In fact, the New York Broadcasters elected to seek statutory damages because they have not suffered any material actual damages.  There is no evidence that the New York Broadcasters lost a single dollar of sales or profit due to the Debtor's operations in New York, where the New York Broadcasters contend that the Debtor had only a few thousand customers whose viewership was unlikely to be reflected in the New York Broadcasters' profits and sales

information.  Therefore, any allowance of statutory damages claims will be non-compensatory

and solely punitive in nature.

77.    In their proofs of claim, the New York Broadcasters claim statutory damages of

$94,930,000 based on the transmission of publicly available over-the-air broadcast content by a

small number of subscribers in a single market.  The Creditor Broadcasters, each of which is

either owned by, commonly owned with, or otherwise affiliated with a New York Broadcaster,

claim $5,030,000 in statutory damages without having produced any evidence of actual damages

with their proofs of claim.  Given the complete absence of any evidence of actual damages, these

astronomical claims conclusively demonstrate that the Broadcasters seek only a punitive, non-

compensatory award.

78.    Indeed, the Broadcasters' proofs of claims, which seek statutory damages in the

amount of $10,000 per work, are expressly based upon precedent in which the amount of

statutory damages had been enhanced due to willful infringement.  For example, the proofs of

claim submitted by Defendant NBCU and its subsidiary, O4B, state that an award of statutory

damages of $10,000 per work is reasonable in light of the ruling in National Football League v.

PrimeTime 24 Joint Venture, 131 F. Supp. 2d 458, 482 (S.D.N.Y. 2001), in which the average

statutory damages award exceeded, on average, $14,000 per telecast.  But in National Football

League, the average of $14,000 included damages of $100,000 per telecast for certain telecasts

deemed willful.  The court in that case awarded only $2,500 per telecast made before the court

had issued adverse rulings against the defendant.

79.    In this case, both the District Court for the Southern District of New York, after

an evidentiary hearing, and the Second Circuit ruled in favor of Aereo, concluding that the use of

Debtor's technology was not a public performance infringing the New York Broadcasters'

copyrights.  The Second Circuit voted 10 to 2 to reject the en banc review sought by the New

20

York Broadcasters.  All or virtually all of the alleged infringement in this case took place while
Aereo's conduct was legally sanctioned.  As soon as the Supreme Court reversed the Second
Circuit, Aereo stopped offering its services to consumers.  Therefore, following the reasoning of
the National Football League, any statutory damage award other than at the lowest end of the
spectrum is unwarranted and would be purely punitive.

80.      In this case, anything above the most minimal statutory damages award would be
predominantly punitive because of the complete absence of any evidence of damage to the
Broadcasters.  Revenues and profits for broadcast television are based largely on advertising,
which is itself based on measurements and estimates of viewership.  Although the Broadcasters
are certainly aware of the advertising rates paid for each of their programs and their estimated
viewership, the Broadcasters have presented no evidence of how viewership by the Debtor's
subscribers affected revenues and sales.  The fair inference is that the Broadcasters recognize
that they suffered no actual loss due to the Debtor's alleged infringement.

81.      The Broadcasters' claims in this case are many orders of magnitude larger than
the claims submitted by the remaining unsecured creditors in this case.  While the Broadcasters'
claims approach $100,000,000, the remaining unsecured creditors have estimated aggregate
claims of less than $10,000,000.  Given that the proceeds from the auction are a small fraction of
even that, payment of the Broadcasters' non-compensatory statutory damages claims as general
unsecured claims with equal priority to the remaining unsecured creditors' claims will result in
non-payment of a significant portion of the remaining unsecured creditors' claims.

## COUNT ONE
### (Violation of the Donnelly Act, New York General Business Law 340(1), Against the New York Broadcasters)

82.      The allegations in paragraphs 1 through 81 are incorporated herein by reference.

83.     Beginning almost immediately after the filing of the Petition, and continuing to the present, the New York Broadcasters have been engaged in an unlawful contract, combination, conspiracy and unreasonable restraint of trade in violation of the Donnelly Act, New York General Business Law 340(1), in one or more relevant product and geographic markets.  The contract, combination and conspiracy will continue unless the relief prayed for herein is granted.

84.     The contract, combination and conspiracy consists of a continuing agreement, understanding and concert of action among the New York Broadcasters, the substantial terms of which include an agreement to eliminate the Aereo Technology as a potential competing system for the delivery of audiovisual content to consumers, and to prevent the delivery to consumers of competing audiovisual content, by discouraging potential purchasers from buying the Debtor's system at auction.

85.     Pursuant to and in effectuation of the aforesaid combination and conspiracy, the New York Broadcasters did the things that they conspired to do, including but not limited to filing objectively baseless motions in these proceedings that ostensibly seek to obtain a permanent injunction against the Debtor and possible purchasers of its video streaming and recording assets, for the illegitimate purpose of discouraging potential buyers from purchasing the Debtor's assets and using them to compete with the New York Broadcasters.

86.     The aforesaid combination and conspiracy had the effect that the New York Broadcasters intended, including to discourage major, well-capitalized cable, satellite, Internet and other content companies from purchasing the Aereo Technology and using it to compete with the New York Broadcasters for the transmission of audiovisual content to consumers.

87.    By reason of the foregoing, the New York Broadcasters have committed violations of the antitrust laws of New York State, the Debtor has been injured, and competition in the relevant markets has been injured.

88.    The Debtor is entitled to compensatory and treble damages in an amount to be ascertained at trial.

## COUNT TWO
### (Tortious Interference with Economic Advantage, Against the New York Broadcasters)

89.    The allegations in paragraphs 1 through 88 are incorporated herein by reference.

90.    The New York Broadcasters have conducted a concerted campaign against the Debtor, including but not limited to filing objectively baseless motions in these proceedings that ostensibly seek to obtain a permanent injunction against the Debtor and possible purchasers of its Aereo Technology with the knowledge that those motions had no merit or without regard for whether they had merit.

91.    This campaign was conducted for the improper and illegal purpose of interfering with the Debtor's pursuit of a sale of its Aereo Technology at auction to a purchaser capable of using the Aereo Technology to compete with the New York Broadcasters in the market for transmission of audiovisual content to consumers and other relevant markets.

92.    As a result of the New York Broadcasters' wrongful conduct, the Debtor has been damaged in that the price obtained for the Debtor's Aereo Technology and related assets was substantially diminished and the Debtor was compelled to incur unnecessary but significant costs to defend against the New York Broadcasters' sham litigation efforts.  This great reduction of the value of the Debtor's assets ultimately harms the remaining unsecured creditors whose claims will not be satisfied by the diminished proceeds.

93.     The New York Broadcasters' conduct constitutes tortious interference with economic advantage, and the Debtor is entitled to compensatory and exemplary damages in amounts to be ascertained at trial.

**COUNT THREE**
**(Equitable Subordination Under Sections 510(c)(1) and 105(a) of the Bankruptcy Code, Against All Broadcasters)**

94.     The allegations in paragraphs 1 through 93 are incorporated herein by reference.

95.     The New York Broadcasters engaged in inequitable conduct, including the filing of sham motions seeking a permanent injunction against the Debtor and the subsequent purchaser of the Debtor's assets, which has resulted in injury to creditors for the benefit of the New York Broadcasters.  This inequitable conduct has resulted in harm to the Debtor and to its entire creditor body in that general unsecured creditors are less likely to recover the full amounts due them because of the conduct of the New York Broadcasters.

96.     The Broadcasters' statutory copyright damages claims, which account for about 90% of all unsecured claims in this case, is comprised entirely, or almost entirely, of non-compensatory damages intended to punish the Debtor for its alleged infringement of the Broadcasters' copyrights and deter future wrongful conduct of the Debtor.  Neither purpose would be served by payment of the Broadcasters' claims for statutory copyright damages as general unsecured claims because the Debtor has no intention of reorganizing or resuming any business operations.

97.     Payment of the Broadcasters' unsecured claims for non-compensatory statutory damages would deplete the Debtor's assets to the detriment of the general unsecured creditors, whose claims are compensatory in nature.

98.     Under principles of equitable subordination, all claims for statutory copyright damages asserted against the Debtor by, on behalf of, or for the benefit of the Broadcasters

24

should be subordinated for purposes of distribution, pursuant to Sections 510(c)(1) and 105(a) of

the Bankruptcy Code.

99.    Equitable subordination as requested herein is consistent with the provisions and

purposes of the Bankruptcy Code.

## COUNT FOUR
### (Objections to Claims, Against All Broadcasters)

100.    The allegations in paragraphs 1 through 99 are incorporated herein by reference.

101.    The claims asserted in this case by the Broadcasters are overstated, non-

compensatory in nature and otherwise not supported by principles of applicable law.

102.    The claims asserted in this case by the Broadcasters are also subject to set-off by

claims in favor of the Debtor's estate against those claimants.

103.    The Broadcasters' claims, accordingly, should be disallowed in full.

## PRAYERS FOR RELIEF

WHEREFORE, the Debtor respectfully requests that this Court enter judgment in its

favor as follows:

A.    A permanent injunction against the New York Broadcasters and those in privity or
acting in concert with them, enjoining them from continued unlawful acts in
violation of the Donnelly Act, New York Gen. Bus. Law § 340(1), including, but
not limited to, the filing sham motions and any other frivolous pleadings or
documents in this Court or the District Court;

B.    Compensatory and treble damages resulting from the New York Broadcasters'
violation of the Donnelly Act;

C.    Compensatory and exemplary damages for the New York Broadcasters' tortious
interference with economic advantage;

D.    The Debtor's reasonable attorneys' fees and costs;

E.    Subordination of all claims or proofs of claim which have been filed or brought or
which may hereafter be filed or brought by, on behalf of, or for the benefit of any
of the Broadcasters against the Debtor;

F.    Disallowance of all Broadcaster claims; and

G.      For such other and further relief as this Court deems just and proper.


Dated: March 9, 2015
        New York, New York                    Respectfully submitted,

                                              By: /s/ William R. Baldiga
                                                    William R. Baldiga, Esquire
                                                    R. Benjamin Chapman, Esquire
                                                    BROWN RUDNICK LLP
                                                    7 Times Square
                                                    New York, NY 10036
                                                    (212) 209-4800

                                                    *Counsel for the*
                                                    *Debtor and Debtor-in-Possession*